## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| INTERTEK TESTING SERVICES, N.A., INC., | Case No. 19-cv-7103 |
| Plaintiff, | |
| v. | **COMPLAINT** |
| FRANK PENNISI, NICHOLAS PENNISI, WENDY ASKLUND, and BIG APPLE TESTING, INC., | |
| Defendants. | |

Plaintiff Intertek Testing Services, N.A., Inc. ("Intertek" or "Plaintiff") by its attorneys Lewis Brisbois Bisgaard & Smith LLP, as and for its Complaint against Defendants Frank Pennisi ("Pennisi"), Nicholas Pennisi ("N. Pennisi"), Wendy Asklund ("Asklund") and Big Apple Testing, Inc. ("Big Apple") (collectively "Defendants"), hereby alleges as follows:

### NATURE OF THE CASE

1.      This is an action for injunctive relief to enforce Intertek's agreements with Pennisi concerning non-competition and non-solicitation covenants and to enjoin him from further violating the aforementioned provisions; to enforce agreements with Asklund and N. Pennisi concerning MT Group's confidential and proprietary information and to enjoin them from further misappropriation or dissemination of the company's trade secrets and confidential information; to enjoin N. Pennisi, Asklund and Big Apple from tortuously interfering with all of the aforementioned agreements; and for damages (including attorneys' fees) resulting from Defendants' conduct.

## PARTIES

2.      Intertek was at all times relevant hereto and still is a New York business corporation with its principal place of business at 3933 US Route 11, Cortland, New York 13045.

3.      Upon information and belief, at all times relevant herein, Pennisi was and still is a resident of the State of New York, residing at 93A Fort Salonga Road, Fort Salonga, New York 11768.

4.      Upon information and belief, at all times relevant herein, N. Pennisi was and still is a resident of the State of New York, residing at 19 Maple Lane, Apt #425, Howell, New Jersey 07731.

5.      Upon information and belief, at all times relevant herein, Asklund was and still is a resident of the State of New York, residing at 60 North Drive, Copiague, New York 11726.

6.      Upon information and belief, Big Apple was at all times relevant hereto and still is a New York business corporation with its principal place of business at 100-03 94th Avenue, Ozone Park, NY 11416.

## JURISDICTION AND VENUE

7.      This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331. This court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

8.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claims occurred in this judicial district.

## BACKGROUND FACTS

9.      MT Group is one of the largest full service testing and inspection companies servicing the construction industry in the Mid-Atlantic and Northeast regions, including the States of New York and New Jersey.

10.     In 2013, Intertek, a leading provider of quality solutions around the world, began exploring opportunities to expand its portfolio of services in the New York City metro area. In particular, Intertek was looking to expand its services in the Building & Construction commissioning and testing services in the area. Eventually, Intertek's exploration focused on MT Group.

11.     By that point, MT Group had served the New York City metro area's construction industry for more than 35 years. As such, Intertek was particularly interested in acquiring the goodwill and client relationships associated with MT Group.

12.     MT Group was at the time owned by Pennisi, Kevin Cosgrove ("Cosgrove") and Jeffrey Roden ("Roden").

13.     Over the course of two years, the two companies conducted lengthy negotiations. Finally, in or around October 2015, Intertek entered into an agreement wherein it would acquire MT Group for considerable financial consideration.

14.     Intertek was willing to pay the substantial fee as a result of MT Group's goodwill in the testing and inspection industries in the New York City metro area.

15.     Intertek's acquisition of MT Group was memorialized in a Sale and Purchase Agreement, dated October 8, 2015. The Sale and Purchase Agreement lists Pennisi, Cosgrove and Roden as "Seller[s]." As such, Pennisi was a signatory to the agreement.

16.     In total, Intertek paid multiple millions of dollars in order to acquire MT Group (the "acquisition price"). In exchange for the acquisition price, Pennisi and the other Sellers became employees of the newly-acquired MT Group.

17.     In order to induce Intertek into the agreement acquiring MT Group, the MT Group owners agreed to certain covenants against competition. The covenant against competition provides, in pertinent part, as follows:

> (a) In order to induce [Intertek] to enter into this Agreement…each Seller agrees that he will not, without the prior written consent of the Buyer, for its or his own account or jointly with another, directly or indirectly, for or on behalf of any Person, as principal, agent, shareholder, participant, partner, promoter, director, officer, manager, employee, consultant, sales representative, or otherwise, except for the benefit of the Buyer….
>
> (i)     for a period of five years from the Closing Date (the "***Restricted Period***"), engage in the Restricted Business within the States of New York and New Jersey (the "***Restricted Area***");
> (ii)    within the Restricted Area during the Restricted Period, solicit, or assist in the solicitation of, Restricted Business from any Person to whom any Company Group member has provided services during the three year period prior to the Closing Date

18.     "Restricted Business" is defined in the Sale and Purchase Agreement as meaning "the commercial inspection and testing of the materials and construction of public works, infrastructure, residential and commercial buildings."

19.     Intertek made clear to the MT Group owners that the reason Intertek was willing to pay a substantial amount of money to acquire the company was because Intertek would be acquiring its goodwill and relationships in the metro area. If not for its acquisition of MT Group's goodwill and relationships, Intertek would not have offered to acquire the company.

20.     The acquisition was officially closed on October 26, 2015. Accordingly, in exchange for the considerable amount of money paid by Intertek, Pennisi agreed to refrain from

competing with the Company until October 26, 2020 within the States of New York and New Jersey with respect to customers with which the former MT Group had provided services from October 26, 2012 through October 26, 2015.

21.     The deal was officially closed on October 26, 2015. Pennisi was a signatory to the Sale and Purchase Agreement and therefore agreed to be bound by the restrictive covenant.

22.     Just before the acquisition was finalized, the terms and conditions of Pennisi's employment with the newly-acquired MT Group were memorialized. Specifically, on October 8, 2015, he entered into a valid and enforceable Employment Agreement.

23.     Pennisi's wife, Maritza Pennisi ("M. Pennisi"), also became an employee of Intertek after the company acquired MT Group. Her title was "Administrative Assistant" and her job responsibilities largely consisted of collection-related duties. This included, but was not limited to, corresponding with clients concerning billing-related issues, reporting on accounts receivable statuses, and investigating historical data for each customers' billing histories.

24.     In this role, M. Pennisi had access to client contact information, Intertek's pricing information for each particular client, Intertek's business history with each client, and the customers' credit histories with Intertek.

25.     Per the terms of his Employment Agreement, Pennisi would serve as Director of Fenestration for the company's New York Operations.

26.     As part of his Employment Agreement, he agreed to restrictive covenants in exchange for access to, among other things, the company's confidential information and trade secrets, including its network of client relationships in the area. This included those which were acquired by way of Intertek's acquisition of MT Group.

27.     Specifically, the Employment Agreement with Intertek provides, in pertinent part, that:

> For a period of one year following the termination of your employment, for any reason, you will not, without the prior written consent of the Human Resources Executive responsible for the United States, directly or indirectly, engage in (as owner, partner, shareholder, employee, director, agent, consultant or otherwise), any business which is a competitor of Intertek, as hereinafter defined. For purposes of this agreement, a "competitor of Intertek" is any entity including without limitation a corporation, sole proprietorship, partnership, joint venture, syndicate, trust or any other form of organization or a parent, subsidiary or division of any of the foregoing, which, is engaged in any business activity of the type for which you were responsible during your last 12 months of employment with Intertek and in the same geographic area for which you were responsible during your last 12 months of employment with Intertek.

28.     The Employment Agreement further provides that for a period of one year following the termination of his employment with the Company, for whatever reason, Pennisi will not, "directly or indirectly…solicit or attempt to solicit Company customers, suppliers and agents with which [he] had contact during the last twenty-four (24) months of [his] employment."

29.     In the agreement, he also acknowledged that in the event that he breached the restrictive covenant, the company would sustain irreparable harm and would therefore be entitled to injunctive relief restraining him from further violating the covenant.

30.     Pennisi further acknowledged that as part of his employment with Intertek, he would have access to certain confidential information. This confidential information included confidential business or affairs or any trade secrets of Intertek and its customers, among others. He further agreed as follows:

> [A]ll information, conclusions, recommendations, reports, advice, or other documents generated or handled by you pursuant to your employment are confidential. **By signing this agreement, you agree that you will not, at**

**any time, during or after employment, in any fashion, form or manner, either directly or indirectly, divulge, disclose or communicate to any person, company, association or entity in any manner whatsoever any Confidential Information. You further agree to keep in confidence business, plans, projects or potential projects, finances and any other information deemed confidential, material or important by Intertek or its affiliates**.

31.     He further agreed to, at the end of his employment with Intertek, to return all confidential information, including computerized data, furnished to him while employed by Intertek. Pennisi also agreed that should his employment with the company cease, he would not retain, copy or transfer any computer or Intertek data.

32.     On October 8, 2015, Defendant indicated his agreement to the terms of the Employment Agreement by signing and dating the document.

33.     Pennisi would eventually be promoted to Director of Products & Projects in MT Group's Farmingdale, New York office in June 2018.

34.     While employed by MT Group, Pennisi's duties and responsibilities included, but were not limited to, managing the profits and losses of the company's construction and materials testing business in the New York and New Jersey markets. He carried out these duties by, in part, investigating and promoting new business opportunities.

35.     He was paid an annual salary ranging from $125,000 up to $183,000 while employed by MT Group. Pennisi also received annual bonuses ranging from $11,934 up to $19,125.

36.     For approximately four years, he reaped the benefits of employment with the company. He was paid an annual salary well in excess of $100,000 in addition to receiving annual bonuses along with other benefits, such as a $500 monthly car allowance.

37.     Pennisi also received access to Intertek's goodwill and client relationships which had been developed at the expense of considerable time and capital resources on the part of the company. This includes the acquisition price, some of which was paid directly to Pennisi.

38.     Like Pennisi, Roden also became an employee of Intertek's when the acquisition was finalized. He signed an employment agreement largely mirroring the agreement signed by Pennisi. In particular, Roden was subject to the same restrictive covenants against competition.

39.     Roden's business relationship with Big Apple, a company which performs special construction inspecting and material testing on behalf of New York's engineering and development firms, began in or around August 2015, as the terms of the acquisition were being completed.

40.     At their first meeting, Roden met with Big Apple's Chief Executive Officer, Jay Rubin ("Rubin").

41.     Because Big Apple lacked the required licensure to perform its own laboratory work, Intertek began performing soil testing for the company. This began in or around September 2015.

42.     Throughout the course of Roden's business relationship with Big Apple, he met with Rubin and/or Big Apple's Executive Director, Joel Lowy ("Lowy"), either in-person or over the telephone on approximately 100 or more occasions.

43.     Around the time that Intertek's acquisition of MT Group was completed, Big Apple began soliciting Roden to leave Intertek to work for Big Apple. The solicitations were carried out by Rubin and Lowy.

44.     In total, between October 2015 and around June 2019, Rubin and Lowy solicited Roden to join their company on more than 15 occasions.

45.     In response to each attempt, Roden informed Rubin and Lowy that I could not join Big Apple based on restrictive covenants he agreed to in the Sale and Purchase Agreement.

46.     Roden specifically informed the two of them, on multiple occasions, that Cosgrove, Pennisi and he all agreed to be bound by restrictive covenants against competition. They were further informed that the covenants would expire in October 2020.

47.     Even with this knowledge, Big Apple continued to interfere with Intertek's contractual relations by repeatedly soliciting Roden to leave Intertek and join their company. Rubin and Lowy even offered to double Roden's salary if he would breach his covenants against competition.

48.     Eventually, the solicitations slowed, but only after Pennisi's promotion in June 2018. At that time, Pennisi ordered Roden to cease communicating with Big  Apple without his prior authorization. Before the promotion, Roden had been the employee at Intertek primarily responsible for the company's dealings with Big Apple. Thereafter, Pennisi took over this responsibility.

49.     On October 4, 2019, M. Pennisi resigned from her employment with Intertek.

50.     On October 14, 2019, Pennisi tendered his resignation from the company. On the same date, his son, Business Development Manager N. Pennisi, and another Business Development Manager, Asklund, followed suit by tendering their resignations.

51.     Asklund and N. Pennisi were responsible for directing and managing the company's overall business development process for the New York and New Jersey markets while employed by Intertek. Among their primary duties and responsibilities was pitching business to prospective clients.

52.     Like Pennisi and M. Pennisi, Asklund joined MT Group as part of Intertek's acquisition of the company. N. Pennisi joined the company later, on June 27, 2017.

53.     None of the four employees returned their company-issued computer devices at the time of their resignations. Intertek made repeated efforts after their resignations to have the employees return their computers. This included telephone calls on nearly a daily basis.

54.     Eventually, on October 23, 2019, Pennisi returned his computer device. It was discovered that he deleted all of his emails from his computer before the device was returned. For the next few days, Intertek continued making telephone calls to M. Pennisi, Asklund and N. Pennisi in attempts to have their devices returned.

55.     Finally, on October 28, 2019, long after M. Pennisi, Asklund, and N. Pennisi resigned from employment with Intertek, their computer devices were returned. The devices were delivered by Pennisi and, just like on his computer, all emails had been deleted from each of the computer devices prior to their return.

56.     Unbeknownst to Intertek, the group of departing employees had orchestrated plans to join Big Apple, a direct competitor of the company.

57.     Within a month of their departures from Intertek, the company learned from Pennisi himself that, with the help of Asklund, N. Pennisi and Big Apple, he had violated the non-compete and non-solicitation provisions in both the Sale and Purchase Agreement and the Employment Agreement.

58.     Specifically, on or around November 22, 2019, in attempting to send an email to N. Pennisi and Asklund, Pennisi inadvertently copied N. Pennisi's email address with MT Group. In the email, which was sent from his Big Apple email address, Pennisi asked the two of them for an update on quotes the group had sent to seven different companies – (1) Bruckner, (2)

HAP Construction, (3) The Durst Organization, (4) Jackson Ave, (5) Ray Construction, (6) Water Works, and (7) The Falcon Group.

59.     All seven of the companies have been and remain customers of MT Group and are based in either New York or New Jersey.

60.     The conduct described by Pennisi in the email represents blatant violations of his contractual obligations, the consequences of which are unascertainable and not capable of being fully compensated by monetary damages.

61.     After becoming aware of this conduct, as well as the former employees' new employer, the company reviewed prior agreements with Big Apple. In doing so, MT Group learned that certain of the standard terms and conditions had been surreptitiously modified by the departed employees in order to remove a non-solicitation of employees provision ordinarily included in all company agreements.

For example, a 2018 agreement between the company and Big Apple contains the following provision as Item 38:

> Non-Solicitation/Hiring of Employees: To promote an optimum working relationship, the Client agrees in good faith not to directly or indirectly otherwise engage any employee of the Consultant or any person employed by the Consultant within the prior six-month period without the prior written consent of the Consultant. This restriction shall apply during the term of and for a period of one (1) year after the termination of this Agreement. The Client further agrees that loss of any such employee would involve considerable financial loss of an amount that could not be readily established by the Consultant.[1]

62.     Shockingly, the non-solicitation provision was removed from the most recent agreement between Plaintiff and Big Apple. Notably, this agreement was prepared by Asklund

---

[1] For purposes of this agreement, "Client" is intended to refer to Big Apple, while "Consultant" refers to Plaintiff.

on October 4, 2019, just 10 days before the group offered their resignation in order to join Big Apple.

63.     Given the fact that this provision was executed just 10 days before all three employees offered their resignation to join Big Apple, it is clear that all Defendants had orchestrated the departure from MT Group and had made plans to compete with MT Group in direct violation of the restrictive covenants.

64.     Had the non-solicitation/hiring of employees provision in the agreement between the two companies not been surreptitiously removed, under the terms of the agreement, Big Apple would have been required to pay "a sum equal to the employee's current annual salary plus 12 additional months of the employee's current annual training of a new employee as liquidated damages."

65.     Because Big Apple had solicited not one, but four of the company's employees, they would have been required to pay double the combined annual salary of all three employees, which would have equaled approximately $700,000.

66.     Additionally, on December 11, 2019, Intertek learned of yet another instance of Defendants' violation of the restrictive covenants. Specifically, the company was informed by a customer based in New York, that the group had solicited his company's services.

67.     The customer forwarded an e-mail he received from N. Pennisi on December 2, 2019, which read, in relevant part, as follows:

> *We spoke in the past when I was at a previous firm*.  I have since transitioned and was hoping to be added to your contact list for the Monitoring, Special Inspections and Testing scope of work on current and upcoming projects.
>
> Please let me know how we can be added and if I can send you a Statement of Qualifications & Services / Quote for your review.  Thank you for your time, I look forward to hearing back from you!

68.     Defendant and his colleagues' conduct in soliciting at least eight of Intertek's customers, as well as their deceptive behavior shortly before and after their resignations, are violations of the non-competition and non-solicitation covenants contained in Pennisi's Sale and Purchase Agreement as well as his Employment Agreement.

69.     Defendants' misconduct, however, extends beyond their collaborative efforts to disregard Pennisi's contractual obligations against competition.

70.     As part of its ongoing compliance efforts and to ensure the confidentiality of company information, Intertek periodically reviews emails including those containing attachments that are sent by company employees to email addresses outside the company.

71.     Around December 3, 2019, the company discovered that both shortly before and after he offered his resignation, N. Pennisi began forwarding emails with confidential pricing information to his personal email address.

72.     The forwarded emails were emails that had been sent to existing and prospective customers of Intertek in furtherance of N. Pennisi's duties with the company.

73.     For example, on October 14, 2019, the day he tendered his resignation, N. Pennisi forwarded an email thread between himself and a representative from SIT Contractor, Inc., an Intertek customer based in Fort Lee, New Jersey. The email thread included structural and support excavation drawings. Also included was a confidential proposal for monitoring services that was presented to the customer. Lastly, the thread also included a signed proposal containing confidential pricing terms.

74.     Defendants have taken reasonable efforts to protect the secrecy of such information by requiring its employees to execute Employee Confidentiality and Innovation Agreements ("Confidentiality Agreement").

75.     N. Pennisi reviewed and signed a copy of this Confidentiality Agreement on June 14, 2017 at the start of his employment.

76.     By signing the Confidentiality Agreement, N. Pennisi agreed as follows:

> I will not, either during or following any termination of my employment, disclose to any person or entity (unless with the Company's consent): (i) information with reference to matters belonging to the Company pursuant to paragraph 5 of this agreement, (ii) proprietary information and trade secrets of the Company, (iii) any information about the Company or its business not publicly known, including financial information, customer lists, and information related to the Company's processes, methods, formulas and techniques (collectively the "Confidential Information").

77.     In paragraph 5 of the same agreement, the employees further agreed as follows:

> I *shall not remove or copy any Confidential Information*, and *I will promptly return to the Company all documents, records, including records stored on computer files or discs*, notebooks, analyses, summaries, notes or other materials containing Confidential Information, whether prepared by me or not.

78.     In further violation of the foregoing Confidentiality Agreement, the company has learned that before returning their company-issued computers, all three individual Defendants erased all histories and information from the computers so as to conceal their tortious conduct.

79.     Therefore it is virtually certain that Defendants possess Intertek's confidential, proprietary information, including, but not limited to, customer lists, information related to the company's processes, methods, formulas and techniques, as well as confidential price quotes that have been issued to customers.

80.     Further evidence of the group's orchestrated attempts to compete with Intertek and misappropriate its trade secrets can be found in another email N. Pennisi forwarded to his personal email address on October 17, 2019. On that occasion, he forwarded links to various New York City Department of Building guides offering guidance on how to set up a business to compete with Intertek.

81.     As a result of this, the company is in the process of performing forensic searches of the individual Defendants' computer drives to determine what other confidential information was improperly downloaded or otherwise improperly transferred by the individuals before their last day of employment.

82.     With this disturbing information at hand, and concerned with protecting and preserving its client relationships, Intertek is left with no alternative but to initiate this proceeding for injunctive relief, together with the filing of its Complaint against Defendants seeking monetary damages.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract)

83.     Intertek incorporates by reference each of the foregoing allegations set forth in paragraphs 1 through 82 as though fully set forth herein.

84.     On October 8, 2015, Intertek and Defendant entered into an Employment Agreement that contained a non-competition and non-solicitation covenant prohibiting Defendant from engaging in any business in competition with Intertek, and soliciting Intertek's customers, for a period of one year following the termination of his employment with respect to customers in New York and New Jersey that he had solicited in his last two years of employment with the company.

85.     Pennisi acknowledged that in the event he breached the restrictive covenant, MT Group would be entitled to immediate and appropriate injunctive relief without the necessity of showing irreparable injury or special damages.

86.     He further agreed that the restrictions set forth in the Employment Agreement were reasonable in both temporal and geographic scope and that they did not impose any greater

restraint than is necessary to protect the goodwill and other legitimate business interests of the company.

87.     Pennisi also entered into a Sale and Purchase Agreement, which was closed on October 26, 2015. The Sale and Purchase Agreement contained a covenant against competition prohibiting him from engaging in any business in competition with Intertek, and soliciting Intertek/MT Group customers, for a period of five years following the closing date with respect to customers in New York and New Jersey, who had performed work for MT Group between October 26, 2012 through the closing date.

88.     Intertek duly performed its obligations pursuant to both agreements.

89.     Conversely, Pennisi has breached both agreements and their restrictive covenants by soliciting at least eight of Intertek's customers. He had a hand in soliciting or attempting to solicit the services of the customers during his final two years with Intertek before resigning.

90.     As a direct and proximate result of Pennisi's breach of the restrictive covenant, Intertek has suffered and will continue to suffer monetary damages in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF
### (Violations of Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836)

91.     Intertek incorporates by reference each of the foregoing allegations set forth in paragraphs 1 through 90 as though fully set forth herein.

92.     Defendants' actions, as set forth herein, constitute misappropriation under the Defend Trade Secrets Act, 18 U.S.C. § 1836.

93.     Defendants Pennisi, Asklund and N. Pennisi possess confidential information belonging to Intertek, including financial, business, customer and strategic information that constitute trade secrets.

94.     Such information was used in connection with Intertek's services, which are offered across the country and throughout the world.

95.     Intertek has taken reasonable measures to keep its proprietary information secret, including by requiring employees to sign Confidentiality Agreements and having in place policies restricting use of company information.

96.      Defendants Pennisi, Asklund and N. Pennisi were subject to provisions designed to protect the proprietary and confidential nature of certain information belonging to Intertek, which was contained in their respective Employment Agreements and Confidentiality Agreements, which required that they maintain the confidentiality of the information, and prohibited them from using such information other than as necessary in the course of performing their duties for Intertek and as authorized by Intertek.

97.     The information, of which Defendants possess on their personal Gmail accounts and potentially other computer hard drives, backup drives and/or cloud drives, derives independent economic value, actual or potential, from not being generally known to, and now being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information. This is particularly so in the construction industry where successfully acquiring business from customers depends largely upon companies' quoting and pricing systems.

98.     Defendants knew or should have known that this information contained trade secrets belonging to Intertek.

99.     Defendants had no right to retain or use any of Intertek's trade secrets or other confidential and proprietary information after resigning from employment with the company.

100. Upon information and belief, Defendants are retaining and using that information to compete with and/or to otherwise harm Intertek.

101. Intertek did not consent to Defendants' use of the information as set forth above.

102. Defendants' conduct constitutes knowing, willful, and malicious misappropriation.

103. As a direct and proximate result of Defendants' wrongful conduct, Intertek has been substantially and irreparably harmed in an amount not readily capable of determination. Unless restrained by this Court, Defendants will cause further irreparable injury to Intertek.

104. As a result of this conduct, Intertek has suffered direct and consequential damages, and is entitled to recover compensatory damages, attorneys' fees, and other damages in an amount to be proven at trial.

### THIRD CLAIM FOR RELIEF
### (New York State Law Misappropriation)

105. Intertek incorporates by reference each of the foregoing allegations set forth in paragraphs 1 through 104 as though fully set forth herein.

106. Defendants' actions, as set forth herein, constitute misappropriation under New York law.

107. Defendants Pennisi, Asklund and N. Pennisi were entrusted with and currently possess information belonging to and used in the operation of Intertek's business, which information constitutes confidential, proprietary and trade secret information under New York law.

108. Such information was developed by Intertek through great effort and expense, in terms of manpower, time and costs, and is extremely valuable to Intertek, crucial to the operation

of its business, cannot be easily acquired or duplicated by others, and, if made available to others, would enable them to compete with Intertek to Intertek's detriment.

109.    Intertek makes reasonable efforts to maintain the secrecy of this information including limiting its disclosure to those who, like the individual Defendants, have signed written agreements to maintain its secrecy.

110.    The individual Defendants were subject to the confidentiality provisions contained with their respective Employment Agreement and Confidentiality Agreements, and had and continue to have a duty to maintain the confidentiality of the aforementioned information and to not use the information for their own purposes.

111.    Upon information and belief, the individual Defendants knowingly and improperly retained and used such trade secrets and confidential information in violation of the above agreements.

112.    The improperly retained information constitute trade secrets and the Defendants' actions pose a real risk that they will misappropriate these secrets by using the information to Big Apple's advantage or for their own personal economic gain and with the willful and malicious intent to injure Intertek's business.

113.    As a result, Intertek has suffered direct and consequential damages, and is entitled to recover compensatory damages, including opportunity costs and punitive damages in an amount to be proven at trial.

### FOURTH CLAIM FOR RELIEF
**(Tortious Interference With Contractual Relations)**

114.    Intertek incorporates by reference each of the foregoing allegations set forth in paragraphs 1 through 113 as though fully set forth herein.

115.    The Sale and Purchase and Employment Agreements are valid contracts between Intertek and Pennisi.

116.    Asklund, N. Pennisi and Big Apple are aware of the existence of these agreements.

117.    Big Apple was made aware of the restrictive covenants applicable to Pennisi under the terms of both agreements on multiple occasions. Despite having this knowledge, Big Apple continued soliciting the services of Roden and eventually Pennisi.

118.    Asklund, N. Pennisi and Big Apple have induced, condoned and supported Pennisi's violation of the restrictive covenants contained within the foregoing agreements. In doing so, Asklund, N. Pennisi and Big Apple have intentionally procured Pennisi's breach of the agreements and New York common law, as a result of which Intertek has suffered and will continue to suffer damages in an amount to be determined at trial.

119.    Big Apple promised Pennisi a substantial raise in order to induce his breach of his contractual obligations to Intertek.

120.    The Confidentiality Agreements between Asklund, N. Pennisi and Intertek are valid contracts.

121.    Big Apple and Pennisi are aware of the existence of the Confidentiality Agreements.

122.    Big Apple and Pennisi have induced, condoned and supported Asklund and N. Pennisi's misuse and misappropriation of Intertek's confidential information and/or trade secrets and their inappropriate and unlawful use of such information to solicit Intertek's customers on Big Apple and N. Pennisi's behalf in violation of the aforementioned agreements and New York common law.

123.    Pennisi returned Asklund and N. Pennisi's computer devices to Intertek weeks after they resigned from the company and only after having erased its contents.

124.    As a result, Intertek has suffered and will continue to suffer damages in an amount to be proven at trial.

## FIFTH CLAIM FOR RELIEF
### (Preliminary Injunction)

125.    Intertek incorporates by reference each of the foregoing allegations set forth in paragraphs 1 through 124 as though fully set forth herein.

126.    Intertek seeks a preliminary injunction against Defendants, prohibiting them from soliciting Intertek's clients and engaging in any restricted business in competition with Intertek.

127.    Pennisi agreed to the restrictive covenants in connection with the sale of his business to Intertek. He agreed that the restrictions imposed in the covenant were reasonable in time and scope. He also agreed that in the event he were to breach the covenant against competition, Intertek would suffer irreparable harm and be entitled to injunctive relief.

128.    Pennisi also agreed to restrictive covenants contained in his Employment Agreement. He agreed that the restrictions imposed in the covenant were reasonable in time and scope. He also agreed that in the event he were to breach the covenant against competition, Intertek would suffer irreparable harm and be entitled to injunctive relief and without the necessity of showing irreparable injury or special damages.

129.    Defendants breached the agreements and their respective covenants by soliciting at least eight different customers of Intertek, all of whom are based in New York and New Jersey, and all of whom Pennisi had solicited or attempted to solicit services in the final two years of his employment with Intertek.

130.    Pennisi's actions have caused, and unless restrained will continue to cause, Intertek severe, immediate and irreparable injury for which Intertek has no adequate remedy at law.

131.    Defendants have also misappropriated Intertek's trade secrets. All individual Defendants possessed and had access to Intertek's confidential and proprietary trade secrets.

132.    Shortly before and after resigning from their positions with Intertek, the individual Defendants began forwarding Intertek's trade secrets to their personal email addresses in an attempt to later use the information to Intertek's detriment and to Defendants' benefit.

133.    The information is currently being used by Defendants without Intertek's consent.

134.    As a direct and proximate result of Defendants' continuing breach of the Employment Agreement and Sale and Purchase Agreement, and their misappropriation of Intertek's trade secrets, Intertek is entitled to injunctive relief restraining and enjoining Defendants from further violations.

## DEMAND FOR JURY TRIAL

135.    Intertek hereby demands a trial by jury on all issues so triable in this action.

## PRAYER FOR RELIEF

**WHEREFORE**, Intertek demands judgment in its favor as against Defendant as follows:

a.  For compensatory damages for breach of contract, misappropriation of trade secrets, and tortious interference with contractual relations according to proof at trial;

b.  For injunctive relief restraining and enjoining Defendants from further violations of the Employment Agreement, Sale and Purchase Agreement and Confidentiality Agreements;

    c.  Ordering that Defendants return all of Intertek's confidential and proprietary trade secrets;

    d.  For the costs of suit, including attorneys' fees; and

    e.  For such other and further relief as this Court deems just and proper.


Dated: New York, New York
       December 18, 2019


           **LEWIS BRISBOIS BISGAARD & SMITH LLP**

           By:___/s/ Elior D. Shiloh_____
                Elior D. Shiloh
                Andrew T. Williamson
                *Attorneys for Plaintiff*
                77 Water Street
                New York, NY 10005
                212-232-1300
                Elior.Shiloh@lewisbrisbois.com
                Andrew.Williamson@lewisbrisbois.com