**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

INTERTEK TESTING SERVICES, N.A., INC.,

                Plaintiff,

      - against -

FRANK PENNISI, NICHOLAS PENNISI, WENDY ASKLUND, and BIG APPLE TESTING, INC.,

                Defendants.

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S**
**MOTION FOR A TEMPORARY RESTRAINING ORDER**
**AND/OR PRELIMINARY INJUNCTION**

**LEWIS BRISBOIS BISGAARD & SMITH LLP**
*Attorneys for Plaintiff*
77 Water Street
New York, New York 10005
212-232-1300
Elior.Shiloh@lewisbrisbois.com
Andrew.Williamson@lewisbrisbois.com

# TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ..................................................................................1

**FACTUAL BACKGROUND** ....................................................................................4

    A.    **Intertek's Acquisition of MT Group's Goodwill and Business Relationships** ...........................................................................................4

    B.    **Pennisi And His Co-Conspirators' Employment With Intertek** ......................6

    C.    **Pennisi's Breaches His Contractual Obligations With The Help Of Others** .............................................................................................................9

    D.    **Big Apple's Pattern And History Of Tortious Interference** ...........................12

    E.    **Defendants' Orchestrated Efforts To Misappropriate Intertek's3Trade Secrets** ..................................................................................13

**LEGAL ARGUMENT** ..........................................................................................155

    A.    **Intertek Is Likely To Suffer Irreparable Injury If Injunctive Relief Is Not Granted**.......................................................................................16

    B.    **Intertek Is Likely To Succeed On The Merits Of Its Claims**..........................19

        1.    **Intertek's Restrictive Covenants Are Reasonable And Enforceable**.................................................................................22

            a.    The restrictive covenant is reasonable in both temporal and geographic scope. ..........................................................22

            b.    The restrictive covenant is designed to protect Intertek's legitimate interests. .............................................................23

        2.    **Intertek Is Likely To Succeed On Its Trade Secrets Claims**................25

        3.    **Defendants Tortiously Interfered With Intertek's Contractual Relations**.................................................................................29

    C.    **The Balance Of Hardships Tips Considerably In Intertek's Favor**...............31

    D.    **Granting An Injunction Would Not Harm The Public Interest.**....................33

**CONCLUSION**....................................................................................................333

# <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Barbagallo v. Marcum LLP*,
    820 F. Supp. 2d 429 (E.D.N.Y. 2011) ................................................................. 28

*BDO Seidman v. Hirshberg*,
    93 N.Y.2d 382 (1999) ............................................................................. 22, 23, 24

*Benihana, Inc. v. Benihana of Tokyo, LLC*,
    784 F.3d 887 (2d Cir. 2015)............................................................................... 33

*Bernberg v. Health Mgmt. Sys., Inc.*,
    303 A.D.2d 348 (2d Dep't 2003) ....................................................................... 29

*Broker Genius, Inc. v. Zalta*,
    280 F. Supp. 3d 495 (S.D.N.Y. 2017)................................................................ 28

*Carvel Corp. v. Noonan*,
    3 N.Y.3d 182 (2004) .......................................................................................... 30

*Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*,
    598 F.3d 30 (2d Cir. 2010)............................................................................. 19,33

*DeWitt Stern Grp., Inc. v. Eisenberg*, 13-cv-3060 (RWS), 2013 U.S. Dist. LEXIS 78598,
    2013 WL 2420835, at *4-5 (S.D.N.Y. June 4, 2013) ...................................... 16, 22

*Devos, Ltd. v. Record*,
    No. 15-cv-6916 (AYS), 2015 U.S. Dist. LEXIS 172929 (E.D.N.Y. Dec. 24, 2015) .............. 17

*Ecolab, Inc. v. K.P. Laundry Mach., Inc.*,
    656 F. Supp. 2d 894 (S.D.N.Y. 1987)................................................................ 24

*Ecolab, Inc. v. Paolo*,
    753 F. Supp. 1100 (E.D.N.Y. 1991) .................................................................. 26

*Global Switching, Inc. v. Kasper*,
    No. 06-cv-412(CPS), 2006 U.S. Dist. LEXIS 44450, 2006 WL 1800001 (E.D.N.Y.
    June 29, 2006)..................................................................................................... 16

*Golden Krust Patties, Inc. v. Bullock*,
    957 F. Supp. 2d 186 (E.D.N.Y. 2013) ........................................... 16, 20, 24, 33

*Grand River Enter. Six Nations, Ltd. v. Pryor*, 4881 F.3d 60, 66 (2d Cir. 2007)......................... 16

*H2O v. Town Bd. of E. Hampton*,
    147 F. Supp. 3d 80 (E.D.N.Y. 2015) ................................................................. 19

*Johnson Controls, Inc. v. APT Critical Systems, Inc.*,
    323 F. Supp. 2d 525 (S.D.N.Y. 2004)........................................................... 24, 31

*L.F. O'Connell Assocs., Inc. v. McGetrick*,
    (N.Y. Sup. Ct. Sept. 4, 2012)............................................................................. 26

*Local 1814, Int'l Longshoremen's Ass'n v. N.Y. Shipping Ass'n, Inc.*,
    965 F.2d 1224 (2d Cir. 1992)............................................................................. 15

*Locke v. Tom James Co.*,
    11 Civ. 2961, 2013 U.S. Dist. LEXIS 48987, 2013 WL 1340841 (S.D.N.Y. Mar. 25,
    2013) ................................................................................................................... 23

*Marsh USA Inc. v. Schuhriemen*,
    183 F. Supp. 3d 529 (S.D.N.Y. 2016)........................................................... 16, 23

*Mercer Health & Benefits LLC v. Digregorio*,
    307 F. Supp. 3d 326 (S.D.N.Y. 2018)................................................................ 24

*Manhattan Real Estate Equities Group LLC v. Pine Equity, NY, Inc.*,
　16 A.D.3d 292 (1st Dep't 2005) ................................................................ 17
*N.Atl. Instruments, Inc. v. Haber*,
　188 F.3d 38 (2d Cir. 1999) ...................................................................... 25
*Oliver Wyman, Inc. v. Eielson*,
　282 F. Supp. 3d 684 (S.D.N.Y. 2017) ........................................................ 22
*Poller v. BioScrip, Inc.*,
　974 F. Supp. 2d 204 (S.D.N.Y. 2013) ................................................... 22, 24
*Purchasing Associates, Inc. v. Weitz*,
　13 N.Y.2d 267 (1963) .............................................................................. 24
*Salinger v. Colting*,
　607 F.3d 68 (2d Cir. 2010) ...................................................................... 15
*Schroeder v. Pinterest, Inc.*,
　133 A.D.3d 12 (1st Dep't 2015) ................................................................ 26
*SEC v. Citigroup Global Markets, Inc.*,
　673 F.3d 158 (2d Cir. 2012) .................................................................... 32
*Second Circuit. See Second Circuit. See DAR & Assocs., Inc. v. Uniforce Servs., Inc.*,
　37 F. Supp. 2d 192 (E.D.N.Y. 1999) ......................................................... 22
*Singas Famous Pizza Brands Corp.* v. NY Adver. LLC
468 Fed. App'x 46 (2d Cir. 2012) ............................................................... 16
*Solomon Agency Corp. v. Choi*,
　No. 16-cv-0353(LDH), 2016 U.S. Dist. LEXIS 75949 (E.D.N.Y. May 16, 2016) ................ 22
*Support Systems Associates, Inc. v. Tavolacci*,
　135 A.D.2d 704 (2d Dep't 1987) ............................................................... 27
*Ticor Title Ins. Co. v. Cohen*,
　173 F.3d 63 (2d Cir. 1999) ................................................................. 16, 17

**Statutory Authorities**
18 U.S.C. § 1836(b)(1) ............................................................................. 26
18 U.S.C. § 1839(3) ................................................................................. 26
18 U.S.C. § 1839(5) ................................................................................. 26
18 U.S.C. § 1839(6) ................................................................................. 27

**Rules and Regulations**
Fed. R. Civ. P. 65 ...................................................................................... 3

# PRELIMINARY STATEMENT

Intertek Testing Services, N.A., Inc. ("Intertek"), by its attorneys Lewis Brisbois Bisgaard & Smith LLP, submits this Memorandum of Law in support of its application for a temporary restraining order and preliminary injunction against Defendants Frank Pennisi ("Pennisi"), Nicholas Pennisi ("N. Pennisi"), Wendy Asklund ("Asklund")(collectively the"individual Defendants") and Big Apple Testing, Inc. ("Big Apple") (collectively "Defendants"). As demonstrated herein and in the accompanying declarations and exhibits,[1] Intertek urgently requires the aid of this Court to save its business from Defendants' unfair competition to prevent further irreparable harm. Since shortly before and after his resignation from Intertek on October 14, 2019, Pennisi has, with his fellow Defendants, embarked on a scheme to steal Intertek's confidential and proprietary information relating to its business model and particularly its customers in order to steal those customers. Defendants' conduct is in direct breach of non-competition and non-solicitation covenants contained in multiple agreements between Pennisi and Intertek, including an agreement he signed when he sold his business to Intertek. As set forth in detail below, Defendants were all well aware of these covenants, and understood the significance of the company's trade secrets, yet still took calculated steps to cause irreparable harm to Intertek. This harm cannot be quantified in monetary damages and necessitates injunctive relief.

Pennisi agreed to the restrictive covenants in order to induce Intertek to pay him millions of dollars for a company partially owned by him. The covenants prohibited Pennisi from engaging in any business in competition with Intertek for one year after termination of his employment with respect to customers located within the geographic area (New York and New Jersey) he serviced in

---

[1] Also submitted herewith in support of the motion are the declarations of Vinu Abraham ("Abraham Dec.") and Jeffrey Roden ("Roden Dec.") along with exhibits thereto.

his final two years with Intertek.  Pennisi's actions are particularly culpable as Intertek has learned that he has violated the covenant with respect to *at least* eight different clients.

The evidence lays bare that Pennisi is acting in concert with his accomplices in committing this misconduct with the goal of taking down Intertek. Pennisi, N. Pennisi, Asklund and Big Apple have collectively orchestrated an attempt to compete unfairly with Intertek in violation of Pennisi's contractual obligations by soliciting Intertek's customers and replicating Intertek's business practices by utilizing Intertek's trade secrets in the possession of its former employees. The methods employed by Defendants in carrying out this plot have been particularly flagrant. The three individual employees all offered their resignation on the same date but only after orchestrating a plan for all three employees to join Big Apple, a direct competitor of Intertek. Evidence of this plan hatched by Defendants is found in the fact that – only days before their departure – the group surreptitiously altered a material agreement between Intertek and Big Apple, removing a non-solicitation of employees provision that carried substantial damages in the event of a breach.

Since joining Big Apple, these conspirators have worked together to solicit a substantial number of Intertek's customers using information, including customer lists and pricing information, which had been obtained through their employment with Intertek. In fact, Intertek has documented proofs in the form of emails from Defendants themselves which demonstrates their intentional and willful conduct, all of which is in violation of confidentiality agreements signed by all three individual Defendants.

The misconduct of Defendants extends beyond the group's orchestrated effort to breach the contractual obligations contained in the agreements between Pennisi and Intertek. To aid their misconduct, Defendants have carefully misappropriated Intertek's trade secrets. Shortly before and also after they offered their resignations from the company, Defendants began forwarding

proprietary information from their Intertek email addresses to their personal email addresses. The information forwarded by Defendants includes emails with various customers and contains confidential proposals which further contain confidential pricing terms and customer information, including confidential customer drawings for purposes of obtaining proposals from Intertek. In an attempt to cover up this behavior, and undoubtedly other bad acts, the former employees returned their company-issued computers weeks after their resignations even after being repeatedly asked to return the devices. The devices were ultimately returned, but only after they carefully deleted all information from the devices.

Further giving credence to these bad acts leading to irreparable harm, Big Apple has always been aware of Defendants' covenants. Despite having this knowledge, Big Apple has in the past repeatedly solicited Intertek's employees to leave the company to join it. Eventually, Big Apple's efforts to tortiously interfere with Intertek's contractual relations were successful in inducing Pennisi to breach his contractual obligations with the aid of the remaining Defendants. Intertek has been irreparably harmed by the fact that Big Apple is in possession of, operating with, and benefiting from Intertek's trade secrets.

By reason of Defendants' blatant disregard for and breach of the aforementioned covenants and agreements, along with their continued misappropriation of Intertek's trade secrets, and faced with continued irreparable harm absent injunctive relief, Intertek now seeks to enjoin Defendants, pursuant to Rule 65 of the Federal Rules of Civil Procedure, from engaging in activities from which they contractually agreed to refrain from and to stop their unfettered misappropriation of Intertek's trade secrets. As demonstrated below, Intertek has no adequate remedy at law and is entitled to a preliminary injunction prohibiting Defendants from competing with Intertek and soliciting its clients during the pendency of this action and also from further misappropriating the company's trade

secrets and other proprietary information during the pendency of this action. Big Apple should be required to turn over all confidential and proprietary trade secrets shared with them by the individually-named Defendants.

**FACTUAL BACKGROUND**

Intertek is a leading quality solutions provider to industries worldwide. Intertek was founded in 1942 and has developed and nurtured close relationships with building commissioning and construction materials testing companies throughout the world. Those relationships have been developed through the expenditure of considerable time and capital resources, including the strategic acquisition of other companies. Of particular relevance here is an acquisition which occurred in October 2015.

**A. Intertek's Acquisition of MT Group's Goodwill and Business Relationships**

In 2013, Intertek began exploring opportunities to extend the reach of its services in the building commissioning and building science markets in the New York City metro area. In particular, Intertek sought to extend its fenestration testing services into the New York City metro area for the first time. (Abraham Dec., ¶¶ 6-7). Eventually, Intertek focused its efforts on acquiring MT Group.

MT Group is a materials testing and specialty construction inspection firm that was headquartered in Farmingdale, New York. At the time, MT Group was owned by three individuals – Pennisi, Jeffrey Roden ("Roden") and Kevin Cosgrove ("Cosgrove"). (Roden Dec., ¶ 4). The company was founded by Cosgrove in or around 1980 and its entrance into the New York City metro area construction and materials testing industry coincided with the 1990s and 2000s construction boom. (*Id*. at ¶ 5). As a result, MT Group established a substantial number of valuable relationships in the area. (*Id*.). Because of its professional reputation, the company had consistently generated up

to $15 million in annual revenue for more than 10 consecutive years. (*Id*. at ¶ 6). Indeed, Intertek's interest in MT Group was rooted in the fact that MT Group had created and cultivated a substantial amount of goodwill in the area.

Over the course of the next two years, the parties engaged in a lengthy negotiation process. Eventually, in October 2015, Intertek entered into an agreement wherein it acquired MT Group all ownership rights to MT Group, including its goodwill. (Abraham Dec., at ¶ 9). The acquisition was memorialized in a Purchase and Sale Agreement, dated October 8, 2015. (Abraham Dec., Ex. A). The deal was officially closed on October 26, 2015. (Abraham Dec., ¶ 16). In total, Intertek paid multiple millions of dollars to Pennisi and his fellow sellers in order to acquire the MT Group. (Abraham Dec., ¶ 10).

It was apparent to all MT Group owners that the reason Intertek was willing to pay a substantial amount of money to acquire the company was because Intertek would be acquiring the company's goodwill and relationships in the metro area. (Roden Dec., ¶ 11). In fact, if not for the longstanding goodwill and relationships MT Group had cultivated over the course of nearly 35 years, Intertek would not have offered to pay such a substantial price for the company. (*Id*.). On October 26, 2015, Intertek issued a press release championing its acquisition of MT Group noting, among other things, MT Group's extensive history of serving the New York City metro area's construction industry. (Abraham Dec., Ex. B). The press release further extols MT Group's "reputation for offering professional quality services to its clients" and its "vast experience with infrastructure, institutional, building and transportation projects." (*Id*.).

In exchange for the substantial purchase price, Pennisi and the other owners agreed to certain covenants against competition. (Abraham Dec., Ex. A at ¶ 7.1) (Roden Dec., ¶ 12). The covenant against competition provides, in pertinent part, as follows:

(a) **In order to induce [Intertek] to enter into this Agreement**…each Seller agrees that he will not, without the prior written consent of the Buyer, for its or his own account or jointly with another, directly or indirectly, for or on behalf of any Person, as principal, agent, shareholder, participant, partner, promoter, director, officer, manager, employee, consultant, sales representative, or otherwise, except for the benefit of the Buyer….

  (i) for a period of five years from the Closing Date (the "***Restricted Period***"), engage in the Restricted Business within the States of New York and New Jersey (the "***Restricted Area***");

  (ii) within the Restricted Area during the Restricted Period, solicit, or assist in the solicitation of, Restricted Business from any Person to whom any Company Group member has provided services during the three year period prior to the Closing Date

(*Id*.) (Emphasis added)[2]. "Restricted Business" is defined in the Sale and Purchase Agreement as meaning "the commercial inspection and testing of the materials and construction of public works, infrastructure, residential and commercial buildings." (*Id*. at pg. 15).

Accordingly, as part of Intertek's acquisition of MT Group, for which the company paid a considerable amount of money to Pennisi and others, Pennisi agreed to refrain from competing with Intertek until October 26, 2020[3] within the States of New York and New Jersey with respect to customers with which MT Group had provided services from October 26, 2012 through the closing date. This covenant was crucial to the parties ultimately reaching an agreement for Intertek to provide millions of dollars to Pennisi and the others.[4]

**B. Pennisi And His Co-Conspirators' Employment With Intertek**

As part of Intertek's acquisition of MT Group, Pennisi agreed to become an employee of Intertek. (Abraham Dec, ¶ 17). The terms and conditions of Pennisi's employment with Intertek

---

[2] Emphasis has only been added with respect to the underlined portion of cited material.

[3] This date falls just two days after the expiration of the restrictive covenant found in Pennisi's Employment Agreement, which is discussed in further detail below.

[4] As much is made clear in the provision itself as it begins by declaring that the owners of MT Group agreed to the covenant "[i]n order to induce" Intertek to enter the agreement.

were memorialized in a valid and enforceable Employment Agreement between the parties. (Abraham Dec., Ex. C).

Per the terms of his Employment Agreement, Pennisi would serve as Director of Fenestration for Intertek's New York Operations.[5] (Abraham Dec., ¶ 18). Pennisi's starting annual salary was $125,000 and he was also set to receive an annual discretionary bonus, a $500 monthly car allowance and other benefits associated with employment, including his participation in the company's shared health care plan. (*Id.* at ¶ 19).

In his Employment Agreement, Pennisi agreed to restrictive covenants in exchange for access to, among other things, Intertek's confidential information and trade secrets, including its network of client relationships in the area. This included those which were acquired by way of Intertek's acquisition of MT Group. Specifically, Pennisi's Employment Agreement with Intertek provides, in pertinent part, that:

> **For a period of one year following the termination of your employment, for any reason**, you will not, without the prior written consent of the Human Resources Executive responsible for the United States, directly or indirectly, engage in (as owner, partner, shareholder, employee, director, agent, consultant or otherwise), any business which is a competitor of Intertek, as hereinafter defined. For purposes of this agreement, a "competitor of Intertek" is any entity including without limitation a corporation, sole proprietorship, partnership, joint venture, syndicate, trust or any other form of organization or a parent, subsidiary or division of any of the foregoing, which, **is engaged in any business activity of the type for which you were responsible during your last 12 months of employment with Intertek and in the same geographic area for which you were responsible during your last 12 months of employment with Intertek**.

(Abraham Dec., Ex. C at ¶ 9) (emphasis added). The Employment Agreement further provides that for a period of one year following the termination of his employment with Intertek, Pennisi will not, directly or indirectly, "solicit or attempt to solicit [Intertek] customers, suppliers and agents with

---

[5] Pennisi's service area included New Jersey as well.

which [he] had contact during the last twenty-four (24) months of [his] employment with Intertek."
(Abraham Dec., Ex. C at ¶ 9(a)).

Pennisi further acknowledged that in the event that he breached the restrictive covenant, Intertek would sustain irreparable harm and would therefore be entitled to injunctive relief restraining him from further violating the covenant. (Abraham Dec., Ex. C at ¶ 9(d)). On October 8, 2015, Pennisi indicated his agreement to the terms of his Employment Agreement by signing and dating the document. Roden also agreed to become an employee of Intertek. (Roden Dec., ¶ 14). He signed an agreement with terms and conditions largely mirroring those set forth in Pennisi's agreement. (Roden Dec., Ex. A).

At Intertek, Pennisi's duties and responsibilities included, but were not limited to, managing the profits and losses of the company's construction and materials testing business in the New York and New Jersey markets. For approximately four years, Pennisi reaped the benefits of employment with Intertek. He was paid an annual salary well in excess of $100,000, which eventually rose as high as $183,000. (Abraham Dec., ¶ 27). He also received bonuses each year which ranged from more than $11,000 to just under $20,000. (*Id.* at ¶ 28). Pennisi also received access to Intertek's goodwill and client relationships which had been developed at the expense of considerable time and financial resources on the part of the company.

Pennisi's wife, Maritza Pennisi ("M. Pennisi"), became an employee of Intertek after the company acquired MT Group. (Roden Dec., ¶ 32). She was employed as an "Administrative Assistant," and her job duties consisted of collections related responsibilities. For example, M. Pennisi was responsible for reporting on the status of accounts receivable, investigating historical data for each client's invoicing histories and overall correspondence with clients concerning any and

all billing-related issues. (*Id*.). In her role, she had access to customer lists, pricing information for every client, their credit histories with Intertek, and Intertek's business history with the client. (*Id*.).

Asklund joined Intertek as a Business Development Manager, also as part of the MT Group's acquisition. (Abraham Dec., ¶ 32). Her duties and responsibilities included directing and managing the company's overall business development process for the New York City metro area market. (*Id*. at ¶ 33). Meanwhile, N. Pennisi joined Intertek in or around June 27, 2017. (*Id*. at ¶ 34). Like Asklund, he served as a Business Development Manager and shared the same duties and responsibilities. (*Id*.). Among their primary duties and responsibilities was pitching business to prospective clients. (*Id*. at ¶¶ 33-34).

### C. Pennisi's Breaches His Contractual Obligations With The Help Of Others

After their departures, Intertek learned that its former employees had accepted positions with, and began working for, Big Apple, a New York-based company with offices located at 100-03 94th Avenue, Ozone Park, NY 11416. Like Intertek, Big Apple performs special construction inspecting and material testing on behalf of New York's engineering and development firms. Big Apple is a direct competitor of Intertek. On occasion, Intertek would even contract with Big Apple in circumstances where both parties would be performing construction and materials testing services for the same project. (*Id*. at ¶ 38).

Less than a month after the employees left Intertek, the company learned that the group had all worked together to violate the non-compete and non-solicitation provisions in Pennisi's Employment Agreement and the Sale and Purchase Agreement. Specifically, on or around December 2, 2019, Intertek's IT Department was alerted to an e-mail someone had attempted to recall. (*Id*. at ¶ 40). The email was sent by Pennisi from his Big Apple email address to Asklund's Big Apple email address and N. Pennisi's Intertek email address. (*Id*.).

In the email, Pennisi asks Asklund and N. Pennisi for an update as to quotes the group had sent to the following companies – (1) Bruckner, (2) HAP Construction, (3) The Durst Organization, (4) Jackson Ave, (5) Ray Construction, (6) Water Works, and (7) The Falcon Group. All of the companies are based in either New York or New Jersey and are customers of Intertek. (Abraham Dec., Ex. D).

Intertek's relationships with the aforementioned companies generates a substantial amount of revenue for the company. For example, thus far in 2019, Intertek's relationship with HAP Construction has generated more than $140,000 in revenue in the metro area. (Abraham Dec., ¶ 42). The conduct described by Pennisi in the email therefore represents blatant violations of Pennisi's contractual obligations.

After the company became aware of this conduct, it immediately reviewed prior agreements with Big Apple. (*Id*. at ¶ 44) (Roden Dec., ¶¶ 41-43). Intertek then learned that its standard terms and conditions had been modified by the departed employees in order to remove a non-solicitation of employees provision ordinarily included in all agreements with outside testing services companies. (*Id*.). This intentional and material modification was made 10 days prior to their resignations. For example, the 2018 agreement between the company and Big Apple, contains the following provision as Item 38:

> Non-Solicitation/Hiring of Employees: To promote an optimum working relationship, the Client agrees in good faith not to directly or indirectly otherwise engage any employee of the Consultant or any person employed by the Consultant within the prior six-month period without the prior written consent of the Consultant. This restriction shall apply during the term of and for a period of one (1) year after the termination of this Agreement. The Client further agrees that loss of any such employee would involve considerable financial loss of an amount that could not be readily established by the Consultant.

(Abraham Dec., Ex. E).

The non-solicitation provision was later surreptitiously removed by Defendants, without authorization, from a new agreement between Intertek and Big Apple executed on October 4, 2019 – just ten days before the employees tendered their resignations to Intertek. The 2019 agreement was prepared by Asklund. (Abraham Dec., Ex. F).

This modification was no coincidence given the fact that the 2019 agreement was prepared just 10 days before all three employees resigned from Intertek to join Big Apple. Therefore, it is clear that Defendants orchestrated their departure from Intertek and previously conspired to compete with Intertek in direct violation of the restrictive covenants. (Roden Dec., ¶ 43).

Had the non-solicitation/hiring of employees provision in the agreement between the two companies not been surreptitiously removed, under the terms of the agreement, Big Apple would have been required to pay "a sum equal to the employee's current annual salary plus 12 additional months of the employee's current annual training of a new employee as liquidated damages." (*Id.*). Because Big Apple solicited not one, but three of the company's employees, they would have been required to pay double the combined annual salary of all three employees, which would have equaled approximately $700,000. (Abraham Dec., ¶¶ 27, 35 n.1).

On December 11, 2019, Intertek uncovered yet another instance of Defendants' disregard of contractual obligations. On that day, one of Intertek's customers, forwarded an email he received from N. Pennisi on December 2, 2019. (Abraham Dec., Ex. G). The email states, in relevant part, as follows:

> ***We spoke in the past when I was at a previous firm***. I have since transitioned and was hoping to be added to your contact list for the Monitoring, Special Inspections and Testing scope of work on current and upcoming projects.
>
> Please let me know how we can be added and if I can send you a Statement of Qualifications & Services / Quote for your review. Thank you for your time, I look forward to hearing back from you!

(*Id*.) (Emphasis added). This provides yet more evidence of the group's extreme indifference towards Pennisi's contractual obligations.

**D.  Big Apple's Pattern And History Of Tortious Interference**

In or around August 2015, Roden began developing a business relationship with Big Apple. (Roden Dec., ¶ 21). The relationship began with a meeting Roden and Big Apple's Chief Executive Officer, Jay Rubin ("Rubin"). (*Id*.). At the time, Big Apple was a direct competitor of MT Group. By the following month, MT Group began performing lab work, including soil testing on behalf of Big Apple because they lacked the necessary licensure from the New York City Department of Buildings to perform its own lab work. (*Id*. at ¶ 22).

At the initial meetings, Roden explained to Big Apple that MT Group was in the process of being acquired by Intertek. After the acquisition was finalized, Rubin and Joel Lowy ("Lowy"), Big Apple's Executive Director, began soliciting Roden to join Big Apple. (*Id*. at ¶ 25). The solicitations began in or around October 2015 and continued until around June 2019. (*Id*. at ¶ 26). On each attempt to solicit, Roden informed Big Apple that he could not join their company based on covenants he agreed to in connection with Intertek's acquisition of MT Group. (*Id*. at ¶ 27). He even informed Big Apple that Cosgrove and Pennisi were subject to the same covenants against competition. (*Id*.).

Despite having this knowledge, Big Apple continued to solicit Roden to leave Intertek. (*Id*. at ¶ 29). Rubin and Lowy even offered to more than double Roden's salary if he would breach his contractual obligations and begin working for Big Apple. (*Id*.). In total, Rubin and Lowy attempted to induce Roden to breach his contractual obligations on around 15-20 occasions. (*Id*. at ¶ 26). In or around June 2018, when Pennisi was promoted to Director of Products & Projects, he ordered Roden to run all contact with Big Apple through him moving forward. (*Id*. at ¶ 30). Big Apple's attempts to

interfere with Intertek and Roden's contractual relations eventually slowed and ceased altogether in or around June 2019. (*Id*. at ¶ 31).

Unbeknownst to Intertek, Big Apple's tortious interference with the company's contractual relations did not cease altogether. Instead, unable to induce Roden into breaching his contractual obligations, Big Apple merely shifted its focus to Pennisi. Eventually, those efforts were rewarded as Pennisi resigned from employment with Intertek on October 14, 2019. On the same date, Asklund and N. Pennisi also tendered their resignation. Their resignations came just ten days after M. Pennisi resigned on October 4, 2019. (Roden Dec., ¶ 33).

None of the employees returned their company-issued computers when they resigned despite Intertek repeatedly requesting that they do so. (*Id*. at ¶ 36). Intertek called the employees on nearly each day asking that the four employees return their computers. (*Id*.). The calls were either ignored or Intertek was told that the computers would be returned later in the same day. However, it was not until October 23, 2019, when the first of four computers was returned. (*Id*. at ¶ 37). On that day, Pennisi returned his computer. Upon receiving the computer, Intertek discovered that he had deleted all of his emails from the device before it was returned. (Id.). The company continued its efforts to obtain the computers that had been retained by M. Pennisi, Asklund and N. Pennisi. The remaining three computers were eventually returned by Pennisi himself on October 28, 2019. (*Id*. at ¶ 38). Curiously, all emails had been deleted from all three of those computers as well. (*Id*.).

### E. **Defendants' Orchestrated Efforts To Misappropriate Intertek's Trade Secrets**

After the employees resigned from Intertek, and as part of the company's ongoing compliance efforts to ensure the confidentiality of company information, Intertek periodically reviews emails including those containing attachments sent by company employees to email addresses outside the company. (Abraham Dec., ¶ 51).

Since the individual Defendants resigned from employment with Intertek, the company has learned that shortly before and after he offered his resignation, N. Pennisi began forwarding emails with confidential pricing information to his personal email address. (*Id*. at ¶ 52). The emails forwarded by N. Pennisi included emails between himself and different customers and contained confidential proposals containing confidential pricing terms, customer information, including confidential structural drawings provided for purposes of obtaining proposals from Intertek. (Abraham Dec., Ex. H, ¶¶ 53-54).

Notwithstanding N. Pennisi's blatant disregard for the confidentiality of this information, Intertek has taken reasonable efforts to protect the secrecy of such information by requiring its employees to execute Employee Confidentiality and Innovation Agreements ("Confidentiality Agreement"). Both N. Pennisi and Asklund signed such agreements. (Abraham Dec., Ex. I). N. Pennisi reviewed and signed a copy of this Confidentiality Agreement on June 14, 2017 at the start of his employment.

By signing the Confidentiality Agreement, N. Pennisi agreed as follows:

> I will not, either during or following any termination of my employment, disclose to any person or entity (unless with the Company's consent): (i) information with reference to matters belonging to the Company pursuant to paragraph 5 of this agreement, (ii) proprietary information and trade secrets of the Company, (iii) any information about the Company or its business not publicly known, including financial information, customer lists, and information related to the Company's processes, methods, formulas and techniques (collectively the "Confidential Information").

In paragraph 5 of the same agreement, the employees further agreed as follows:

> I *shall not remove or copy any Confidential Information*, and *I will promptly return to the Company all documents, records, including records stored on computer files or discs*, notebooks, analyses, summaries, notes or other materials containing Confidential Information, whether prepared by me or not.

(*Id*.) (Emphasis added).

In further violation of the above agreements, Intertek has learned that just before separating from Intertek, Pennisi, Asklund and N. Pennisi deleted all files and histories from their company-issued computers in attempts to cover up their willful and devious actions.[6] (Abraham Dec., ¶ 59). Given their calculated conduct shortly before and since the individuals' resignation from Intertek, it is virtually certain that Defendants possess Intertek's confidential and proprietary trade secrets. This includes, but is not limited to, confidential customer information, pricing terms, proposal forms and project lists.

Pennisi's conduct ratifies his disregard for the Sale and Purchase Agreement and Employment Agreement for which he has already reaped substantial benefits, including up to and possibly more than $1,000,000. The remaining Defendants have supported, condoned and induced each others' tortious conduct in violation of various contractual obligations. Their conduct betrays any belief that they will ever abide by the contractual obligations governing their separation from employment with Intertek. Concerned with protecting and preserving its client relationships as well as its own trade secrets, and with this disturbing information at hand, Intertek has no alternative but to initiate this proceeding for injunctive relief, together with the filing of its Complaint against Defendants.

## **LEGAL ARGUMENT**

In the Second Circuit, the standard for issuing a temporary restraining order and a preliminary injunction are the same. *Local 1814, Int'l Longshoremen's Ass'n v. N.Y. Shipping Ass'n, Inc.*, 965 F.2d 1224, 1228-29 (2d Cir. 1992). In determining whether to grant a temporary restraining order

---

[6] As a result, Intertek is in the process of performing forensic searches of its former employees' computer drives to ascertain what information was improperly downloaded or otherwise transferred by the employees before and/or after resigning. Intertek intends to assert additional allegations to supports its claims for misappropriation of trade secrets under both federal and New York law should the forensic search uncover any further bad acts. Intertek intends to also name Pennisi's wife, M. Pennisi, following completion of the forensic searches.

or preliminary injunctive relief, the Court should consider whether Intertek is likely to suffer possible irreparable injury if the injunction is not granted and "either (1) a likelihood of success on the merits of its case or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor." *Salinger v. Colting*, 607 F.3d 68, 75 (2d Cir. 2010). The facts here decidedly support the issuance of a temporary restraining order now and a subsequent preliminary injunction following a hearing.

### A. **Intertek Is Likely To Suffer Irreparable Injury If Injunctive Relief Is Not Granted**.

To satisfy the irreparable harm requirement, a party must demonstrate that absent preliminary relief, it will suffer "an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Singas Famous Pizza Brands Corp., N.Y. Adver. LLC*, 468 F. App'x 43, 45 (2d Cir. 2012) (quoting *Grand River Enter. Six Nations, Ltd. V. Pryor*, 4881 F.3d 60, 66 (2d Cir. 2007)).

Generally, when a party violates a reasonable non-compete clause, the resulting loss of client relationships and customer goodwill built up over the years constitutes irreparable harm for purposes of imposing a preliminary injunction. *See Singas Famous Pizza Brands Corp.*, 468 F. App'x at 46; *see also Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 68-69 (2d Cir. 1999); *Golden Krust Patties, Inc. v. Bullock*, 957 F. Supp. 2d 186, 194 (E.D.N.Y. 2013); *DeWitt Stern Grp., Inc. v. Eisenberg*, 13-cv-3060 (RWS), 2013 U.S. Dist. LEXIS 78598, 2013 WL 2420835, at *4-5 (S.D.N.Y. June 4, 2013) ("Irreparable harm to an employer results through . . . the loss of client relationships and customer goodwill from a breach of a non-compete clause . . . ."); *Marsh USA Inc. v, Karasaki*, No. 08-cv-4195 (JGK), 2008 U.S. Dist. LEXIS 90986, 2008 WL 4778239, at *14 (S.D.N.Y. Oct. 31, 2008) ("It is well established in this Circuit that the loss of client relationships and customer goodwill that results from the breach of a non-compete clause generally constitutes irreparable harm."); *Global*

*Switching, Inc. v. Kasper*, No. 06-cv-412 (CPS), 2006 U.S. Dist. LEXIS 44450, *35-36, 2006 WL 1800001 (E.D.N.Y. June 29, 2006) ("In cases involving a person competing with his or her former employer, particularly when such activity is prohibited by a restrictive covenant or is facilitated by the misappropriation of trade secrets or customer information, courts have often taken a somewhat relaxed approach to the irreparable harm inquiry, and in certain circumstances have found it appropriate to presume the existence of such an injury."); *Devos, Ltd. v. Record*, No. 15-cv-6916 (ADS) (AYS), 2015 U.S. Dist. LEXIS 172929, *26-29 (E.D.N.Y. Dec. 24, 2015) (finding irreparable injury where the defendant previously agreed that a breach of the restrictive covenant would result in irreparable injury to plaintiff).

This is because it is particularly difficult to measure the monetary damages sufficient to compensate an employer for the loss of a client relationship which could produce an indeterminate amount of business in years to come. *See Ticor Title Ins. Co.*, 173 F.3d at 68-69. Further, where an employee concedes that a violation of a restrictive covenant would cause the employer to suffer irreparable harm in the event of a breach, courts have held that such concessions could be viewed as admissions further supporting a finding of irreparable harm. *Id.* at 68-69 ("[T]he employment contract sought to be enforced concedes that in the event of [defendant's] breach of the post-employment competition provision, [plaintiff] shall be entitled to injunctive relief, because it would cause irreparable injury. Such . . . might arguably be viewed as an admission by [defendant] that plaintiff will suffer irreparable harm were he to breach the contract's non-compete provision.").

In fact, irreparable harm is often presumed "to protect a buyer's purchase of a business" and under the circumstances presented here. *See Manhattan Real Estate Equities Group LLC v. Pine Equity, NY, Inc.*, 16 A.D.3d 292 (1st Dep't 2005) ("We note as well that irreparable injury is presumed from the breach of a noncompetition agreement entered into to protect a buyer's purchase

of a business and accompanying goodwill."). Pennisi has breached covenants against competition that were agreed-upon in connection with Intertek's acquisition of MT Group. The Sale and Purchase Agreement explicitly provides that Intertek Pennisi and the other owners agreed to the covenants against competition "in order to induce" Intertek to enter into the agreement. (Abraham Dec., Ex. A at ¶ 7.1).

Here, Intertek will suffer immediate and irreparable harm in the absence of injunctive relief. Pennisi breached restrictive covenants in both his Employment Agreement and those tied directly to the Sale and Purchase Agreement by soliciting Intertek's customers, all of whom are based in the New York and New Jersey area despite agreeing not to do so for one year following his separation from Intertek.[7] He has further breached those contractual obligations by directing Asklund, N. Pennisi and surely others at Big Apple to do the same. Pennisi explicitly agreed to refrain from such conduct, which induced Intertek into paying millions of dollars to purchase MT Group and its goodwill back in 2015.

Pennisi, along with the aid of his fellow Defendants, has demonstrated a complete and total disregard for his contractual obligations, for which Intertek has paid millions of dollars to obtain. Thus, while Pennisi has reaped a financial windfall as a result of the aforementioned agreements, he refuses to hold up his end of the agreement. His conduct has already caused Intertek to suffer losses, including but not limited to expenditures for legal fees and expenses associated with the filing of this application, but also for further investigating Pennisi and his colleagues' improper conduct just before their separation from Intertek. Additionally, Pennisi's possession of the entirety of Intertek's current business model in the form of proprietary and confidential trade secrets stands to do further

---

[7] Based on the terms of the covenant against competition in the Sale and Purchase Agreement, Pennisi agreed not to compete until October 26, 2020. The terms of the Employment Agreement provides that Pennisi may not compete until October 24, 2020, based on his date of resignation.

irreparable harm as he, through Big Apple, duplicates Intertek's strategy. In doing so, Pennisi and the other Defendants will continue to irreparably damage Intertek's business practices.

Additionally, if injunctive relief is not granted, Defendants will be able to skirt enforcement of Pennisi's contractual obligations altogether as they are set to expire less than one year from now. By that time, Pennisi will have escaped his contractual obligations for which Intertek paid millions of dollars to acquire and Big Apple's business will have benefited from all of Intertek's trade secrets.

Indeed, unless Pennisi is restrained and enjoined, Intertek's relationship and goodwill with its customer base, for which it has expended millions of dollars, will be irreparably harmed and Intertek would suffer immeasurable losses. There is no adequate remedy at law to compensate Intertek for the loss of its relationships and goodwill with its customers nor to address Defendants' blatant disregard for the confidentiality of Intertek's trade secrets. As such, a preliminary injunction is warranted.

Pennisi, in fact, acknowledged the inherent difficulty in quantifying damages in such a situation, declaring in his Employment Agreement that in the event he were to breach the covenant contained therein, that "Intertek and its subsidiaries and affiliated companies would sustain irreparable harm and…shall be entitled to an injunction…restraining [him] from committing or continuing any such violation" of the covenant. (Abraham Dec., Ex. C at ¶ 9(d)). These facts, taken together, make a clear showing that Intertek will be irreparably harmed if Defendants are permitted to breach the restrictive covenant by continuing his efforts to solicit Intertek's clients in the area.

**B**. <u>**Intertek Is Likely To Succeed On The Merits Of Its Claims.**</u>

The Second Circuit has adopted a flexible standard with regard to the "likelihood of success" requirement, allowing a party seeking a preliminary injunction to show either a likelihood of success on the merits or "sufficiently serious questions going to the merits to make them a fair ground for

litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *H2O v. Town Bd. of E. Hampton*, 147 F. Supp. 3d 80, 95 (E.D.N.Y. 2015) (quoting *Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010)).

Intertek will likely succeed on the merits of its claims. In the underlying Complaint, Intertek charges Pennisi with breach of contract, and seeks preliminary injunctive relief based on his violation of the non-competition and non-solicitation covenant contained in the Sale and Purchase Agreement as well as the Employment Agreement. The strength of Intertek's claims are sufficient to satisfy the "likelihood of success" requirement.

In order to succeed on its breach of contract claim, Intertek must establish: (1) the existence of a contract, (2) Intertek's performance under the contract, (3) Pennisi's breach of the contract, and (4) resulting damages. *See Golden Krust Patties, Inc.*, 957 F. Supp. 2d at 197.

Here, Intertek can establish that there was an employment agreement between the parties and that it performed its obligations under the agreement. (Abraham Dec., Ex. C). Pennisi, however, has breached this contract (as well as the similar provisions in the Purchase and Sale Agreement) by soliciting Intertek's existing clients in New York and New Jersey.

As noted above, at all times while employed by Intertek, Pennisi received an annual salary in excess of $125,000. (Abraham Dec., ¶ 27). He received salary increases throughout his time with the company as well, until eventually his annual salary was $183,000. (*Id.*). Pennisi also received a monthly car allowance of $500, paid time-off and discretionary annual bonuses. (*Id.*). For example, from 2017 through 2019, Pennisi received bonuses in the amount of $18,750, $19,125 and $11,934, respectively. (*Id.* at ¶ 28). In exchange for his receipt of the foregoing as well as other consideration, including access to Intertek's confidential, proprietary information, Pennisi agreed to be bound by a

restrictive covenant that prohibited him from engaging in any business in competition with Intertek, and soliciting Intertek's clients for a period of one year following the termination of his employment with respect to customers located in either New York or New Jersey. The restriction is further limited to only those customers with which Pennisi had worked with for a two-year period prior to his separation from the company.

Under the Agreements, Pennisi acknowledged that in the event he breached the restrictive covenants, Intertek would be entitled to immediate and appropriate injunctive relief without the necessity of showing irreparable injury or special damages. (Abraham Dec., Ex. A at ¶ 7.3; Ex. C at ¶ 9(d)). It bears noting that in executing the Sale and Purchase Agreement, Pennisi was represented by counsel. (Abraham Dec., Ex. A at ¶ 10.6).

Intertek carried out its obligations under the Employment Agreement – employing and compensating Pennisi for more than four years, including the payment of bonuses at the end of each year and increasing his salary by nearly 50%. (*Id*. at ¶¶ 27-28). Intertek further carried out its obligations under the Sale and Purchase Agreement by providing Pennisi and his fellow sellers millions of dollars. (Abraham Dec., ¶¶ 10-30). Conversely, Pennisi breached the Agreements and their restrictive covenants by soliciting several of Intertek's customers, all of whom are based in New York or New Jersey, and threatening Intertek with the loss of its customers' business. As a consequence of Pennisi's breach, Intertek has suffered a loss of goodwill and potential future business with the Clients and surely other customers.

The remaining Defendants have likewise cause Intertek damages. Their devious and tortious conduct shortly before and after the individual Defendants resigned from Intertek suggest a complete disregard for the confidentiality of Intertek's trade secrets. Unless they are immediately enjoined,

Defendants' unlawful conduct will continue and Intertek will continue to suffer irreparable damage and immeasurable losses.

## 1. Intertek's Restrictive Covenants Are Reasonable And Enforceable.

A non-competition and/or non-solicitation restrictive covenant is enforceable in New York provided it (1) is reasonable in geographical and temporal scope, (2) is no greater than is required for the protection of the legitimate interest of the employer, (3) does not impose undue hardship on the employee, and (4) is not injurious to the public. *See BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 388-89 (1999); *see also Poller v. BioScrip, Inc.*, 974 F. Supp. 2d 204, 214-15 (S.D.N.Y. 2013).

### a. The restrictive covenant is reasonable in both temporal and geographic scope.

Assessing the reasonableness of a restrictive covenant's temporal and geographic scope is case and fact-dependent. *See BDO Seidman*, 93 N.Y.2d at 390. Here, the restrictive covenants prohibit Pennisi from competing with Intertek and soliciting only those clients with whom he solicited services in the last two years of his employment with the company for the reasonable period of one-year within the States of New York and New Jersey. The restrictions are reasonable in temporal and geographic scope.

The one year timeframe during which Pennisi is prohibited from competing with Intertek is unquestionably reasonable as such a timeframe has been routinely held to be reasonable in the *Second Circuit. See* Second Circuit. *See DAR & Assocs., Inc. v. Uniforce Servs., Inc.*, 37 F. Supp. 2d 192, 199 (E.D.N.Y. 1999) (upholding provision restricting former licensee, a professional staffing business, from competing within fifty miles of former place of business for one year); *Solomon Agency Corp. v. Choi*, No. 16-cv-0353 (LDH), 2016 U.S. Dist. LEXIS 75949 (E.D.N.Y. May 16, 2016) (enforcing provision restricting former insurance employee from competing for a two-year period); *DeWitt*, 2013 U.S. Dist. LEXIS 78598, *13-15 (enforcing provision where former employee

was prohibited from competing for two years); *Oliver Wyman, Inc. v. Eielson*, 282 F. Supp. 3d 684, 697 (S.D.N.Y. 2017) ("'New York courts have routinely found one-year restrictions to be reasonable.'") (quoting *Marsh USA Inc. v. Schuhriemen*, 183 F. Supp. 3d 529, 535 (S.D.N.Y. 2016)); *Locke v. Tom James Co.*, 11 Civ. 2961 (GBD), 2013 U.S. Dist. LEXIS 48987, 2013 WL 1340841 (S.D.N.Y. Mar. 25, 2013) (enforcing a covenant prohibiting the former employee, a custom clothing salesman, from competing or soliciting his former employer's customers for two years in any territory where he previously conducted business for the employer).

Similarly, a two-state restrictive radius, which is further limited to only those customers with which he had solicited or attempted to solicit business from in the last two years of his employment with Intertek, is reasonable. This is particularly so given the nature of Pennisi's work with the company. With Intertek, Pennisi was responsible for managing staff and for revenue growth in the New York/New Jersey region. (Abraham Dec., ¶ 29). Courts have routinely upheld geographical restrictions corresponding with an employer's direct area of business. *See Locke*, 2013 U.S. Dist. LEXIS 48987, at *27-28. The same is true in the present case. The one-year, two-state restriction in this case is reasonable to protect Intertek's valid interest in protecting its client base and is therefore enforceable.

b.  The restrictive covenant is designed to protect Intertek's legitimate interests.

The requirement that a restrictive covenant should be "no greater than is required for the protection of the legitimate interest of the employer" includes not only protection against misappropriation of the employer's trade secrets and protection from competition by a former employee whose services are unique, but also, protection against the exploitation or appropriation of client relationships and the employer's goodwill with its clients. *See BDO Seidman*, 93 N.Y.2d at 389-92.

It is well-settled in the Second Circuit that a legitimate purpose of an employer in connection with employee restraint is to prevent competitive use, for a time, of information and/or relationships which pertain peculiarly to the employer and which the employee acquired in the course of the employment. *Id*. at 391 (finding that an employer may have a legitimate interest in protecting client relationships developed by an employee at the employer's expense). When an employee is able to work closely with a customer, especially over an extended period of time, the employee has been "enabled" to share in the goodwill of the customer which the employer's overall efforts and expenditures created. *See Ticor*, 173 F.3d at 70-71 (likening client relationships to special or unique services); *Purchasing Associates, Inc. v. Weitz*, 13 N.Y.2d 267 (1963) (noting that a restrictive covenant is enforceable to the extent necessary to prevent an employee's "solicitation of, or disclosure of any information concerning, [the former employer's] customers").

The employer has a legitimate interest in preventing a former employee, such as Pennisi, from exploiting that goodwill, which was created and maintained at the employer's competitive detriment. *See BDO Seidman,* 93 N.Y.2d at 392; *see also Golden Krust Patties, Inc.*, 957 F. Supp. 2d at 199; *Johnson Controls, Inc. v. APT Critical Systems, Inc.*, 323 F. Supp. 2d 525, 536 (S.D.N.Y. 2004); *Poller*, 974 F. Supp. 2d at 220 ("[E]ven where the goodwill is developed by the [employee], that development 'is done for the benefit of the employer under a duty of loyalty and in return for the compensation paid to the [employee] by the employer.'") (quoting *Ecolab, Inc. v. K.P. Laundry Mach., Inc.*, 656 F. Supp. 2d 894, 899 (S.D.N.Y. 1987)). In contrast, a restrictive covenant would not be extended to protect an employer's interest with regard to clients with whom the employee did not work or develop a relationship while employed. *See Poller*, 974 F. Supp. 2d at 220-22. The key question is therefore whether the employee developed a relationship with the customers

independently of any efforts or expenditures made by the employer. *See Mercer Health & Benefits LLC v. Digregorio*, 307 F. Supp. 3d 326, 349-50 (S.D.N.Y. 2018).

Here, Intertek has a legitimate interest in protecting against Pennisi's exploitation of its relationship and goodwill with the Clients. As noted, Intertek created and cultivated the relationship and goodwill with the clients through its own efforts and at its own considerable expense and enabled Pennisi and the two employees he took with him to Big Apple, Asklund and N. Pennisi, to share in those relationships and goodwill through their employment. Pennisi was introduced to the Clients as part of their employment with Intertek.

The entire purpose of Intertek's acquisition of MT Group, and employment of Pennisi thereafter, was to acquire the substantial goodwill and customer relationships MT Group had established in the New York City metro area market. (Abraham Dec., Ex. B). Now that he has received a considerable amount of financial compensation from Intertek, Pennisi seeks to shirk his contractual obligation to refrain from competing with Intertek for one year under not one, but two different agreements.

Pennisi should not be permitted to exploit and take unfair advantage of Intertek's relationships and goodwill, particularly where those relationships and goodwill were cultivated at Intertek's considerable expense. The restrictive covenant at issue should serve to ensure that he is unable to.

**2. Intertek Is Likely To Succeed On Its Trade Secrets Claims.**

The standards for establishing misappropriation of trade secrets under New York and federal law are similar. To establish misappropriation under New York law, a party must demonstrate: (1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an

agreement, confidential relationship or duty, or as a result of discovery by improper means. *See N.Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 43-44 (2d Cir. 1999).

In determining whether information constitutes a trade secret under New York law, courts consider "(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *Schroeder v. Pinterest, Inc.*, 133 A.D.3d 12, 27 (1st Dep't 2015) (quoting Restatement of Torts § 757, comment b). Trade secret misappropriation may be established under New York law by showing that a defendant "used the trade secrets in breach of an agreement" between the parties. *Id*. at 28.

In determining whether something is protectable as a trade secret, New York courts will "frequently examine the method by which the defendant acquired it, such as by stealing or copying. Even when the information does not rise to the level of a trade secret, the unauthorized physical taking and exploitation of internal company documents by an employee for use in his future business or employment may be enjoined as unfair competition." *L.F. O'Connell Assocs., Inc. v. McGetrick*, 36 Misc. 3d 1238(A) (N.Y. Sup. Ct. Sept. 4, 2012) (citing *Ecolab, Inc. v. Paolo*, 753 F. Supp. 1100, 1111 (E.D.N.Y. 1991)).

Similarly, the Defend Trade Secrets Act of 2016 ("DTSA") provides a private cause of action to the "owner of a trade secret that is misappropriated." 18 U.S.C. § 1836(b)(1). The DTSA broadly provides trade secret protection, describing protectable trade secrets as including "all forms and types" of information that "derive[] independent economic value, actual or potential, from not being

generally known to, and not being readily ascertainable through proper means by another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3).

"Misappropriation" is further defined to include "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or "disclosure or use of a trade secret of another without express or implied consent" in certain circumstances. 18 U.S.C. § 1839(5). Notably, "[i]mproper means" under the DTSA includes "breach or inducement of a breach of a duty to maintain secrecy," but excludes lawful means of acquisition. 18 U.S.C. § 1839(6).

The information retained by the individual Defendants, and potentially uploaded from their work computers to Google Drives or other electronic storage devises, clearly constitute trade secrets under both state and federal law. The information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means from others who could otherwise obtain economic value from the disclosure or use of the information. For instance, Intertek's service pricing, which is the product of the company's global presence as well as MT Group's four decades of experience in the New York City metro area, undeniably derive independent economic value from not being generally known by the public. *See, e.g.*, *Support Systems Associates, Inc. v. Tavolacci*, 135 A.D.2d 704, 706 (2d Dep't 1987) (holding that the information used by the former employee to generate proposals for his new employer, confidential pricing information and other information used to generate bid proposals, was highly confidential and entitled to trade secret protection).

The company's extensive client database, also the product of 40 years of servicing the area industry, likewise derives independent economic value from not being known by the general public as well. The fact that Intertek paid multiple millions of dollars in a confidential Sale and Purchase

Agreement to acquire this information as well as MT Group's related goodwill further proves this point.

Moreover, the fact that the individual Defendants returned their company-issued computer devices wiped clean suggests that other trade secrets were copied or otherwise improperly transferred before their departure. (Roden Dec., ¶¶ 36-38). This would include the company's information relating to customer accounts and credit data, confidential contracting processes, market development materials including but not limited to those disseminated during internal presentations, and also past bids and sales information. This is precisely the sort of information that N. Pennisi began forwarding to his private email address shortly before and after the group offered their resignations. (Abraham Dec., ¶ 52). The employees took several weeks to return their company-issued computers—all of which contained Intertek's trade secrets—after the company repeatedly demanded they do so. (Roden Dec., ¶ 38). The fact that they only returned the devices after they had deleted all of their emails and erased other information from the computers points to but one conclusion: that the employees have misappropriated Intertek's trade secrets and are using the information to benefit their new employer, and Intertek's direct competitor, Big Apple.

Further, Intertek has expended a substantial amount of resources – millions of dollars – in developing those trade secrets. *See, e.g.*, *Broker Genius, Inc. v. Zalta*, 280 F. Supp. 3d 495, 514 (S.D.N.Y. 2017) (noting that the plaintiff who spent approximately $4 million in developing their trade secrets had expended a "substantial amount of resources"). Intertek did so by purchasing MT Group from Pennisi himself.

Finally, Intertek has taken extensive measures to guard the secrecy of its trade secrets. The company has in place ongoing compliance efforts in which it periodically reviews emails including those containing attachments that are sent by company employees to outside email addresses.

(Abraham Dec., ¶ 51). Additionally, Intertek requires all employees to execute confidentiality agreements similar to those executed by the individual Defendants. (*Id*. at ¶ 55). The agreements prohibit employees from disclosing or using the company's confidential information and trade secrets outside of their employment with Intertek.

Defendants' continued use and retention of this information is in direct violation of their contractual obligations. Thus, because the Defendants have used the trade secrets in breach of their respective agreements, it is likely that Intertek will succeed on its misappropriation of trade secrets claims.

### 3. Defendants Tortiously Interfered With Intertek's Contractual Relations.

In order to establish a likelihood of success on its claim against Defendants for tortious interference with a contract, Intertek must demonstrate: (i) the existence of a contract between Intertek and a third party; (ii) the Defendant's knowledge of the contract; (iii) the Defendant's intentional inducement of the third party to breach or otherwise render performance impossible; and (iv) damages suffered by Intertek. *See, e.g.*, *Bernberg v. Health Mgmt. Sys., Inc.*, 303 A.D.2d 348, 349 (2d Dep't 2003).

As discussed above, Intertek had valid and enforceable contracts in place with Pennisi, Asklund and N. Pennisi. Big Apple had knowledge of the contracts based on their prior, impermissible attempts to solicit Roden to breach his restrictive covenants. (Roden Dec., ¶¶ 26-28). Big Apple solicited Roden to leave Big Apple on 15-20 different occasions. (*Id*. at ¶ 26). On several of those occasions, Roden specifically informed them that, along with himself, Pennisi's employment with Intertek was subject to restrictive covenants that prevented them from working for Big Apple. (*Id*. at ¶¶ 27-28). Despite knowledge of this information, Big Apple continued to engage in efforts to induce Roden to breach his contractual obligations. When those efforts were

unsuccessful, they eventually turned their attention to Pennisi. Eventually, Big Apple's attempts to tortiously interfere with Intertek's contractual relations with Pennisi were successful as he resigned to begin working for Big Apple. (*Id*. at ¶ 34).

As long as a valid contract exists, "a plaintiff may recover damages for tortious interference with contractual relations even if the defendant was engaged in lawful behavior." *Barbagallo v. Marcum LLP*, 820 F. Supp. 2d 429, 444 (E.D.N.Y. 2011) (citing *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 190 (2004) ("[W]here there is an existing, enforceable contract and a defendant's deliberate interference results in a breach of that contract, a plaintiff may recover damages for tortious interference.")). Thus, even if Big Apple's conduct in hiring the individual Defendants was entirely lawful, it is still liable for tortious interference because it has caused Defendants to breach their respective agreements with Intertek. Similarly, Defendants Asklund and N. Pennisi are also liable for tortious interference because they have caused Pennisi to breach his covenants against competition.

As was discussed above, Pennisi was and is contractually obligated to refrain from soliciting Intertek's customers and using Intertek's trade secrets and other confidential and proprietary information. Asklund and N. Pennisi were and still are contractually obligated to refrain from using Intertek's trade secrets and other confidential and proprietary information. Big Apple, the individual Defendants' current employer and a direct competitor of Intertek, is aware of the terms of the Defendants' agreements. Further, the fact that Asklund surreptitiously removed the non-solicitation provision in Intertek's agreement with Big Apple suggests that the Defendants knew their actions were improper yet they proceeded anyway.

Within a matter of weeks after leaving Intertek, the individual Defendants began soliciting Intertek's customers in direct violation of Pennisi's restrictive covenants. The fact that two of the Defendants—Pennisi and N. Pennisi—are father and son, only provides further support for the

tortious interference claims.[8] Based on the foregoing, it is also likely that the forensic analyses of the individual Defendants' company-issued computer devices being performed is likely to reveal further proofs supporting Defendants' tortious interference of each others' contractual obligations.

### C. The Balance Of Hardships Tips Considerably In Intertek's Favor.

Intertek's legitimate interest in protecting against Defendants' exploitation of its long-standing relationships and goodwill with its customers certainly outweighs Defendants' minimal interest in working with those customers in competition with Intertek. As discussed above, Intertek has created and cultivated the relationships and goodwill with its customer base through its own efforts and at is own considerable expense – including the multiple millions of dollars Intertek paid to acquire MT Group. Thus, it would be patently unfair to allow Defendants to escape contractual obligations they agreed to in order to exploit and misappropriate Intertek's relationships and goodwill with its customer base. Pennisi even acknowledged as much when signing both the Sale and Purchase Agreement and his Employment Agreement. (Abraham Dec., Ex. A at ¶ 7.1(iv); Ex. C at ¶ 7).

On the other hand, enforcement of the restrictive covenant would merely preclude Pennisi from competing with Intertek only with respect to customers he solicited on behalf of Intertek in the New York and New Jersey markets for the final two years of his tenure with the company. He would still have access to an entire market of clients in New York and New Jersey whom he did not solicit on behalf of Intertek. Additionally, Pennisi would also have access to the entire market of neighboring states, such as Connecticut, Massachusetts, Pennsylvania, Vermont, Maryland, and any other market. *See, e.g.*, *Johnson Controls, Inc.*, 323 F. Supp. 2d at 541 (noting that the potential

---

[8] This was likely a family affair considering that Pennisi's wife, who was employed as an Administrative Assistant, also resigned in October 2019.

harm to an affected former employee was "limited" where there were hundreds of other business in the tri-state area whom he could solicit).

Thus, while Intertek stands to lose valuable relationships and goodwill that were obtained through its own efforts – including the multiple millions of dollars spent to acquire MT Group – Pennisi merely stands to lose the ability to solicit the company's customers from whom he solicited business while at Intertek for the reasonable time period of one year. As such, any harm suffered by Pennisi should the injunction be granted will be minimal at best; instead, the injunction will merely require him to abide by the contractual promises he made to Intertek on two occasions—for which he was abundantly compensated—which he has now chosen to ignore. Thus, any harm suffered by Pennisi is "self-inflicted" by virtue of his decision to flout his contractual obligations to Intertek. *See, e.g.*, *Citizens Secs., Inc. v. Bender*, 19-cv-916 (MAD/DJS), 2019 U.S. Dist. LEXIS 128571, *15-16, 2019 WL 3494397 (N.D.N.Y. Aug. 1, 2019) (finding the equities favor the employer where the employee was merely required to abide by a non-solicitation clause that was a condition of his employment).

The same is true with respect to the remaining Defendants' efforts to misappropriate Intertek's confidential and proprietary trade secrets. That the balance of hardships tips decidedly in favor of Intertek cannot be questioned, especially given the underhanded conduct of Defendants shortly before the individual Defendants' resignations to join Big Apple, a direct competitor. To recap, it is known that the individual Defendants: (1) deleted their computer drives, (2) forwarded confidential e-mails to their personal e-mail accounts, and (3) altered standard material contract terms with their new employer so as to facilitate their ability to join Big Apple to Intertek's detriment. Accordingly, the balance of hardships unquestionably tips decidedly in favor of Intertek warranting injunctive relief.

**D. Granting An Injunction Would Not Harm The Public Interest.**

Before ordering injunctive relief, the Court should also "ensure that the injunction does not cause harm to the public interest." *Golden Krust Patties, Inc.*, 957 F. Supp. 2d at 194 (quoting *SEC v. Citigroup Global Markets, Inc.*, 673 F.3d 158, 163 n.1 (2d Cir. 2012)). There is no reason to believe that the restrictions imposed upon Pennisi under the Agreements with Intertek, which are designed to protect the company's client relationships and goodwill with customers, would cause injury to the public.

The covenants do not, and will not, stifle market competition, cause any signification dislocation in the market, or seriously impinge on the availability of construction and materials testing services in the New York and New Jersey markets. As is noted above, only a limited number of customers are affected by the covenants, leaving the public, even within the States of New York and New Jersey, free to retain the services of any one of the many construction and materials testing businesses throughout those markets.

The public interest is best served in this instance by the enforcement of the parties' lawful agreement. *See Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 897 (2d Cir. 2015). Thus, like the remaining factors, this factor favors injunctive relief in favor of Intertek.

## CONCLUSION

Intertek has demonstrated a likelihood for success on the merits of its claims against Defendants and that without an award of injunctive relief under Rule 65, it would suffer irreparable harm. Intertek has no adequate remedy at law and is therefore entitled to a preliminary injunction prohibiting Pennisi from soliciting its customers and competing with Intertek during the pendency of this action.

For these reasons and the reasons set forth herein, Intertek respectfully requests that this

Court grant Intertek's Order to Show Cause for Preliminary Injunction and Temporary Restraining

Order Petitioner and issue further relief as is just and proper.


Dated: New York, New York
December 18, 2019

**LEWIS BRISBOIS BISGAARD & SMITH LLP**
By:   /s/ Elior D. Shiloh
       Elior D. Shiloh
       Andrew T. Williamson
       *Attorneys for Petitioner*
       77 Water Street
       New York, NY 10005
       212-232-1300
       Elior.Shiloh@lewisbrisbois.com
       Andrew.Williamson@lewisbrisbois.com
