**FILED**
**CLERK**

3/9/2020 3:12 pm

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
INTERTEK TESTING SERVICES, N.A., INC.,

                    Plaintiff,

      -against-

FRANK PENNISI, NICHOLAS PENNISI,
WENDY ASKLUND and BIG APPLE
TESTING, INC.,

                  Defendants.
---------------------------------------------------------------X

**OPINION AND ORDER**
19-cv-7103 (SJF)(ARL)

FEUERSTEIN, United States District Judge

      On December 19, 2019, plaintiff Intertek Testing Services, N.A., Inc. ("plaintiff" or "Intertek") commenced this action against defendants Frank Pennisi ("Pennisi"), Nicholas Pennisi ("Nicholas"), Wendy Asklund ("Asklund") and Big Apple Testing, Inc. ("BAT") (collectively, "defendants"), seeking, *inter alia*, (i) injunctive relief (A) to enforce restrictive covenants in Pennisi's agreements with plaintiff, and to enjoin Pennisi from further violating those provisions, (B) to enforce agreements with Asklund and Nicholas concerning plaintiff's trade secrets and confidential information, and to enjoin them from further misappropriation or dissemination of the company's trade secrets and confidential information, and (C) to enjoin Nicholas, Asklund and BAT (collectively, the "BAT defendants") from tortiously interfering with all of the aforementioned agreements; and (ii) damages, including attorneys' fees, (A) for Pennisi's alleged breach of contract, (B) for the alleged misappropriation of trade secrets and confidential information by Pennisi, Nicholas and Asklund (collectively, the "individual defendants") in violation of the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1836, and New York State law, and (C) for the BAT defendants' tortious interference with contractual

relations under the New York common law. On that same date, upon plaintiff's application pursuant to Rule 65 of the Federal Rules of Civil Procedure, and after hearing argument from both sides, the Court entered a temporary restraining order ("TRO"), enjoining and restraining, upon the giving of security as provided therein, pending determination of plaintiff's motion for a preliminary injunction: (i) Pennisi "from performing services, in any capacity for [BAT];"[1] and (ii) the individual defendants "from disclosing any of Intertek's Confidential Information or Trade Secrets, . . . [and] from communicating, contacting, and/or soliciting any customers of Intertek" in violation of the agreements entered into between them and Intertek. (Order for Preliminary Injunction and Temporary Restraining Order ["TRO Order"] at 2-3).

Pending before the Court is plaintiff's motion for a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure enjoining and restraining, pending the final hearing and determination of this action, (i) the individual defendants "from working with or for [BAT], or any other competitor of Intertek until after October 26, 2020;" (ii) BAT from employing Pennisi until after October 26, 2020; and (iii) all defendants (A) from "directly or indirectly using, disclosing or disseminating to any other person, organization or entity or otherwise using any of Intertek's confidential information or trade secrets, as set forth between [*sic*] the Agreements between the parties[,]" (B) from "directly or indirectly soliciting, contacting, doing business with, calling upon or communicating with any customer, former customer or prospective customer of Intertek with whom . . . [they] had contact or about whom they obtained confidential information . . . during their employment with Intertek, for the

---

[1] Although the TRO indicates that Nicholas and Asklund were also temporarily restrained and enjoined "from performing services, in any capacity for [BAT,]" (TRO Order at 2), during the initial pretrial conference before the undersigned on January 9, 2020, after counsel for defendants represented that only Pennisi is subject to non-competition and non-solicitation provisions, the Court indicated that the TRO would not be enforced against defendants who are not subject to a non-compete clause, effectively vacating so much of the TRO as enjoined and restrained Nicholas and Asklund "from performing services, in any capacity for [BAT]." (*Id.*).

purpose of providing or selling services of other business engaged in the services provided by Intertek or that Intertek was engaged in at the time of . . . [the individual defendants'] resignation/separation from Intertek until after October 26, 2020[,]" and (C) "from using, for any purpose, any confidential information or trade secrets of Intertek." (TRO Order at 2). For the reasons set forth below, plaintiff's application is granted in part and denied in part.

## I.     BACKGROUND

### A.  Factual Background

In or about 1983, Pennisi became a partner in Materials Testing Laboratory ("MTL"), a company founded by Kevin Cosgrove ("Cosgrove") which was "engaged in the business of commercial inspection and testing of the materials and construction of public works, infrastructure, and residential and commercial buildings." (Declaration of Frank Pennisi ["Pennisi Decl."], ¶ 2). From 1983 through 2012, Pennisi served as MTL's Vice President of Mid-Atlantic Operations, pursuant to which he "opened and oversaw divisions in New Jersey, Delaware, Connecticut and Pennsylvania." (*Id.*, ¶ 3). According to Pennisi, (i) MTL was reorganized in 2012 to become MT Group, LLC ("MT Group"); (ii) Jeffrey Roden ("Roden"), "an operations manager and long-time employee, received shares in the company;" and (iii) Pennisi became the Director of Fenestration for MT Group's offices in Farmingdale, New York and Cliffwood, New Jersey. (*Id.*, ¶¶ 3-4).

In November 2013, Asklund joined MT Group as a Business Development Associate, pursuant to which her responsibilities included "business development and bidding on new projects." (Declaration of Wendy Asklund ["Asklund Decl."], ¶ 2).

In 2013, Intertek, which describes itself as "a leading provider of quality solutions around the world," (Complaint ["Compl."], ¶ 10; *see also* Declaration of Vinu Abraham ["Abraham Decl."], ¶ 6), began exploring opportunities to expand its "portfolio of services to include Building & Construction [B&C] commissioning and testing services" in the New York metropolitan area. (Abraham Decl., ¶ 6; *see also* Compl., ¶ 10). Eventually, Intertek's exploration focused on the acquisition of MT Group, which plaintiff indicates "is one of the largest full service [*sic*] testing and inspection companies servicing the construction industry in the Mid-Atlantic and Northeast regions, including the States of New York and New Jersey."[2] (Compl., ¶¶ 9-10; *see also* Abraham Decl., ¶ 6). According to plaintiff, since MT Group "had served the New York City metro area's construction industry for more than 35 years[,] . . . [plaintiff] was particularly interested in acquiring the goodwill and client relationships with MT Group." (Compl., ¶ 11; *see also* Abraham Decl., ¶ 8; Declaration of Jeffrey Roden ["Roden Decl."] , ¶¶ 6, 8). At that time, MT Group was owned by Pennisi, Cosgrove and Roden (collectively, the "MT Group Members"). (Compl., ¶ 12; *see also* Abraham Decl., ¶ 11; Roden Decl., ¶ 4).

According to plaintiff, in or around August 2015, as the terms of Intertek's acquisition of MT Group were allegedly "being completed," Roden commenced a "business relationship" with BAT, described as a New York-based "company which performs special construction inspecting and materials testing on behalf of New York's engineering and development firms." (Compl., ¶ 39; *see also* Roden Decl., ¶ 21; Abraham Decl., ¶ 37). Plaintiff further alleges: (i) that "[a]t their first meeting, Roden met with [BAT's] Chief Executive Officer, Jay Rubin ('Rubin')," (Compl., ¶ 40; *see also* Roden Decl., ¶ 21); and (ii) that Roden "met with Rubin and/or [BAT's] Executive

---

[2] Vinu Abraham ("Abraham"), Intertek's vice president, describes Intertek in virtually the same way following its acquisition of MT Group. (*See* Abraham Decl., ¶ 2).

Director, Joel Lowy ('Lowy'), either in-person or over the telephone on approximately 100 or more occasions," throughout the course of his "business relationship" with BAT. (Compl., ¶ 42; *see also* Roden Decl., ¶ 24).

Beginning in or around September 2015, MT Group began performing soil testing for BAT because BAT "lacked the required licensure to perform its own laboratory work" at that time. (Compl., ¶ 41; *see also* Roden Decl., ¶ 22).

After "lengthy negotiations" over a two (2)-year period, Intertek entered into a Sale and Purchase Agreement (the "Purchase Agreement"), dated October 8, 2015, "to acquire MT Group for considerable financial consideration[,]" (Compl., ¶¶ 13, 15; *see also* Abraham Decl., ¶ 9 and Ex. A at p. 12, Art. 2), which, according to plaintiff, it was willing to pay in order to acquire MT Group's goodwill and relationships in the testing and inspection industries in the New York metropolitan area. (Compl., ¶¶ 14, 19; *see also* Abraham Decl., ¶¶ 10, 12, 15, 30). All of the MT Group Members, including Pennisi, signed the Purchase Agreement. (Compl., ¶¶ 15, 21; *see* Abraham Decl., Ex. A; Roden Decl., ¶ 10). According to plaintiff, it "paid multiple millions of dollars in order to acquire MT Group (the 'acquisition price')," in exchange for which the MT Group Members "became employees of the newly-acquired MT Group." (Compl., ¶ 16; *see also* Abraham Decl., ¶ 17; Roden Decl., ¶ 14). According to Abraham, "the MT Group entity survived the acquisition," but the MT Group Members "released all ownership interest in the entity." (Abraham Decl., ¶ 11).

Pursuant to the Purchase Agreement, the MT Group Members, including Pennisi, agreed to a covenant against competition, (Compl. ¶¶ 17, 21; *see also* Abraham Decl., ¶ 16), which provides, in pertinent part, as follows:

> "(a) In order to induce [Intertek] to enter into this Agreement…each [MT Group Member] agrees that he will not, without the prior written consent of [Intertek], for

its or his own account or jointly with another, directly or indirectly, for or on behalf of any Person, as principal, agent, shareholder, participant, partner, promoter, director, officer, manager, employee, consultant, sales representative, or otherwise, except for the benefit of [Intertek] . . . (i) for a period of five years from the Closing Date (the 'Restricted Period'), engage in the Restricted Business within the States of New York and New Jersey (the 'Restricted Area'); [or] (ii) within the Restricted Area during the Restricted Period, solicit, or assist in the solicitation of, Restricted Business from any Person to whom any Company Group Member[3] has provided services during the three year period prior to the Closing Date. . . ."

(Abraham Decl., Ex. A at 45, § 7.1). The Purchase Agreement defines the term "Restricted Business" to mean "the commercial inspection and testing of the materials and construction of public works, infrastructure, residential and commercial buildings[,]" (*id.*, at 10), which, according to Abraham and Roden, encompassed "all of the work" performed or carried out by MT Group before it was acquired by Intertek. (Abraham Decl., ¶ 14; Roden Decl., ¶ 13). Since the acquisition was officially closed on October 26, 2015, (Compl., ¶ 20; *see also Id.*, ¶ 87), the non-competition provision extends to October 26, 2020.

On October 8, 2015, prior to the Closing Date, Pennisi entered into an Employment Agreement with Intertek, (Compl., ¶¶ 22, 32; *see also* Abraham Decl., ¶¶ 17, 26), pursuant to which he "would serve as Director of Fenestration for the company's New York Operations." (Compl., ¶ 25; *see also* Abraham Decl., Ex. C, ¶¶ 1, 18; Pennisi Decl., ¶ 5). According to Abraham, "Pennisi's role after the acquisition was vital to the acquisition because this would be Intertek's first entry into the fenestration market in the New York City metro area[,]" (Abraham Decl., ¶ 18), and Intertek "paid hundreds of thousands of dollars to secure the employment of Pennisi due to his extensive client network in the New York City metro area which was the

---

[3] The Purchase Agreement refers to MT Group, MTL, and two (2) subsidiaries of MT Group, *i.e.*, MT Operating of New York, LLC and MT Operating of New Jersey, LLC, as "Company Group Members," and each of those entities as a "Company Group Member." (Abraham Decl., Ex. A at 1).

product of his relationship with MT Group prior to the acquisition and which was built over the course of decades of experience in the construction and materials testing business." (*Id.*, ¶ 30).

Paragraph 9 of Pennisi's Employment Agreement with Intertek provides, in pertinent part, that:

> "[F]or a period of one year following the termination of your employment, for any reason, you will not, without the prior written consent of the Human Resources Executive responsible for the United States, directly or indirectly, engage in (as owner, partner, shareholder, employee, director, agent, consultant or otherwise), any business which is a competitor of Intertek, as hereinafter defined. For purposes of this agreement, a 'competitor of Intertek' is any entity, including without limitation a corporation, sole proprietorship, partnership, joint venture, syndicate, trust or any other form of organization or a parent, subsidiary or division of any of the foregoing, which, is engaged in any business activity of the type for which you were responsible during your last 12 months of employment with Intertek and in the same geographic area for which you were responsible during your last 12 months of employment with Intertek.
>
> > a.   For a period of one year following the termination of your employment, for any reason, you will not, directly or indirectly, either by yourself or through any person, firm or corporation for which you perform any services or in which you have any interest, solicit or attempt to solicit [Intertek's] customers, suppliers and agents with which you had contact during the last twenty-four (24) months of your employment with Intertek, for the purpose of selling, providing, or obtaining some or all of the same products and/or services as those sold or provided by or to [Intertek]. For purposes of this paragraph, the terms 'solicit' and 'attempt to solicit' include responding to contact initiated by a customer, dealing with a customer for business purposes, and working with a customer for business purposes on behalf of a competitor.
> >
> > \*\*\*
> >
> > d.   . . . ]Y]ou consent and agree that if you violate any of the provisions of this paragraph 9, Intertek and its subsidiaries and affiliated companies would sustain irreparable harm and, therefore, in addition to any other remedies which Intertek may have under this agreement or otherwise, Intertek shall be entitled to an injunction from any court of competent jurisdiction restraining you from committing or continuing any such violation of this paragraph 9. . . ."

(Abraham Decl., Ex. C, ¶ 9).

In addition, paragraph 7 of Pennisi's Employment Agreement provides, *inter alia*, that:

"You have access to certain Confidential Information and trade secrets of Intertek and its affiliates ('Confidential Information') and will receive access to additional Confidential Information in the course of your continued employment with Intertek. Such Confidential Information includes, but is not limited to: information concerning the confidential business or affairs or any trade secrets of Intertek, its parent entities and subsidiaries and all of their affiliates, predecessors and successors and its customers; customer account and credit data; customer comments; referral sources; information relating to confidential or secret designs, processes, formulae, plans, inventions, devices, services or materials; product, services or market development; management, accounting and reporting systems, compilations of information; manuals; technologies, records, specifications, procedures and programs; plans, research and related information and data; forms, agreements and legal documents; regulatory and supervisory reports; correspondence; statements; corporate books and records; bids, sales, financial, accounting, statistical, or personnel information; strategic and tactical business plans, methodologies, analysis and processes owned by Intertek, regularly used in the operation of Intertek's business or concerning or belonging to third parties or Intertek customers, and includes all such confidential data of Intertek, third parties or Intertek's customers, which has been labeled 'confidential' or 'proprietary', in both 'hard copy' and electronic form.

a. You shall not disclose any Confidential Information, directly or indirectly, or use it in any way, either during or at any time after your employment, except as required in the course of your employment. All files, records, documents, drawings, specifications, equipment, and similar items relating to the business of Intertek or third parties and/or customers of Intertek, whether or not prepared by you, shall remain the exclusive property of Intertek or the respective third party and/or customer and shall not be used by you for any purpose unrelated to your work for Intertek nor retained by you after separation from employment with Intertek.

b. You agree that all Confidential Information communicated or made available to you by Intertek or its affiliates, or by any third party or customer of Intertek, including any information gained by you or your representatives by reason of association with Intertek or any third party or client of Intertek is confidential. You further agree that all information, conclusions, recommendations, reports, advice, or other documents generated or handled by you pursuant to your employment are confidential. By signing this agreement, you agree that you will not, at any time, during or after employment, in any fashion, form or manner, either directly or indirectly, divulge, disclose or communicate to any person, company, association or entity in any manner whatsoever any Confidential Information. You further agree to keep in confidence business, plans, projects or potential projects,

finances and any other information deemed confidential, material or important by Intertek or its affiliates. . . .

c. You and Intertek stipulate that these matters are important, material and confidential and gravely affect the effective and successful conduct of the business of Intertek and the good will of Intertek. Any breach of the terms of this section concerning Confidential Information constitutes a material breach of this agreement and Intertek reserves the right to pursue all legal and equitable remedies for violation of this provision. Intertek may seek a temporary restraining order and injunctive relief in a court of competent jurisdiction. . . ."

(Abraham Decl., Ex. C, ¶ 7) (emphasis omitted).

In addition, pursuant to paragraph 8 of the Employment Agreement, Pennisi agreed that,

"Upon termination of employment, you are to return all Confidential Information, data, drawings, documents, contracts, computerized data, information printouts and tapes, tape recordings, data, accounting records, personnel files, computer information, computer equipment, mobile telephones, automobiles and any other property furnished to you while in the employ of Intertek. You shall not retain any Confidential Information or Intertek property, or make copies or transfer computer data or other Intertek data. Upon termination of employment or whenever requested by Intertek, you shall immediately deliver all such Intertek property as described above. . . . No copies of any such information shall be retained by you."

(Abraham Decl., Ex. C, ¶ 8).

Roden "also became an employee of Intertek's when the acquisition was finalized[,] [and] . . . signed an employment agreement largely mirroring the agreement signed by Pennisi[,] . . . [so] was subject to the same restrictive covenants against competition." (Compl., ¶ 38; *see also* Roden Decl., ¶ 15). Roden is currently plaintiff's Director of Operations for the New York area. (Roden Decl., ¶ 3).

Likewise, Asklund "joined MT Group as part of Intertek's acquisition of the company," (Compl., ¶ 52; *see also* Abraham Decl., ¶ 32), and was employed as a Business Development Manager within its B&C Division for the New York metropolitan area, pursuant to which she was responsible, *inter alia*, "for directing and managing the company's overall business

development process for the New York and New Jersey markets[,] . . . [including] pitching business to prospective clients." (Compl., ¶¶ 50-52; *see also* Abraham Decl., ¶¶ 33; Asklund Decl., ¶ 3).

On June 27, 2017, Nicholas, who is Pennisi's son, was hired by Intertek as a Business Development Manager in the B&C Division, with the same duties and responsibilities as Asklund. (Compl., ¶¶ 51-52; *see also* Abraham Decl., ¶ 34; Declaration of Nicholas Pennisi ["Nicholas Decl."], ¶ 2). According to Abraham, Asklund and Nicholas reported to Kevin Nakamoto ("Nakamoto"), Intertek's Vice President of Sales in the B&C Division. (Abraham Decl., ¶ 34).

In addition, sometime after Intertek acquired MT Group, Pennisi's wife, Maritza Pennisi ("Maritza"), commenced employment with Intertek as an "Administrative Assistant," pursuant to which "her job responsibilities largely consisted of collection-related duties," including, *inter alia*, "corresponding with clients concerning billing-related issues, reporting on accounts receivable statuses, and investigating historical data for each customers' billing histories." (Compl., ¶ 23; Roden Decl., ¶ 32). According to Roden, as a result of her position and duties, Maritza "had access to client contact information, Intertek's pricing information for each particular client, Intertek's business history with each client, and the customers' credit histories with Intertek." (Roden Decl., ¶ 32; *see also* Compl., ¶ 24).

Around the time that Intertek's acquisition of MT Group was finalized, Rubin and Lowy, on behalf of BAT, began soliciting Roden to leave Intertek to work for BAT. (Compl., ¶ 43; Roden Decl., ¶ 25). Between October 2015 and on or about June 2019, Rubin and Lowy solicited Roden to join BAT on more than fifteen (15) occasions, (Compl., ¶ 44; Roden, ¶ 26), but Roden repeatedly informed them "that [he] could not join [BAT] based on restrictive covenants he

agreed to in the . . . Purchase Agreement[;] . . . that Cosgrove, Pennisi and he all agreed to be bound by restrictive covenants against competition[;] . . . [and] that the covenants would expire in October 2020." (Compl., ¶ 46; *see also* Roden Decl., ¶ 28). Nonetheless, Rubin and Lowy continued to repeatedly solicit Roden to leave Intertek and join BAT, and "even offered to double Roden's salary if he would breach his covenants against competition." (Compl., ¶ 47; *see also* Roden Decl., ¶ 29).

Pennisi asserts that approximately two (2) months after Intertek's acquisition of MT Group, *i.e.*, on or about December 2015, the laboratory manager for Intertek's B&C Division passed away, so he "assumed [those] responsibilities in addition to his previous responsibilities until [his] resignation from Intertek in October 2019." (Pennisi Decl., ¶ 5). According to Pennisi, BAT "did not provide the same services as the departments [he] worked for at Intertek."[4] (*Id.*, ¶ 5).

However, according to plaintiff, "[w]hile employed by MT Group, Pennisi's duties and responsibilities included, but were not limited to, managing the profits and losses of the company's construction and materials testing business in the New York and New Jersey markets[,]" by, *inter alia*, investigating and promoting new business opportunities, (Compl., ¶ 34; *see also* Abraham Decl., ¶ 29), for which "[h]e was paid an annual salary ranging from $125,000 up to $183,000[,] . . . [and] also received annual bonuses ranging from $11,934 up to $19,125 . . . along with other benefits, such as a $500 monthly car allowance." (Compl., ¶¶ 35-36; *see also* Abraham Decl., ¶¶ 19, 27-28 and Ex. C, ¶ 6). Plaintiff further alleges that "Pennisi

---

[4] However, Pennisi also asserts: (i) that Roden "took over as Director of Operations for the B&C Division" at some time in 2017 and "remained in the position until July 1, 2018 when [Pennisi] was promoted to Director of Products and Projects NY/NJ Building and Construction, a title [he] retained until [his] resignation from Intertek[,]" (Pennisi Decl., ¶ 6; *see also id.*, ¶ 8); (ii) that on July 1, 2018, Pennisi's responsibilities for Intertek "were limited to Fenestration and did not include the B&C Division[,]" (*id.*, ¶ 7); and that (iii) as Director of Products and Projects NY/NJ Building and Construction, his "responsibilities included the administration of operations" for Intertek's Farmingdale office. (*Id.*, ¶ 9).

also received access to Intertek's goodwill and client relationships which had been developed at the expense of considerable time and capital resources on the part of the company[,] . . . includ[ing] the acquisition price, some of which was paid directly to Pennisi." (Compl., ¶ 37; *see also* Abraham Decl., ¶ 68).

Plaintiff asserts that after Pennisi's promotion, (i) Pennisi took over Roden's duty of being primarily responsible for Intertek's dealings with BAT and "ordered Roden to cease communicating with [BAT] without his prior authorization;" (ii) BAT's solicitations to Roden became less frequent, (Compl., ¶ 48; *see also* Roden Decl., ¶¶ 30-31); and (iii) both Asklund and Nicholas worked regularly with BAT under Pennisi's direction. (Roden Decl., ¶ 35).

According to Pennisi, after his promotion, he repeatedly informed Abraham, who was his direct supervisor/manager, and Gavin Campbell ("Campbell"), Intertek's Vice President for the Americas, (Pennisi Decl., ¶ 7), about various and recurring issues in the B&C Division, including, *inter alia*, (i) Roden's alleged self-dealing, phony billing practices and unauthorized use of Intertek personnel, equipment and resources, (*id.*, ¶¶ 11-20); and (ii) Intertek's purported failure to comply with certain contractual obligations. (*Id.*, ¶ 24). Pennisi asserts that Abraham "ignored [his] concerns and refused to address any of the issues that [he] had brought to his attention regarding Mr. Roden and his staff[,]" (*id.*, ¶ 21); and, "[a]t one point, the B&C Division began to lose various repeat customers. . . ." (*Id.*). In addition, Pennisi asserts: (i) that he was "particularly concerned" about the issues involving Intertek's alleged failure to comply with contractual obligations because "another testing company . . . and its employees were recently indicted on criminal charges relating to the same issue[,]" (*id.*, ¶ 25); (ii) that "it became increasingly apparent that Intertek . . . had no intention of investigating the issues [he] had

brought to their attention[,]" (*id.*, ¶ 26); and (iii) that, therefore, he "was left with no choice but to resign. . . ." (*Id.*, ¶ 27).

On October 4, 2019, Maritza resigned from her employment with Intertek. (Compl., ¶ 49; Roden Decl., ¶ 33). Ten (10) days later, *i.e.*, on October 14, 2019, the individual defendants also tendered their resignations from Intertek. (Abraham Decl., ¶ 35; *see also* Compl., ¶ 50; Roden Decl., ¶ 34; Pennisi Decl., ¶ 28, Asklund Decl., ¶¶ 5, 24 and Ex. D; Nicholas Decl., ¶ 4).

According to Nicholas, he tendered his resignation from Intertek after learning that his father had tendered his resignation earlier the same day and, "[a]lthough the timing of [his] resignation was influenced by the fact that [his] father had just resigned, [he] had already been unhappy in [his] position at Intertek for some time." (Nicholas Decl., ¶ 4; *see also Id.*, ¶ 16). Nicholas further asserts that after resigning from Intertek, he accepted a position at BAT. (*Id.*, ¶ 5).

Asklund also went to work at BAT following her resignation from Intertek, (Asklund Decl., ¶ 5), but she asserts that "[t]he reasons for [her] resignation from Intertek were unrelated to any solicitation by [BAT]." (*Id.*, ¶ 7). Rather, according to Asklund, "[f]or approximately two years prior to tendering [her] resignation, [she] spoke openly about [her] desire to leave Intertek and expressed [her] frustration with various aspects of [her] job to several Intertek managers," including Roden, Abraham, Carmen Constantin ("Constantin") and Marisa A. Harte ("Harte"), Intertek's Director of the B&C unit. (*Id.*). Asklund identifies one (1) of the reasons for her resignation as being "the unavailability and unresponsiveness" of Nakamoto, who she describes as her direct supervisor, as well as "his outright hostility toward [her]." (*Id.*, ¶¶ 8-12). According to Asklund, although she complained to Abraham several times about Nakamoto's alleged unresponsiveness, refusal to give her a copy of her annual review, and unfair sales goals,

Abraham never addressed all of her concerns or took care of the situation, as he indicated he would. (*Id.*, ¶¶ 13-14).

Nicholas also complains about Nakamoto, indicating, *inter alia*, that Nakamoto "did not provide [him] with any direction, tools, resources or support and was extremely unresponsive." (Nicholas Decl., ¶ 11). In addition, Nicholas asserts, *inter alia*, that Nakamoto, Roden, Abraham and another individual in management, Tom Valanzano ("Valanzano"), "created an extremely hostile work environment[,] . . . [which] made it intolerable to continue to work at Intertek." (*Id.*, ¶¶ 12-16).

Other reasons identified by Asklund for her resignation include: (i) the "inordinate and unorthodox pressure" that Abraham purportedly placed on her and other business development employees "to find additional revenue when it did not exist[,]" which included "daily and weekly emails and text messages . . . pressuring [them] to find additional ways to bill new and existing customers[,]" (Asklund Decl., ¶ 16); (ii) "the constantly changing sales commission plan that deprived [her] of [her] fair share of commissions for contracts that [she] secured for Intertek[,]" (*id.*, ¶ 17; *see also id.*, ¶¶ 18-20); and (iii) her purported "inability to compete for many projects because any bids [she] made would be undercut by Trio Testing Corp ('Trio'), a Woman Owned Business founded and owned by Mr. Roden's wife." (*Id.*, ¶ 21; *see also Id.*, ¶ 22-23). Nicholas similarly notes such issues at Intertek, (*see* Nicholas Decl., ¶¶ 7-10), although he does not specifically identify them as reasons for his resignation from Intertek, except to state that "the virtually unattainable commission structure made it impossible" to continue to work at Intertek, (*id.*, ¶ 16); nor does he indicate that he ever complained to anyone at Intertek about those issues.

However, Sheryll Evans ("Evans"), Intertek's Regional Human Resources Manager who is responsible, *inter alia*, for "overseeing all human resource functions and managing employee

relations of Intertek-MT Group," (Declaration of Sheryll Evans ["Evans Decl."], ¶ 2), asserts, *inter alia*, (i) that Asklund "never made any complaint to [her] about . . . being subjected to a 'hostile work environment' or her supervisors referring to her in derogatory terms[,]" (*id.*, ¶ 2); and (ii) that "none of the individually named Defendants . . . ever made any complaints to [her] about their being subject to 'intolerable' work conditions." (*Id.*). According to Evans, she first heard that Asklund was complaining about a "hostile work environment" after Asklund resigned and demanded that she be paid "severance." (*Id.*, ¶ 3). Furthermore, in the email in which Pennisi tendered his resignation, he "made no claim about his work conditions being intolerable or that he felt he had no choice but to resign." (*Id.*, ¶ 8 and Ex. A).

In addition, Nakamoto denies that he was "outright hostile" towards Asklund, (Nakamoto Decl., ¶¶ 16-17), and asserts that "[a]ny complaints made by Asklund at work were always related to money[,]" as she "was never satisfied with her compensation or the commission goals set by Intertek." (*Id.*, ¶ 19). According to Nakamoto, Intertek's commission plans for all of its sales employees "change every three months because the sales targets change each month[,]" (*id.*, ¶ 20), and "Asklund's issues and inability to generate new sales were a direct result of her lack of effort the last two months of her employment with Intertek." (*Id.*, ¶ 22; *see also Id.*, ¶¶ 23-24 and Ex. A).

Nakamoto also denies that he, Roden and Valanzano created a hostile work environment at Intertek, (Nakamoto Decl., ¶ 26); and asserts, *inter alia*, that Nicholas never made any complaints to anyone about them. (*Id.*, ¶ 27).

According to Roden, none of the above-mentioned employees who resigned in October 2019 returned their company-issued computer devices at the time of their resignations,

notwithstanding that Intertek made repeated efforts, including "telephone calls on nearly a daily basis," to have them do so. (Roden Decl., ¶ 35; *see also* Compl., ¶ 53).

However, according to Pennisi, "as required under [his] employment agreement, [he] intended to continue performing [his] job for another 4 weeks" after he tendered his resignation, (Pennisi Decl., ¶ 28), and he agreed to Abraham's request "to assist him in transitioning someone else into [his] role at Intertek[,]" (*id.*), but Intertek terminated his employment effective October 24, 2019 and "refused to pay [him] any additional salary." (*Id.*, ¶ 29). Pennisi nonetheless asserts that he "continued to discharge [his] responsibilities at Intertek up until [his] termination and, on [his] last day of employment, [he] returned [his] company-issued laptop to Intertek." (*Id.*).

According to Asklund, after she tendered her resignation, Harte told her that she needed to return her laptop in order to continue getting paid through the last day of her employment, but Asklund "immediately contacted the Human Resources department and was told to continue working through October 25, 2019 and to disregard Ms. Harte's demand that [she] return [her] laptop before then." (Asklund Decl., ¶ 28; *see also* ¶¶ 29-31). Asklund asserts that "[a]t the direction of Human Resources and Ms. Harte, all of the files on [her] laptop were copied to another location on Intertek's network, named the 'R-drive[,]'" and she returned her laptop to Pennisi, whom she describes as her supervisor, "on October 25, 2019 – the last day of [her] employment."[5] (*Id.*, ¶ 32).

However, according to Evans, Asklund "refus[ed] to report to work in person" for the entire two (2)-week notice period following her resignation. (Evans Decl., ¶ 4). Similarly, Harte

---

[5] However, according to both plaintiff and Pennisi himself, Pennisi's last day of employment was October 24, 2019, (Abraham Decl., ¶ 35; Pennisi Decl., ¶ 29), one (1) day before Asklund allegedly returned her laptop to him as her supervisor. Nicholas similarly asserts that he returned his laptop to Pennisi on the last day of his employment, *i.e.*, October 25, 2019, and asked Pennisi to return it to Intertek for him, (Nicholas Decl., ¶ 22), notwithstanding that Pennisi's termination was effective the day before Nicholas returned the laptop to him.

asserts that "[s]hortly after she resigned, Asklund decided not to come into the office and instead worked from home during her notice period[,] . . . claim[ing] she was unable to come into work because she was not feeling well." (Declaration of Marisa Harte ["Harte Decl."], ¶¶ 6-7). According to Harte, when she asked Asklund if the company could retrieve her laptop "to ensure that all files were preserved," Asklund responded that "she would begin uploading the documents," (*id.*, ¶ 7), and repeatedly indicated that she would "drop off her computer tomorrow," but never did so. (*Id.*, ¶ 8). Harte further asserts: (i) that Asklund also indicated that "her laptop 'wouldn't upload' all of the files, yet she still refused [Intertek's] requests to pick up the computer[,]" (*id.*, ¶ 9); and (ii) that "[w]hen Asklund was finally 'able' to upload her files, it took several days for her to return the laptop." (*Id.*, ¶ 10). Harte denies ever telling Asklund that she would not be paid if she failed to turn in her laptop. (*Id.*, ¶ 9).

According to Evans, it was "extremely improper" for Asklund and Nicholas to give their computers to Pennisi to return, since he had resigned and was no longer an Intertek employee when they did so, (Evans Decl., ¶¶ 6-7); and they could not know "what was and was not present on their laptops when they were returned to the company because the laptops were not in their possession for several days before they were returned to Intertek." (*Id.*, ¶ 7). Similarly, Harte asserts that "the fact that Asklund returned her laptop device to Pennisi, who she knew was no longer employed by Intertek, is extremely suspicious." (Harte Decl., ¶ 12).

Although Pennisi eventually returned his computer device on October 23, 2019[6], and subsequently returned the computer devices of Maritza, Asklund and Nicholas five (5) days later, *i.e.*, on October 28, 2019, plaintiff asserts that all emails, histories and information from the computers had been deleted prior to their return. (Compl., ¶¶ 54-55, 78; *see also* Abraham Decl.,

---

[6] Thus, Pennisi allegedly returned his computer prior to his last day of employment, albeit allegedly with the emails, history and information purportedly erased therefrom.

¶ 59; Roden Decl., ¶¶ 37-38). Thus, according to plaintiff, "it is virtually certain that Defendants possess Intertek's confidential, proprietary information, including, but not limited to, customer lists, information related to the company's processes, methods, formulas and techniques, as well as confidential price quotes that have been issued to customers." (Compl., ¶ 79; *see also Id.*, ¶ 97; Abraham Decl., ¶ 60).

However, the individual defendants deny deleting, downloading, copying or otherwise removing any information from their laptops before they were returned to Intertek. (Pennisi Decl., ¶ 30; Asklund Decl., ¶ 34; Nicholas Decl., ¶ 21). Specifically, they deny "stealing" Intertek's customer lists and price information, each claiming, *inter alia*, that they "would have nothing to gain from doing so[;]" that they are "not even aware of a specific 'customer list' maintained by Intertek[;]" and that "there is nothing proprietary or unique about the identity of Intertek's customers or pricing[,] . . . there is no value in knowing a competitor's historical pricing on the projects it has bid to its customers in the past[,] . . . [and] there are no formal or written price lists or policies to steal." (Pennisi Decl., ¶¶ 31-32; Asklund Decl., ¶¶ 37-39; Nicholas Decl., ¶¶ 23-25). Moreover, according to the individual defendants, Intertek (i) had certain capabilities and manpower that [BAT] lacked and . . . constantly quoted jobs to [BAT], who was one of [Intertek's] largest customers[;]" and (ii) "constantly exchanged customer and price information with [BAT] in the course of their business." (Pennisi Decl., ¶ 33; Asklund Decl., ¶ 42; Nicholas Decl., ¶ 26). According to Abraham, "[o]n occasion, Intertek would . . . contract with [BAT] in circumstances where both parties would be performing construction and materials testing services for the same project." (Abraham Decl., ¶ 38).

In contrast, Nakamoto asserts, *inter alia*, (i) that "[w]hile the employees do search public databases for projects themselves, their subsequent solicitation and sales efforts are directed to

18

customer contact persons with whom Intertek-MT Group has developed significant relationships [] over the course of decades in the industry[,]" (Nakamoto Decl., ¶ 5); (ii) that "[t]he price quotes and the prices contained within the proposals are submitted confidentially and are not posted on any public database for other companies to see[,]" (*id.*, ¶ 7); (iii) that "[t]he prices quoted on behalf of Intertek are based on highly-confidential and proprietary fee and rate schedules developed internally by Intertek[,]" (*id.*, ¶ 8; *see also id.*, ¶ 29); (iv) that "[t]he fee and rate schedules vary among different customers and are based on not only the project's scope, but also on historical data [Intertek's] employees are privy to based on [its] history of contracting with different companies over the course of decades in the area[,]" (*id.*, ¶ 9); and (v) that "[t]here is no 'industry standard' by which Intertek's pricing is set[,]" because if there was, "then there would be no reason for companies to solicit bids and proposals from companies such as Intertek and [BAT]." (*Id.*, ¶ 10). According to Nakamoto, "[i]f a competitor such as [BAT] were to have access to Intertek's historical fee and rate schedules for all services in the New York City metro area, it could easily undercut Intertek's pricing and win contracts over the company." (*Id.*, ¶ 11). In addition, Nakamoto asserts that "while Intertek has quoted jobs to [BAT], those quotes were based on fee and rate schedules specific to [BAT] and not to any other customer[,]" and "[u]nless it was obtained through improper means, [BAT] would not have access to Intertek's rate and fee schedules for any other customer for any period of time." (*Id.*, ¶ 15).

According to Abraham, shortly after the individual defendants resigned, Intertek learned that they had all accepted positions with, and began working for, BAT, which he describes as a direct competitor of plaintiff. (Abraham Decl., ¶ 36, 44; *see also* Compl., ¶ 61). Specifically, on or about November 22, 2019, Pennisi, in attempting to send an email to Nicholas and Asklund from his email address at BAT, inadvertently copied Nicholas's former email address at

Intertek.[7] (Compl., ¶ 58; *see also* Abraham Decl., ¶ 40). Pennisi's email asked Nicholas and Asklund if there were "[a]ny answers on some of the quotes sent," (Abraham Decl., Ex. D), with respect to seven (7) different companies, "all of which were, and still are, customers of MT Group and are based in either New York or New Jersey." (Compl., ¶ 58; *see* Abraham Decl., ¶ 41 and Ex. D). According to Abraham, plaintiff's relationships with those companies "generates a substantial amount of revenue. For example, thus far in 2019, Intertek's relationship with [one of those companies] generated $140,709.10 in revenue between the States of New York and New Jersey." (Abraham Decl., ¶ 42).

However, according to the individual defendants, "the seven companies listed in the email are well known through the industry and anyone within the industry can easily determine what projects the companies are working on and obtain all the information necessary to bid on those projects and submit quotes." (Pennisi Decl., ¶ 34; Asklund Decl., ¶ 44; Nicholas, ¶ 28). Moreover, the individual defendants (i) assert, *inter alia*, that all of those projects "were brand new projects and bids that [they] had not previously worked on at Intertek[,]"[8] (Pennisi Decl., ¶ 34; Asklund Decl., ¶ 44; Nicholas Decl., ¶ 28); and (ii) deny relying on any "customer list" or "confidential information" from Intertek either in connection with those quotes, or "at any time [or] for any purpose since [their] termination by Intertek." (Pennisi Decl., ¶ 35; Asklund Decl., ¶ 46; Nicholas Decl., ¶ 30). In addition, Nicholas maintains that "[t]his includes [his] email of December 2, 2019, informing a customer that [he] had left Intertek and asking to be placed on his contact list for future projects." (Nicholas Decl., ¶ 30). The individual defendants further

---

[7] The email was sent to Asklund's email address at BAT, but to Nicholas's email address at Intertek. (*See* Abraham Decl., Ex. D).

[8] Harte refutes this contention, claiming, *inter alia*, that "most of the names listed are specific projects and not companies[;] . . . [and] Defendants did work on bidding for those projects while they were at Intertek." (Harte Decl.., ¶¶ 19-21).

deny that they conspired with one another, (Pennisi Decl., ¶¶ 36-38; Asklund Decl., ¶¶ 47-48; Nicholas Decl., ¶¶ 31-32); and Pennisi also denies being "lured away from Intertek based on third-party solicitations." (Pennisi Decl., ¶ 36).

According to plaintiff, after it became aware of the individual defendants' conduct, and the fact that its four (4) former employees had joined BAT, it reviewed prior agreements into which it had entered with BAT and "learned that certain of the standard terms and conditions had been surreptitiously modified by the departed employees in order to remove a non-solicitation of employees provision ordinarily included in all company agreements" with outside testing services companies. (Compl., ¶ 61; Abraham Decl., ¶ 44). For example, a "Non-Solicitation/Hiring of Employees" provision that was included in a 2018 agreement between plaintiff and BAT, (*see* Abraham Decl., Ex. E, ¶ 38), was removed from the most recent agreement between them, which had been prepared by Asklund on October 4, 2019, *i.e.*, only ten (10) days prior to the individual defendants' resignations. (Compl., ¶¶ 61-62; Abraham Decl., ¶¶ 45-46 and Ex. F; Roden Decl., ¶ 42). Plaintiff asserts: (i) that had that provision "not been surreptitiously removed, under the terms of the agreement, [BAT] would have been required to pay 'a sum equal to the employee's current annual salary plus 12 additional months of the employee's current amount for training of a new employee as liquidated damages[;]'" and (ii) that since BAT had solicited four (4) employees, it "would have been required to pay double the combined annual salary of all three [*sic*] employees, which would have equaled approximately $700,000." (*Id.*, ¶¶ 64-65; *see* Abraham Decl., Ex. E, ¶ 38).

Asklund asserts that she does not know why the "Non-Solicitation/Hiring of Employees" provision was not included in Intertek's October 4, 2019 agreement with BAT, and that "[a]ny proposal that [she] would have sent out to [BAT] would have required the approval of [her]

superiors prior to being sent out."[9] (Asklund Decl., ¶ 36). However, according to Harte, "[t]he Microsoft Word version of the agreement was saved by Asklund on October 4, 2019 at 9:03 am just before it was forwarded to [BAT] for review and execution." (Harte Decl., ¶ 22 and Ex. A).

Furthermore, plaintiff asserts that on or about December 3, 2019, it discovered that both shortly before and after he tendered his resignation, Nicholas began forwarding to his personal email address, emails containing confidential pricing information, which he had sent to plaintiff's existing and prospective customers in furtherance of his duties with plaintiff. (Compl., ¶¶ 71-72; Abraham Decl., ¶¶ 52-53). For example, on October 14, 2019, *i.e.*, the day Nicholas tendered his resignation, he "forwarded an email thread between himself and a representative from . . . an Intertek customer based in Fort Lee, New Jersey[,] . . . [which] included structural and support excavation drawings[,] . . . [as well as] a confidential proposal for monitoring services . . . [and] a signed proposal containing confidential pricing terms." (Compl., ¶ 73; *see also* Abraham Decl., ¶ 54 and Ex. H). In addition, on October 17, 2019, Nicholas forwarded another email to his personal email address, which contained "links to various New York City Department of Building guides offering guidance on how to set up a business to compete with Intertek." (Compl., ¶ 80; Abraham Decl., ¶ 61 and Ex. J).

According to Nicholas, he "forwarded the emails to [him]self before [he] resigned and before [he] learned [his] father was resigning, because [he] was experiencing network issues and needed to be able to access the emails for work-related purposes."[10] (Nicholas Decl., ¶ 18). Nicholas further asserts that, in any event, "the emails did not contain any 'trade secrets' or other

---

[9] However, as previously indicated by Asklund, Pennisi was her supervisor and thus her "superior," at that time. (*See* Asklund Decl., ¶ 32).

[10] However, one (1) email was forwarded on the date Nicholas tendered his resignation, and the other was forwarded three (3) days later.

'confidential information[,]' . . . [since] there is nothing secret about the identity of customers in the industry and pricing is invariably based on industry standards and is project specific." (*Id.*, ¶ 19).

Abraham asserts that at the start of their employment with Intertek, Nicholas and Asklund each signed an "Employee Confidentiality and Innovation Agreement" ("Confidentiality Agreement"),[11] (Compl., ¶¶ 74-75, 95; Abraham Decl., ¶¶ 55-56 and Ex. I), indicating, in relevant part, as follows:

> "I will not, either during or following any termination of my employment, disclose to any person or entity (unless with the Company's consent): (i) information with reference to matters belonging to the Company pursuant to paragraph 5 of this agreement[12], (ii) proprietary information and trade secrets of the Company, [and] (iii) any information about the Company or its business not publicly known, including *financial information, customer lists*, and information related to the Company's processes, methods, formulas and techniques . . . ."

(Abraham Decl., Ex. I, ¶ 3) (emphasis added).

Asklund indicates that she has "no recollection of signing any confidentiality agreement." (Asklund Decl., ¶ 35). Nonetheless, Evans asserts that "[a]ll Intertek employees are trained annually as to the company's confidentiality requirements and their code of ethics obligations[;] [] Asklund completed her annual training for 2019 on March 4, 2019[,] . . . [while] Pennisi and Nicholas . . . completed their annual training . . . on March 6, 2019[,]" (*id.*, ¶ 13); and they "all signed varying confidentiality agreements before beginning their employment" with Intertek.

---

[11] According to plaintiff, one of the measures it takes to safeguard the secrecy of its confidential information is to require all employees to sign confidentiality agreements before beginning their employment. (*See* Nakamoto Decl., ¶ 14; Declaration of Aaron Wetherhold ["Wetherhold Decl."], ¶ 2).

[12] Paragraph 5 of the Confidentiality Agreement provides, in relevant part, "Upon termination for any reason, I agree that I shall not remove or copy any Confidential Information, and I will promptly return to the Company all documents, records, including records stored on computer files or discs, notebooks, analyses, summaries, notes or other materials containing Confidential Information, whether prepared by me or not." (Abraham Decl., Ex. I, ¶ 5).

(*Id.*, ¶ 14). Nakamoto similarly asserts that "[a]ll Intertek employees . . . are required to undergo annual compliance and code of ethics training." (Nakamoto Decl., ¶ 14).

Additionally, plaintiff asserts that on December 11, 2019, it "was informed by a customer based in New York, that [defendants] had solicited . . . [the] services" of the customer's company. (Compl., ¶ 66; *see* Abraham Decl., ¶¶ 49-50). The customer forwarded to Harte an email he received from Nicholas, which was sent in Nicholas's capacity as a Business Development Manager for BAT on December 2, 2019, indicating, in relevant part:

> "We spoke in the past when I was at a previous firm. I have since transitioned and was hoping to be added to your contact list for the Monitoring, Special Inspections and Testing scope of work on current and upcoming projects. Please let me know how we can be added and if I can send you a Statement of Qualifications & Services / Quote for your review. Thank you for your time, I look forward to hearing back from you!"

(Compl., ¶ 67; Abraham Decl., ¶ 50 and Ex G). According to plaintiff, defendants solicited at least eight (8) of its customers after leaving their employment with it. (Compl., ¶¶ 68, 89).


B.  Procedural History

On December 19, 2019, plaintiff commenced this action against defendants seeking, *inter alia*, (i) injunctive relief (A) to enforce the restrictive covenants in Pennisi's agreements with it, and to enjoin him from further violating those provisions, (B) to enforce the Confidentiality Agreements and enjoin Asklund and Nicholas from further misappropriation or dissemination of its trade secrets and confidential information, and (C) to enjoin the BAT defendants from tortiously interfering with all of the aforementioned agreements (fifth claim for relief); and (ii) damages, including attorneys' fees, (A) for Pennisi's alleged breach of contract, *i.e.*, of the restrictive covenants in the Purchase Agreement and his Employment Agreement (collectively, "Pennisi's Agreements") (first claim for relief), (B) for the individual defendants' alleged

misappropriation of trade secrets and confidential information in violation of the DTSA and New York State law (second and third claims for relief, respectively), and (C) for the BAT defendants' tortious interference with contractual relations under the New York common law (fourth claim for relief).

On that same date, upon plaintiff's application pursuant to Rule 65 of the Federal Rules of Civil Procedure, and after hearing argument from both sides, the Court entered the TRO Order temporarily enjoining and restraining, upon the giving of security as provided therein, (i) Pennisi "from performing services, in any capacity for [BAT];" and (ii) defendants "from disclosing any of Intertek's Confidential Information or Trade Secrets, . . . [and] from communicating, contacting, and/or soliciting any customers of Intertek" in violation of the agreements entered into between them and Intertek. (TRO Order at 2-3).

Plaintiff now moves for a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure enjoining and restraining, pending the final hearing and determination of this action, (i) the individual defendants "from working with or for [BAT], or any other competitor of Intertek until after October 26, 2020;" (ii) BAT from employing Pennisi until after October 26, 2020; and (iii) all defendants (A) from "directly or indirectly using, disclosing or disseminating to any other person, organization or entity or otherwise using any of Intertek's confidential information or trade secrets, as set forth between the Agreements between the parties[,]" (B) from "directly or indirectly soliciting, contacting, doing business with, calling upon or communicating with any customer, former customer or prospective customer of Intertek with whom . . . [they] had contact or about whom they obtained confidential information . . . during their employment with Intertek, for the purpose of providing or selling services of other business engaged in the services provided by Intertek or that Intertek was engaged in at the time of . . .

[the individual defendants'] resignation/separation from Intertek until after October 26, 2020[,]" and (C) "from using, for any purpose, any confidential information or trade secrets of Intertek." (TRO Order at 2).

## II.    DISCUSSION

Initially, both parties submit briefs that exceed this Court's twenty-five (25)-page limit pursuant to Rule 4(G) of the undersigned's individual rules, without permission to do so. While the Court will exercise its discretion to overlook the parties' failure to comply with the rules in this instance, *see Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001)[13], they are advised that a failure to comply with local court rules, including the undersigned's individual rules, in the future **will result in the imposition of sanctions**, including striking any brief or memorandum of law which fails to comply with Rule 4 of the undersigned's individual rules absent express permission to do so.

### A.    Subject Matter Jurisdiction

Defendants challenge this Court's subject matter jurisdiction under the DTSA, which is the only basis for the Court's jurisdiction asserted in the complaint.

"For the purpose of determining whether a district court has federal question jurisdiction pursuant to Article III and 28 U.S.C. § 1331, the jurisdictional inquiry depends entirely upon the allegations in the complaint and asks whether the claim as stated in the complaint "arises under the Constitution or laws of the United States." *Southern New England Tel. Co. v. Global NAPs Inc.*, 624 F.3d 123, 132 (2d Cir. 2010); *see also Fairfield Cty. Med. Ass'n v. United Healthcare*

---

[13] Unless otherwise noted, case quotations omit all internal quotation marks, citations, footnotes, and alterations.

*of New England, Inc. ("FCMA")*, 557 F. App'x 53, 55 (2d Cir. Feb. 7, 2014) (summary order) ("A cause of action 'arises under' federal law and thus confers subject matter jurisdiction pursuant to 28 U.S.C. § 1331 when the plaintiff's well-pleaded complaint raises an issue of federal law.") "Provided that it does, the district court has subject matter jurisdiction unless the purported federal claim is clearly immaterial and made solely for the purpose of obtaining jurisdiction or is wholly insubstantial and frivolous." *Southern New England*, 624 F.3d at 132; *accord Binder & Binder PC v. Barnhart*, 399 F.3d 128, 131 (2d Cir. 2005). "The inadequacy of a federal claim is ground for dismissal for lack of subject-matter jurisdiction only when the claim is so insubstantial, implausible, foreclosed by prior decisions of the Supreme Court, or otherwise completely devoid of merit as not to involve a federal controversy." *Southern New England*, 624 F.3d at 133; *accord Nat'l Assoc. for Advancement of Colored People v. Merrill*, 939 F.3d 470, 475 (2d Cir. 2019).

"A federal claim is not 'insubstantial' merely because it might ultimately be unsuccessful on its merits." *Southern New England*, 624 F.3d at 133; *accord Merrill*, 939 F.3d at 475. Since the issue of "whether a plaintiff has pled a jurisdiction-conferring claim is a wholly separate issue from whether the complaint adequately states a legally cognizable claim for relief on the merits[,] . . . a *defense*, however valid, does not oust the district court of subject matter jurisdiction." *Southern New England*, 624 F.3d at 132 (emphasis in original); *see also Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 254, 130 S. Ct. 2869, 177 L. Ed. 2d 535 (2010) ("Subject-matter jurisdiction . . . refers to a tribunal's 'power to hear a case' . . . [and] presents an issue quite separate from the question whether the allegations the plaintiff makes entitle him to relief."); *City of N.Y. v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 126 (2d Cir. 2011) ("Whether a court possesses subject-matter jurisdiction, and whether a plaintiff can state a claim

for relief, are two questions that are easily, and often, confused. . . . The concept of subject-matter jurisdiction, which relates solely to the court's adjudicatory authority, is analytically distinct from the essential ingredients of a plaintiff's claim for relief.")  "[O]nce a federal court has determined that a plaintiff's jurisdiction-conferring claims are not insubstantial on their face, no further consideration of the merits of the claim is relevant to a determination of the court's jurisdiction of the subject matter." *FCMA*, 557 F. App'x at 55.

The DTSA provides a federal cause of action for "[a]n owner of a trade secret that is misappropriated . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). Defendants contend that the complaint does not allege any trade secret relating to "a product or service used in, or intended for use in, interstate or foreign commerce."

Initially, plaintiff's contention that defendants' position "is at odds with the way the phrase 'interstate commerce' has always been interpreted by federal courts[,]" insofar as the phrase '[a]ffecting interstate commerce' has consistently been construed in the broadest possible sense[,]" (Plaintiff's Memorandum of Law in Further Support of Preliminary Injunction ["Plf. Reply"] at 5), is without merit. "The Supreme Court observes a distinction between legislation invoking Congress' full power over activity substantially 'affecting [] commerce' and legislation which uses more limiting language, such as activities 'in commerce,' and thereby does not purport to exercise the full scope of congressional authority." *United States v. Aleynikov*, 676 F.3d 71, 81 (2d Cir. 2012).

Although plaintiff correctly indicates that "the Supreme Court has broadly construed the phrase 'involving interstate commerce' . . . to mean 'the functional equivalent of the more familiar term 'affecting commerce'- words of art that ordinarily signal the broadest permissible

exercise of Congress' Commerce Clause power[,]'" *Aleynikov*, 676 F.3d at 81 (quoting *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56, 123 S. Ct. 2037, 156 L. Ed. 2d 46 (2003)), the actual language used in the DTSA is "used *in*, or intended for use *in, interstate . . . commerce*." 18 U.S.C. § 1836(b)(1) (emphasis added). The words "in commerce" are not as broad as the words "involving commerce," or "affecting commerce," and cover "only persons or activities within the flow of interstate commerce." *Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 273, 115 S. Ct. 834, 130 L. Ed. 2d 753 (1995) (emphasis omitted); *see also Citizens Bank*, 539 U.S. at 56, 123 S. Ct. 2037 (holding that the term "involving commerce" "encompasses a wider range of transactions than those actually 'in commerce'—that is, within the flow of interstate commerce."); *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 118, 121 S. Ct. 1302, 149 L. Ed. 2d 234 (2001) ("The plain meaning of the words 'engaged in commerce' is narrower than the more open-ended formulations 'affecting commerce' and 'involving commerce.'"); *Gulf Oil Corp. v. Copp Paving Co., Inc.*, 419 U.S. 186, 195, 95 S. Ct. 392, 42 L. Ed. 2d 378 (1974) (interpreting the "in commerce" language to "denote only persons or activities within the flow of interstate commerce—the practical, economic continuity in the generation of goods and services for interstate markets and their transport and distribution to the consumer.")

Nonetheless, the complaint pleads, *inter alia*, that defendants misappropriated plaintiff's trade secrets, including, *inter alia*, customer lists and pricing information, relating to its services used in interstate commerce, *i.e.*, by customers in the New York metropolitan area, including the State of New Jersey. Thus, plaintiff's DTSA claim is not insubstantial on its face. *See, e.g. Yager v. Vignieri*, No. 16-cv-9367, 2017 WL 4574487, at * 2 (S.D.N.Y. Oct. 12, 2017) (finding that the plaintiff's claim "that the DTSA covers trade secrets related to his plastic surgery practice, which he contends serves clients in interstate commerce, [was] at least colorable" and, thus, was not

insubstantial or frivolous on its face). Since the allegations in the complaint state a colorable

claim arising under the DTSA, this Court has subject matter jurisdiction under 28 U.S.C. § 1331.

B.     Standard of Review

"A party seeking preliminary injunctive relief must establish: (1) either (a) a likelihood of

success on the merits of its case or (b) sufficiently serious questions going to the merits to make

them a fair ground for litigation and a balance of hardships tipping decidedly in its favor, and (2)

a likelihood of irreparable harm if the requested relief is denied." *Time Warner Cable, Inc. v.*

*DIRECTV, Inc.*, 497 F.3d 144, 152–53 (2d Cir. 2007); *accord North American Soccer League,*

*LLC v. United States Soccer Fed'n, Inc. ("NASL")*, 883 F.3d 32, 37 (2d Cir. 2018). In addition,

the movant must show that "a preliminary injunction is in the public interest[,]" *NASL*, 883 F.3d

at 37; *accord Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 143

(2d Cir. 2016); and "that the balance of equities tips in his favor." *Benisek v. Lamone*, -- U.S. --,

138 S. Ct. 1942, 1944, 201 L. Ed. 2d 398 (2018); *see also American Civil Liberties Union v.*

*Clapper*, 804 F.3d 617, 622 (2d Cir. 2015) ("A preliminary injunction is an equitable remedy and

an act of discretion by the court. A party seeking a preliminary injunction must generally show a

likelihood of success on the merits, a likelihood of irreparable harm in the absence of preliminary

relief, that the balance of equities tips in the party's favor, and that an injunction is in the public

interest.")  "[A] preliminary injunction is 'an extraordinary remedy never awarded as of right[,]'"

*Benisek*, --- U.S. ---, 138 S. Ct. at 1943 (quoting *Winter v. Natural Res. Defense Council, Inc.*,

555 U.S. 7, 24, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008)), and "should not be granted unless the

movant, by a *clear showing*, carries the burden of persuasion." *Sussman v. Crawford*, 488 F.3d

136, 139-40 (2d Cir. 2007) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S. Ct. 1865,

138 L. Ed. 2d 162 (1997) (emphasis in original)); *accord Capstone Logistics Holdings, Inc. v. Navarrete*, 736 F. App'x 25, 26 (2d Cir. Aug. 31, 2018) (summary order).

1.      Irreparable Injury

Since "[i]rreparable harm is the single most important prerequisite for the issuance of a preliminary injunction[,] . . . the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered." *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999) (quotations and citations omitted); *see also JBR, Inc. v. Keurig Green Mountain, Inc.*, 618 F. App'x 31, 33 (2d Cir. Oct. 26, 2015) (summary order) (holding that since irreparable harm "is the *sine qua non* for preliminary injunctive relief[,] . . . the moving party must first demonstrate that irreparable harm would be 'likely' in the absence of a preliminary injunction before the other requirements for the issuance of a preliminary injunction will be considered." (quotations and citations omitted)); *Coscarelli v. ESquared Hosp. LLC*, 364 F. Supp. 3d 207, 221 (S.D.N.Y. 2019) ("[I]f a party fails to show irreparable harm, a court need not even address the remaining elements" of the preliminary injunction standard).

 "Irreparable harm is defined as certain and imminent harm for which a monetary award does not adequately compensate[,] . . . [and] exists where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Allstate Ins. Co. v. Harvey Family Chiropractic*, 677 F. App'x 716, 718 (2d Cir. Jan. 27, 2017) (summary order) (quotations and citations omitted); *see also WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 285 (2d Cir. 2012) (holding that irreparable harm is "harm to the plaintiff's legal interests that could not be remedied after a final adjudication.")

Contrary to defendants' contention, (*see* Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for a TRO and Preliminary Injunction ["Def. Mem."] at 43), plaintiff is not required to demonstrate that it has actually suffered harm as a result of defendants' conduct. "The standard for preliminary injunctive relief requires a *threat* of irreparable harm, not that irreparable harm already have occurred." *Mullins v. City of New York*, 626 F.3d 47, 55 (2d Cir. 2010) (emphasis in original); *see also Motorola Credit Corp. v. Uzan*, 322 F.3d 130, 135 (2d Cir. 2003) ("To obtain a preliminary injunction, a plaintiff must show a threat of irreparable injury. . . ." (quotations and citation omitted)).

"Harm may be irreparable where the loss is difficult to replace or measure, or where plaintiffs should not be expected to suffer the loss." *WPIX*, 691 F.3d at 285; *accord Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010). Thus, unless the movant demonstrates "an injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages[,] . . . a motion for a preliminary injunction should be denied." *Rodriguez*, 175 F.3d at 234 (quotations and citation omitted); *see also eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391, 126 S. Ct. 1837, 164 L. Ed. 2d 641 (2006) (holding that before a court may grant injunctive relief, the plaintiff must demonstrate, *inter alia*, "that remedies available at law, such as monetary damages, are inadequate to compensate for [its] injury."); *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) ("[T]o satisfy the irreparable harm requirement, plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm. . . . Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." (quotations, alterations and citations omitted)).

"Generally, when a party violates a reasonable non-compete clause, the resulting loss of client relationships and customer good will built up over the years constitutes irreparable harm for purposes of imposing a preliminary injunction." *Singas Famous Pizza Brands Corp. v. New York Advert. LLC*, 468 F. App'x 43, 46 (2d Cir. Mar. 19, 2012) (summary order). Nonetheless, the Second Circuit "has rejected the proposition that irreparable harm must inevitably be assumed in breach of covenant cases." *Id.* "Though courts often issue preliminary injunctions when it appears likely that the plaintiff will prevail in covenant-not-to-compete cases, this is not an automatic process, but instead depends upon the factual particulars in each case." *Id.* Indeed, in determining whether the plaintiff demonstrated irreparable harm, "[t]he court must not adopt a categorical or general rule or presume that the plaintiff will suffer irreparable harm (unless such a departure from the long tradition of equity practice was intended by Congress)[,] . . . [and] must actually consider the injury the plaintiff will suffer if he or she loses on the preliminary injunction but ultimately prevails on the merits, paying particular attention to whether the remedies available at law, such as monetary damages, are inadequate to compensate for that injury." *Salinger*, 607 F.3d at 80; *accord Hyde v. KLS Prof'l Advisors Grp., LLC*, 500 F. App'x 24, 25 (2d Cir. Oct, 12, 2012) (summary order). "[C]onclusory statements of loss of reputation and goodwill constitute an insufficient basis for a finding of irreparable harm." *Uni-World Capital L.P. v. Preferred Fragrance, Inc.*, 73 F. Supp. 3d 209, 236 (S.D.N.Y. 2014).

The MT Group Members, including Pennisi, agreed to a covenant against competition in connection with the sale of MT Group, and its accompanying goodwill, to plaintiff. Indeed, the MT Group Members expressly agreed to the covenant in order to induce plaintiff to enter into the Purchase Agreement. (*See* Abraham Decl., Ex. A at 45, § 7.1). "The circumstances surrounding the sale, particularly the size of the purchase price and the existence of express covenants barring

competition by the seller[s], provide persuasive proof that [the MT Group Members] did indeed intend to part with [MT Group's] 'good will' along with its tangible assets when [they] sold the business to plaintiff[]. . . ." *Mohawk Maint. Co. v Kessler*, 52 N.Y.2d 276, 286-87, 437 N.Y.S.2d 646, 419 N.E.2d 324 (N.Y. 1981). Accordingly, the goodwill of MT Group clearly passed to plaintiff when the business was sold. *Id.*

"Where . . . there is a sale of a business, involving as it does the transfer of its good will as a going concern, the courts will enforce an incidental covenant by the seller not to compete with the buyer after the sale. . . . This rule is grounded, most reasonably, on the premise that a buyer of a business should be permitted to restrict his seller's freedom of trade so as to prevent the latter from recapturing and utilizing, by his competition, the good will of the very business which he transferred for value." *Purchasing Assocs., Inc. v. Weitz*, 13 N.Y.2d 267, 271, 246 N.Y.S.2d 600, 196 N.E.2d 245 (N.Y. 1963); *see also Devos, Ltd. v. Record*, No. 15-cv-6916, 2015 WL 9593616, at * 8 (E.D.N.Y. Dec. 24, 2015) ("[I]t has consistently been held that the loss resulting from a party's breach of a restrictive covenant is not easily quantifiable by money damages and is, therefore, protectable by a preliminary injunction.").

Moreover, "it would be very difficult to calculate damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come." *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999); *see also Mercer Health & Benefits LLC v. DiGregorio*, 307 F. Supp. 3d 326, 347 (S.D.N.Y. 2018) ("It is well established in this Circuit that the loss of client relationships and customer goodwill that results from the breach of a non-compete clause generally constitutes irreparable harm.")

Plaintiff has submitted sufficient evidence demonstrating, *inter alia*, (i) that the individual defendants regularly worked with BAT for a period of approximately sixteen (16)

months prior to resigning, simultaneously tendered their resignation from Intertek, returned their laptops with certain information erased, commenced employment with BAT following their resignations, and sent quotes to several of plaintiff's clients following their move to BAT; (ii) that the "Non-Solicitation/Hiring of Employees" provision that is generally included in plaintiff's agreements with outside testing services companies, including BAT, was omitted from the October 2019 agreement between plaintiff and BAT, which Asklund had prepared and forwarded to BAT for review and execution only ten (10) days before she tendered her resignation to plaintiff, and on the same day that Maritza had resigned; and (iii) that Nicholas, while still employed by plaintiff, emailed confidential information to his personal email address and, in his capacity as a Business Development Manager at BAT, which is the same title he held with plaintiff, sent an email to one of plaintiff's customer announcing his move to BAT and soliciting the customer's business. Since the total value of Intertek's loss of customers and goodwill resulting from such conduct, and from Pennisi's alleged breach of the non-competition and non-solicitation clauses in the Purchase Agreement and his Employment Agreement, cannot be readily measured or adequately compensated by damages, plaintiff has sufficiently demonstrated that it would suffer irreparable harm absent preliminary injunctive relief. *See, e.g. Nat'l Elevator Cab & Door Corp. v. H&B, Inc.*, 282 F. App'x 885, 887 (2d Cir. June 27, 2008) (summary order) (affirming the district court's conclusion that the defendant's solicitation of the plaintiff's clients would likely harm the plaintiff's good will and, thus, that the plaintiff would suffer irreparable harm if the defendant was not enjoined from violating the non-competition clause contained in its agreement with the plaintiff); *Mercer*, 307 F. Supp. 3d at 347-48 (finding irreparable harm based upon evidence that "the Individual Defendants met with [the competitor's] representatives repeatedly over a period of months while still employed with

Mercer, and emailed confidential Mercer documents to their personal email accounts during the same period; orchestrated simultaneous resignations from Mercer; sent Mercer clients targeted announcements of their move to [the competitor]; sought and held meetings with several Mercer clients after joining [the competitor]; and persuaded at least one Mercer client . . . to move its business to [the competitor].")

The case *In re Document Techs. Litig. ("DTI")*, 275 F. Supp. 3d 454 (S.D.N.Y. 2017), upon which defendants rely, is distinguishable insofar as, *inter alia*, it involved a dissimilar restrictive covenant purporting "to prohibit at-will employees, who have yet to accept an offer of new employment, from 'inducing' or even 'encouraging' their coworkers to leave their present employer[,]" which that district court found to be unenforceable. *Id.* at 466. Indeed, the court specifically noted that the plaintiff in that case did not "contend that the employee non-solicitation covenant [was] necessary to protect its trade secrets or confidential customer lists[,]" *id.*; nor that either of the two (2) employees that the individual defendants therein allegedly improperly solicited possessed any trade secrets or provided any unique or extraordinary services. *Id.* at 468.

In contrast, plaintiff submits evidence, *inter alia*, that the individual defendants were disseminating its trade secrets to one of its competitors, which, under the circumstances of this case, is sufficient to show a likelihood of irreparable harm absent a preliminary injunction. *See, e.g. IDG USA, LLC v. Schupp*, 416 F. App'x 86, 88 (2d Cir. Mar. 25, 2011) (summary order) (finding that the district court "was within its discretion to conclude that [the plaintiff] satisfied the irreparable harm requirement and that a preliminary injunction was justified[,]" where it presented substantial evidence that the defendant was disseminating the plaintiff's trade secrets to its customers and a primary competitor); *FMC Corp. v. Taiwan Tainan Giant Indus. Co., Ltd.*,

730 F.2d 61, 63 (2d Cir. 1984) ("[I]t is clear that the loss of trade secrets cannot be measured in money damages. . . . A trade secret once lost is, of course, lost forever."); *Int'l Bus. Machs. Corp. v. Papermaster*, No. 08-cv-9078, 2008 WL 4974508, at * 7 (S.D.N.Y. Nov. 21, 2008) ("Courts routinely have noted that it is very difficult to calculate the monetary damages that would successfully redress the loss associated with trade secret misappropriation." (citing cases)). "Under New York law, the use and disclosure of an employer's confidential customer information and the possibility of loss of customers through such usage, constitutes irreparable harm." *Capstone Logistics Holdings, Inc. v. Navarrete*, No. 17-cv-4819, 2018 WL 6786338, at *33 (S.D.N.Y. Oct. 25, 2018), *aff'd in part and remanded in part*, --- F. App'x ---, 2020 WL 1062636 (2d Cir. Mar. 5, 2020); *accord Ecolab Inc. v. Paolo*, 753 F. Supp. 1100, 1110 (E.D.N.Y. 1991); *see also S. Nassau Control Corp. v. Innovative Control Mgmt. Corp.*, No. 95-cv-3724, 1996 WL 496610, at * 4 (E.D.N.Y. June 20, 1996) ("The actual or likely use of . . . a former employer's confidential customer information, and the resulting possible loss of customers, constitutes irreparable harm.")

Furthermore, Pennisi expressly agreed in his Employment Agreement that the time, geographic and scope of activity restrictions in the non-compete clause were "reasonable;" that those restrictions "do not impose any greater restraint than is necessary to protect the goodwill and other legitimate business interests of Intertek, including but not limited to the protection of Confidential Information;" and that a violation of those restrictions would cause Intertek irreparable harm, entitling it to injunctive relief. (Abraham Decl., Ex. C, ¶ 9). "[A] defendant's agreement to such contractual provisions might arguably be viewed as an admission [] that plaintiff will suffer irreparable harm were defendant to breach the contract's non-compete provision." *Singas*, 468 F. App'x at 46; *see, e.g. N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38,

49 (2d Cir. 1999) (finding irreparable injury in light of, *inter alia*, the defendant's acknowledgement in his employment agreement "that a breach of the confidentiality clause would cause 'irreparable injury'" to the plaintiff). Although not dispositive, Pennisi's acknowledgement in the Employment Agreement that a violation of the non-competition and non-solicitation restrictions would cause plaintiff irreparable harm entitling it to injunctive relief, further supports a finding of irreparable harm. *See, e.g. HRB Res. LLC v. Schon*, No. 6:19-cv-0339, 2019 WL 4015256, at * 2-3 (N.D.N.Y. Apr. 25, 2019); *Solomon Agency Corp. v. Choi*, No. 16-cv-0353, 2016 WL 3257006, at * 4 (E.D.N.Y. May 16, 2016); *Devos*, 2015 WL 9593616, at * 8, 10; *Uni-World*, 73 F. Supp. 3d at 236-37; *Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F. Supp. 2d 525, 532 (S.D.N.Y. 2004).

Although the individual defendants dispute whether they actually possess any of plaintiff's trade secrets or confidential information, the record is sufficient to support a finding in plaintiff's favor in this regard. The individual defendants had meaningful access to important customer information and client contacts, and they performed an integral aspect of the company's business development strategy, including investigating and promoting new business opportunities, handling clients and soliciting business from existing and prospective clients, *i.e.*, construction and real estate development companies in the New York metropolitan area. Indeed, the active cultivation of client relationships was the entire premise of the commission-based compensation system under which Asklund and Nicholas worked. (*See* Asklund Decl., ¶¶ 17-20; Nicholas Decl., ¶ 7). To that end, plaintiff has submitted evidence indicating, *inter alia*, (i) that the construction and real estate development market in the New York City metropolitan area is "extremely price-sensitive," (Nakamoto Decl., ¶ 12); (ii) that the individual defendants had

access to such confidential information as customer lists[14] and pricing information, *e.g.*, price quotes and proposals made on behalf of plaintiff to secure contracts, which plaintiff chose not to make publicly available, *see, e.g. DeWitt Stern Grp., Inc. v. Eisenberg,* No. 13 Civ. 3060, 2013 WL 2420835, at * 4 (S.D.N.Y. June 4, 2013) ("Irreparable harm to an employer results through both the loss of client relationships and customer goodwill from a breach of a non-compete clause, and where an employee has misappropriated trade secrets or confidential customer information, including pricing methods, customer lists and customer preferences"); *Devos*, 2015 WL 9593616, at * 10 (finding that the plaintiff satisfied its burden of demonstrating irreparable harm where there was evidence, *inter alia*, "that the Defendants had 'virtually unlimited access' to material such as customer lists, prospective customer lists, referral sources, customer preferences, sales strategies, pricing and margin information, and other financial data that [the plaintiff] chose not to make publicly available"); (iii) that information on the individual defendants' laptops was erased prior to being returned to plaintiff; and (iv) that Nicholas sent plaintiff's confidential information from his Intertek email address to his personal email account.

---

[14] "[C]ustomer lists are trade secrets only if the names on the list are not 'readily ascertainable' from sources outside an employer's business." *FMC*, 730 F.2d at 63; *see also Sandrino v. Michaelson Assocs., LLC*, No. 10 Civ. 7897, 2012 WL 5851135, at * 11 (S.D.N.Y. Nov. 19, 2012) ("The identity of customers can be considered a trade secret when such information is not readily ascertainable to the public and requires personal solicitation to develop.") According to Nakamoto, "[w]hile the employees do search public databases for projects themselves, their subsequent solicitation and sales efforts are directed to customer contact persons with whom Intertek-MT Group has developed significant relationships with [*sic*] over the course of decades in the industry." (Nakamoto Decl., ¶ 5). Moreover, Nakamoto asserts that the prices quotes and prices contained within the proposals to customers, which "are based on highly-confidential and proprietary fee and rate schedules developed internally by Intertek," are submitted confidentially, "and are not posted on any public database for other companies to see." (*Id.*, ¶¶ 7-9, 15). In addition, Intertek took reasonable measures to protect the secrecy of its confidential and proprietary information, and "to ensure that, except by use of improper means, there would be difficulty in acquiring the information," *Sandrino*, 2012 WL 5851135, at * 11, including, *inter alia*, requiring employees to sign nondisclosure agreements and to participate in annual compliance and code of ethics training; storing information on password protected computers and servers; requiring employees to obtain approval from senior management in order to store the information on personal equipment; and requiring the return of such information when an employee's service with the company ends. (Wetherhold Decl., ¶ 2 and Ex. A; Nakamoto Decl., ¶ 14; Evans Decl., ¶¶ 13-14). *See, e.g. Sandrino*, 2012 WL 5851135, at * 11 ("Having required recruiters to sign nondisclosure agreements, trained all new employees on the need to protect confidential information, limited administrative staff's access to documents, and instituted password protections, the Court finds that MA took steps to ensure that, except by use of improper means, there would be difficulty in acquiring the information.")

Accordingly, plaintiff has sufficiently demonstrated that defendants' conduct is likely to cause imminent harm to its goodwill, customer relationships and business "in a manner that will elude a straightforward dollars-and-cents calculation[,]" *Devos*, 2015 WL 9593616, at * 10, and, thus, that it will likely suffer irreparable harm absent a preliminary injunction.

2. Likelihood of Success on the Merits

a. Breach of Contract Claim

Plaintiff contends that it demonstrated a likelihood of success on the merits of its breach of contract claim alleging that Pennisi violated the restrictive covenants in his agreements with plaintiff.

Under New York law, which undisputedly applies in this case, "[i]n order to recover from a defendant for breach of contract, a plaintiff must prove, by a preponderance of the evidence, (1) the existence of a contract between itself and that defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by that defendant; and (4) damages to the plaintiff caused by that defendant's breach." *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011); *accord Stone Key Partners LLC v. Monster Worldwide, Inc.*, 788 F. App'x 50, 52 (2d Cir. Oct. 11, 2019) (summary order).

With respect to the first element, plaintiff must demonstrate that the restrictive covenants in Pennisi's Agreements are enforceable. "The issue of whether a restrictive covenant not to compete is enforceable by way of an injunction depends in the first place upon whether the covenant is reasonable in time and geographic area." *Ticor*, 173 F.3d at 69. "In this equation, courts must weigh the need to protect the employer's legitimate business interests against the employee's concern regarding the possible loss of livelihood, a result strongly disfavored by

public policy in New York." *Id.* "Because of strong public policy militating against the sanctioning of a person's loss of the ability to earn a livelihood, New York law subjects a non-compete covenant by an employee to an overriding limitation of reasonableness which hinges on the facts of each case." *Id.* at 70; *see also Singas*, 468 F. App'x at 45 ("Under New York law, a restrictive covenant is rigorously examined and only enforced if it is reasonable in terms of its time, space or scope and not oppressive in its operation.") "[A] restrictive covenant will only be subject to specific enforcement to the extent that it is reasonable in time and area, necessary to protect the employer's legitimate interests, not harmful to the general public and not unreasonably burdensome to the employee." *BDO Seidman v Hirshberg*, 93 N.Y.2d 382, 389, 690 N.Y.S.2d 854, 712 N.E.2d 1220 (N.Y. 1999); *accord Crye Precision LLC v. Bennettsville Printing*, 755 F. App'x 34, 36 (2d Cir. Oct. 30, 2018) (summary order).

Defendants contend only that the restrictive covenants in Pennisi's Agreements are unreasonable in scope, and that the restrictive covenant in the Purchase Agreement is unreasonable in duration; they do not dispute the reasonableness of the space limitations in Pennisi's Agreements or the time limitation in his Employment Agreement.

Plaintiff has sufficiently demonstrated the reasonableness of the restrictive covenants in Pennisi's Agreements. The non-compete clause in the Purchase Agreement, to which Pennisi agreed, limits the "Restricted Period" to a term of five (5) years from the Closing Date, *i.e.*, until October 26, 2020; the "Restricted Area" to the States of New York and New Jersey; the "Restricted Business" to "the commercial inspection and testing of the materials and construction of public works, infrastructure, residential and commercial buildings;" and the solicitation of "Restricted Business" from any person to whom Pennisi "provided services during the three year period prior to the Closing Date[,]" *i.e.*, from customers for whom he provided services as an MT

Group Member from October 26, 2012 through October 26, 2015. (Abraham Decl., Ex. A at 10, 45).

The restrictive covenants in Pennisi's Employment Agreement limit (i) the time restriction to a period of one (1) year following the termination of his employment, *i.e.*, until October 24, 2020; (ii) the geographic restriction to "the same geographic area for which [Pennisi was] responsible during [his] last 12 months of employment with Intertek," *i.e.*, the New York metropolitan area; and (iii) the scope of activity restriction to prohibit him from (A) engaging in "any business which is a competitor of Intertek," defined to mean "any entity . . . which[] is engaged in any business activity of the type for which [Pennisi] [was] responsible during [his] last 12 months of employment with Intertek," and (B) soliciting any of plaintiff's "customers, suppliers and agents with which [Pennisi] had contact during the last twenty-four (24) months of [his] employment with Intertek." (*Id.*, Ex. C, ¶ 9).

Defendants' reliance upon the case *Data Commc'n, Inc. v. Dirmeyer*, 514 F. Supp. 26 (E.D.N.Y. 1981), in support of their contention that the scope of activity limitations are unreasonable is misplaced. The restrictive covenant in that case provided, "[Defendant] will not directly or indirectly own, manage, operate, control or be employed by, participate in, or be in any manner connected with the ownership[,] management, operation and control of any business in competition with [the plaintiff] or any affiliated corporation at the time" of the termination by the defendant of the Agreement, for a period of six (6) months after such termination. *Id.* at 28. There was no geographic restriction in that covenant. The court found, *inter alia*, the restrictive covenant to be of "doubtful enforceability since it completely restrain[ed] competition;" its "broad sweeping language [was] unrestrained by any limitations keyed to uniqueness, trade

secrets, confidentiality or even competitive unfairness;" and "the employer's business was not endangered by [the] worker's employment with a competitor." *Id.* at 33.

In contrast, the scope of activity limitation in the restrictive covenant in the Purchase Agreement is not as broad as the one in *Dirmeyer*, and only limits Pennisi from engaging in "the commercial inspection and testing of the materials and construction of public works, infrastructure, residential and commercial buildings" within the States of New York and New Jersey, and soliciting such business, without the prior written consent of plaintiff, from any person to whom he provided services as an MT Group Member from October 26, 2012 through October 26, 2015, until October 26, 2020[15]. (Abraham Decl., Ex. A at 10, 45). Unlike the restrictive covenant in *Dirmeyer*, which contained no geographic or scope of activity limitation, the restrictive covenant in the Purchase Agreement does not entirely prevent Pennisi from pursuing a similar vocation, albeit not in New York or New Jersey until October 26, 2020, and is sufficiently restrained by limitations related to competitive unfairness, particularly considering that it was included in the Purchase Agreement in order to induce plaintiff to enter into the agreement and acquire MT Group.

Similarly, the restrictive covenants in Pennisi's Employment Agreement limit (i) the time restriction to a period of one (1) year following the termination of his employment, i.e., until October 24, 2020; (ii) the geographic restriction to "the same geographic area for which [Pennisi was] responsible during [his] last 12 months of employment with Intertek," i.e., the New York

_____

[15] Defendants' contention that the five (5)-year restriction in the Purchase Agreement "is unreasonable in duration," (Def. Mem. at 32), is without merit. The actual restriction is only for "a period of five years from the Closing Date," (Abraham Decl., Ex. A at 45, § 7.1), which expires on October 26, 2020, *i.e.*, in approximately eight (8) months and only two (2) days after the non-compete clause in his Employment Agreement expires. In any event, the five (5)-year duration is not unreasonable in the context of a sale of a business. *See Uni-World*, 73 F. Supp. 3d at 235; *Pontone v. York Grp., Inc.*, No. 08 Civ. 6314, 2008 WL 4539488 at * 5 (S.D.N.Y. 2008); *e.g. Brintec Corp. v. Akzo, N.V.*, 129 A.D.2d 447, 448, 514 N.Y.S.2d 18 (N.Y. App. Div. 1987); *Eric Woods, LLC v. Schrade*, 45 Misc. 3d 1206(A), 998 N.Y.S.2d 306, 2014 WL 5032341 at * 4 (N.Y. Sup. Ct. Oct. 2, 2014).

metropolitan area; and (iii) the scope of activity restriction to prohibit Pennisi (A) from engaging in "any business which is a competitor of Intertek," which is specifically defined to mean "any entity . . . which[] is engaged in any business activity of the type for which [Pennisi] [was] responsible during [his] last 12 months of employment with Intertek," and (B) from soliciting any of plaintiff's "customers, suppliers and agents with which [Pennisi] had contact during the last twenty-four (24) months of [his] employment with Intertek." (Abraham Decl., Ex. C, ¶ 9). Clearly, the scope of activity limitation in the restrictive covenant in the Purchase Agreement is much narrower than the one in *Dirmeyer* and is sufficiently limited in time, space and scope of activity as to be enforceable.

Since, *inter alia*, the time, space and scope restrictions in Pennisi's Agreements are not overly broad and, as set forth below, appear to be reasonably calculated to further plaintiff's legitimate interests in protecting its goodwill, customer relationships and confidential information, plaintiff has sufficiently demonstrated that the restrictive covenants are reasonable under the circumstances of this case. *See, e.g. Mercer*, 307 F. Supp. 3d at 349; *Poller v. BioScrip, Inc.*, 974 F. Supp. 2d 204, 220-21 (S.D.N.Y. 2013); *Asness v. Nelson*, 273 A.D.2d 165, 711 N.Y.S.2d 717 (N.Y. App. Div. 2000).

"Assuming a covenant by an employee not to compete surmounts its first hurdle, that is, that it is reasonable in time and geographic scope, enforcement will be granted to the extent necessary (1) to prevent an employee's solicitation or disclosure of trade secrets, (2) to prevent an employee's release of confidential information regarding the employer's customers, or (3) in those cases where the employee's services to the employer are deemed special or unique." *Ticor*, 173 F.3d at 70; *see also BDO Seidman*, 93 N.Y.2d at 389, 690 N.Y.S.2d 854 (holding that the legitimate employer interests are limited to "the protection against misappropriation of the

employer's trade secrets or of confidential customer lists, or protection from competition by a former employee whose services are unique or extraordinary.") Additionally, an employer "has a legitimate interest in preventing former employees from exploiting or appropriating the goodwill of a client or customer, which had been created and maintained at the employer's expense, to the employer's competitive detriment." *BDO Seidman*, 93 N.Y.2d at 392, 690 N.Y.S.2d 854; *see also Mercer*, 307 F. Supp. 3d at 349 ("[U]nder New York law an employer . . . has a legitimate interest in protecting client relationships developed by an employee at the employer's expense." (quoting *Johnson*, 323 F. Supp. 2d at 534)); *Am. Inst. of Chem. Eng'rs v. Reber-Friel Co.*, 682 F.2d 382, 387 (2d Cir. 1982) (holding that the protection of an employer's legitimate interests is limited to protection "from unfair competition which stems from the employee's use or disclosure of trade secrets[,] confidential customer lists, . . . or confidential customer information[;] . . . to protect the good will of the employer's business[;] or perhaps when the employer is exposed to special harm because of the unique nature of the employee's services."); *Devos*, 2015 WL 9593616, at * 12 ("[E]mployers generally possess a legitimate business interest in protecting client relationships which were developed by a former employee at the employer's expense.") "[T]he New York Court of Appeals has also suggested that this interest may extend to clients with whom the former employee had not had a relationship during employment, but whom he solicited using confidential information belonging to the employer." *Devos*, 2015 WL 9593616, at * 12 (citing *BDO Seidman*, 93 N.Y.2d at 392 n. 2, 690 N.Y.S.2d 854). Moreover, "an employer's interest in protecting client relationships developed by a former employee extends to clients of other employees who were supervised by the former employee." *Mercer*, 307 F.Supp.3d at 350.

Additionally, "a covenant associated with the sale of a business[] . . . will be enforced if the covenant is 'reasonable,' that is, not more extensive, in terms of time and space, than is reasonably necessary to the buyer for the protection of his legitimate interest in the enjoyment of the asset bought." *Crye Precision LLC v. Duro Textiles, LLC*, No. 15-cv-1681, 2016 WL 1629343, at *5 (S.D.N.Y. Apr. 22, 2016), *aff'd*, 689 F. App'x 104 (2d Cir. May 3, 2017).

Plaintiff has sufficiently established a likelihood of success on the merits on its claim that enforcement of the restrictive covenants in Pennisi's Agreements is necessary to protect its legitimate interests in safeguarding the goodwill and relationships of its clients and customers; and in maintaining its trade secrets and confidential information, particularly its client contacts and pricing information, from unfair competition; and in preserving the benefits of its bargain in acquiring MT Group.

Defendants rely on *Dirmeyer*, 514 F. Supp. 2d 26, in support of their contention that the restrictive covenants are not enforceable because Pennisi's "pre-acquisition responsibilities at MT Group involved services not offered by [BAT]," and, thus, plaintiff and BAT "are not competitors with respect to anything Plaintiff could possibly claim the Restrictive Covenants were intended to protect."[16] (Def. Mem. at 30). However, *Dirmeyer* is distinguishable insofar as, *inter alia*, the court questioned the applicability of the restrictive covenant at issue because the parties were "at best marginal competitors" based upon the fact, *inter alia*, that there were operational differences in their businesses and they competed for only one (1) contract in a year and a half period and, therefore, "hardly appear[ed] to be competitors in the traditional sense." *Dirmeyer*, 514 F. Supp. 2d at 32-33. To the contrary, plaintiff has sufficiently established that

---

[16] Defendants also contend, somewhat inconsistently, that the effect of the restrictive covenants "is merely to remove *from possible competition* one whose knowledge and skill, acquired before he came into [plaintiff's] employ, has been found valuable to it, and to prevent that same knowledge and skill being utilized for the benefit of himself and others, after he has ceased to be employed by plaintiff." (Def. Mem. at 31) (emphasis added).

plaintiff and BAT are competitors in the construction inspection and materials testing business within the New York metropolitan area.

Moreover, contrary to defendants' contention, (*see* Def. Mem. at 30), plaintiff has sufficiently demonstrated that Pennisi was responsible for developing customer relationships, insofar as his duties with plaintiff allegedly included, *inter alia*, investigating and promoting new business opportunities. Indeed, Pennisi indicates in his email tendering his resignation that his role with plaintiff included "assist[ing] in running the business for 26+ years," (Evans Decl., Ex. A), which undoubtedly involved developing relationships with clients and customers. In addition, Pennisi served as the Vice President of Mid-Atlantic Operations for MTL, the predecessor of MT Group[17], which, like plaintiff, was engaged in the business of commercial inspection and testing of materials, and pursuant to which he "opened and oversaw divisions" in, *inter alia*, the State of New Jersey. (Pennisi Decl., ¶ 3).

Plaintiff also has a legitimate interest in enforcing the confidentiality provision in its Employment Agreement with Pennisi in order to prevent the use and disclosure of its confidential and proprietary information. *See, e.g. Mercer*, 307 F. Supp. 3d at 351 ("[T]he Confidentiality Agreements protect a broader legitimate interest that the Non-Solicitation Agreements. Restrictions on the use of trade secrets and confidential information in the solicitation of prospective clients can be justified based on the need to protect that information.")

Furthermore, the restrictive covenants in the Purchase Agreement are enforceable against Pennisi in order to protect plaintiff's legitimate interest in the enjoyment of its purchase of MT Group. *See, e.g. Purchasing Assoc.* 13 N.Y.2d at 271, 246 N.Y.S.2d 600 ("[A] buyer of a business should be permitted to restrict his seller's freedom of trade so as to prevent the latter

---

[17] MTL is a "Company Group Member" to which the restrictive covenant in the Purchase Agreement specifically refers. (*See* Abraham Decl., Ex. A at 45, § 7.1).

from recapturing and utilizing, by his competition, the good will of the very business which he transferred for value.") Accordingly, plaintiff has sufficiently demonstrated a likelihood of success on the merits on its claim that the restrictive covenants in Pennisi's Agreements are necessary to prevent his unfair competition, solicitation of its clients and use and disclosure of its confidential information; and to protect plaintiff's legitimate interest in, *inter alia*, safeguarding its valuable customer relationships and confidential information.

Furthermore, plaintiff is likely to prevail on its showing that the restrictive covenants do not impose an undue hardship on Pennisi, particularly since (i) the non-competition and non-solicitation restrictions apply only until October 26, 2020, at the latest; and (ii) he is free (A) to engage in any business other than the "Restricted Business," or any business activity of the type for which he was responsible during his last twelve (12) months of employment with plaintiff, outside of the States of New York and New Jersey in the interim, *see, e.g. Mercer*, 307 F.Supp.3d at 351; *MasterCard Int'l Inc. v. Nike, Inc.*, 164 F. Supp. 3d 592, 602 (S.D.N.Y. 2016), and (B) to solicit any customer except those with which he had contact during the last two (2) years of his employment with Intertek. Nor will the public be harmed by enforcement of the restrictive covenants against Pennisi. "If anything, the public interest would be advanced by such an injunction, because, on the facts here, such an injunction would tend to encourage parties to abide by their agreements." *Mercer*, 307 F. Supp. 3d at 351 (quoting *Uni-World*, 73 F. Supp. 3d at 237).

In addition, plaintiff has submitted sufficient evidence to demonstrate a likelihood of success on its claim that it performed its obligations under Pennisi's Agreements, and that Pennisi breached the restrictive covenants in those agreements. *See, e.g. Mercer*, 307 F. Supp. 3d at 351-53. Specifically, plaintiff submits evidence showing, *inter alia*, (i) that under the terms of

the Employment Agreement, (A) it had the option either to require Pennisi to work during the four (4) week period following written notice of his resignation or to "accept [his] resignation immediately," and (B) Pennisi was not entitled to severance benefits or further renumeration, "other than payment of [his] base salary through [his] last day of employment," in the event he resigned his employment without good cause, (*see* Abraham Decl., Ex. C at 5-6, §§ 10(a) and 11); and (ii) that Pennisi never claimed or complained about a purported hostile work environment prior to his resignation, and did not complain in his email tendering his resignation of a hostile work environment, nor indicate any other basis for finding that he was constructively discharged[18]. Accordingly, plaintiff has established a likelihood of success on the merits of its breach of contract claim against Pennisi and, thus, the branch of its motion seeking a preliminary injunction to enforce the restrictive covenants in Pennisi's Agreements, and to enjoin Pennisi from further violating those provisions, is granted.

### b.    Trade Secrets Claims

Under New York law, "[a] plaintiff claiming misappropriation of a trade secret must prove that (1) it possessed a trade secret, and (2) the trade secret was used by defendant in breach of an agreement, confidence, or duty, or as a result of discovery by improper means." *Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*, 924 F.3d 32, 49 (2d Cir. 2019); *accord E.J. Brooks Co. v. Cambridge Sec. Seals*, 31 N.Y.3d 441, 452, 80 N.Y.S.3d 162, 105 N.E.3d 301 (N.Y. 2018). "A trade secret is any formula, pattern, device or compilation of information which is used in one's business, and which gives one an opportunity to obtain an advantage over

---

[18] Pennisi's email states, "After much thought I have decided to end my tenure as the Director of Projects and Products for the MTGroup [*sic*]. I want to thank you for the opportunity to serve in this role for the last 15 months and to assist in running the business for 26+ years. My last day will be 11/8/2019. Until then I will continue my duties and assist in a smooth transition." (Evans Decl., Ex. A).

competitors who do not know or use it." *E.J. Brooks*, 31 N.Y.3d at 452, 80 N.Y.S.3d 162; *accord Faiveley*, 559 F.3d at 117.

"In determining whether information constitutes a trade secret, New York courts have considered:

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; [and] (6) the ease or difficulty with which the information could be properly acquired or duplicated by others."

*Faiveley*, 559 F.3d at 117; *accord Haber*, 188 F.3d at 44. "These factors are also instructive in analyzing a claim under the DTSA." *Uni-Systems, LLC v. U.S. Tennis Ass'n, Inc.*, 350 F. Supp. 3d 143, 172 (E.D.N.Y. 2018).

The DTSA prohibits any person, "with intent to convert a trade secret, that is related to a product or service used in or intended for use in interstate or foreign commerce, to the economic benefit of anyone other than the owner thereof, and intending or knowing that the offense will, injure any owner of that trade secret," from, *inter alia*, knowingly, and without authorization, stealing, misappropriating, copying, duplicating, transmitting, communicating or conveying such information; receiving or possessing such information, knowing that it was "stolen or appropriated, obtained, or converted without authorization;" attempting to commit any such offense; or conspiring with others to commit any such offense, "and one or more of such persons do[es] any act to effect the object of the conspiracy[.]" 18 U.S.C. § 1832(a). The statute defines the term "trade secret" to mean "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes,

whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if-- (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3).

The term "misappropriation" is defined in the DTSA to mean:

> "(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent by a person who-- (i) used improper means to acquire knowledge of the trade secret; (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was-- (I) derived from or through a person who had used improper means to acquire the trade secret; (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or (iii) before a material change of the position of the person, knew or had reason to know that-- (I) the trade secret was a trade secret; and (II) knowledge of the trade secret had been acquired by accident or mistake."

18 U.S.C. § 1839(5).

Thus, "[t]o succeed on a claim misappropriation of a trade secret under the DTSA, a plaintiff must show that the trade secret was: (A) acquired by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosed by another without express or implied consent." *Uni-Systems*, 350 F. Supp. 3d at 171; *see also Elsevier Inc. v. Doctor Evidence, LLC*, No. 17-cv-5540, 2018 WL 557906, at * 3 (S.D.N.Y. Jan. 23, 2018) ("[U]nder the [DTSA], a party must show an unconsented disclosure or use of a trade secret by one who (i) used improper means to acquire the secret, or, (ii) at the time of disclosure, knew or had reason to know that the trade secret was acquired through improper means, under

circumstances giving rise to a duty to maintain the secrecy of the trade secret, or derived from or through a person who owed such a duty.") The term "improper means" is defined to include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means;" but does not include "reverse engineering, independent derivation, or any other lawful means of acquisition." 18 U.S.C. § 1839(6).

 "Confidential proprietary data relating to pricing, costs, systems, and methods are protected by trade secret law." *Jasco Tools, Inc. v. Dana Corp. ("In re Dana Corp.")*, 574 F.3d 129, 152 (2d Cir. 2009); *see, e.g. Continental Indus. Grp., Inc. v. Altunkilic*, 788 F. App'x 37, 40-41 (2d Cir. Oct. 2, 2019) (finding that information such as, *inter alia*, customer and supplier lists and pricing and payment terms are "routinely afforded trade secret protection"). Moreover, "[c]ourts have repeatedly held that knowledge of a customer's pricing information in the context of bidding is extremely potent in the hands of a competitor and such knowledge has been held to constitute a trade secret protectible by an injunction." *Juniper Entm't, Inc. v. Calderhead*, No. CV 07-2413, 2007 WL 9723385, at *23 (E.D.N.Y. Aug. 17, 2007) (citing cases); *see, e.g. Laro Maint. Corp. v. Culkin*, 267 A.D.2d 431, 432, 700 N.Y.S.2d 490 (N.Y. App. Div. 1999) (finding ample evidence that the defendants exploited confidential pricing information for the plaintiff's customer contracts, to which the plaintiff limited employee access, and that access to such information would permit a competitor to undercut the plaintiff's bids on private contracts).

Furthermore, "[a] customer list developed by a business through substantial effort and kept in confidence may be treated as a trade secret and protected at the owner's instance against disclosure to a competitor, provided the information it contains is not otherwise readily ascertainable." *Haber*, 188 F.3d at 44; *see, e.g. Altunkilic*, 788 F. App'x at 40-41. Indeed, in

enacting the DTSA, Congress specifically indicated that "[e]xamples of trade secrets include confidential formulas, manufacturing techniques, and customer lists." H.R. Rep. No. 114-529, at 197 (2016).

In addition, under New York law, an employee has an implied duty "not to use confidential knowledge acquired in his employment in competition with his principal[,] . . . [which] exists as well after the employment is terminated as during its continuance." *Haber*, 188 F.3d at 47-48. Furthermore, the individual defendants' employment agreements expressly provided that they had a comparable duty to maintain the confidentiality of plaintiff's trade secrets and confidential information, "mak[ing] explicit an employee's implied duties under New York law with respect to confidential information." *Id.* at 48.

Plaintiff has demonstrated a likelihood of success on the merits on his claims that the individual defendants violated the duty imposed upon them under New York law and their respective agreements with plaintiff by using and disclosing plaintiff's trade secrets and confidential information, including its client contact list and pricing information, which does not appear to be otherwise readily ascertainable to others in the industry, for the benefit of plaintiff's competitor. *See, e.g. Haber*, 188 F.3 at 45-48; *General Sec., Inc. v. Commercial Fire & Sec., Inc.*, No. 17-cv-1194, 2018 WL 3118274, at * 5 (E.D.N.Y. June 25, 2018). While the identity of plaintiff's customers may be readily ascertainable from public sources, as alleged by defendants, (*see* Def. Mem. at 23-24), its pricing information and client contacts may not be. *See, e.g. Haber*, 188 F.3d at 44-45. Indeed, plaintiff has submitted sufficient evidence demonstrating, *inter alia*, (i) that its client and pricing information derives independent economic value from being kept secret, particularly since it paid a considerable amount to acquire MT Group's assets, including its intangible goodwill and reputation in the industry, and because exposing such information

could enable competitors to underprice or underbid plaintiff and divert customers; and (ii) that it took sufficient measures to prevent unauthorized disclosure of its confidential information, including, most pertinently, requiring its employees, including the individual defendants, to sign agreements containing express confidentiality provisions[19]. *See, e.g. ExpertConnect, LLC v. Fowler*, No. 18-cv-4828, 2019 WL 3004161, at * 4-5 (S.D.N.Y. July 10, 2019); *B.U.S.A. Corp. v. Ecogloves, Inc.*, No. 05 Civ. 9988, 2006 WL 3302841, at * 3 (S.D.N.Y. Jan. 31, 2006); *Unisource Worldwide, Inc. v. Valenti*, 196 F. Supp. 2d 269, 278-79 (E.D.N.Y. 2002). In light of the care with which plaintiff guarded such information and the plain terms of its employment agreements with the individual defendants, it would be difficult to conclude that the individual defendants were unable to discern their responsibilities with respect to plaintiff's trade secrets and confidential information, including its client list and pricing information *See, e.g. Haber*, 188 F.3d at 45-47.

Plaintiff also submitted sufficient evidence indicating that the individual defendants misappropriated and misused its trade secrets and confidential information by, *inter alia*, breaching the confidentiality and/or nondisclosure provisions in their employment agreements, which imposed a duty upon them to maintain secrecy; erasing the information on their company laptops before returning them to plaintiff; commencing employment with plaintiff's competitor shortly after leaving their employment with plaintiff; and using the trade secrets and confidential information for purposes unrelated to their employment at Intertek, without plaintiff's consent. In addition, plaintiff submits evidence, *inter alia*, indicating that Nicholas forwarded plaintiff's

---

[19] Contrary to defendants' contention, plaintiff has submitted evidence of measures it took to protect the secrecy of its trade secrets and confidential information other than requiring that "its employees sign confidentiality agreements," (*see* Def. Mem. at 26), including, *inter alia*, requiring its employees to participate in annual compliance and code of ethics training and to obtain approval from senior management in order to store information on personal equipment; storing information on password protected computers and servers; and requiring the return of such information and equipment upon the termination of employment. (*See* Wetherhold Decl., ¶ 2 and Ex. A; Nakamoto Decl., ¶ 14; Evans Decl., ¶¶ 13-14).

trade secrets and confidential information to his personal email account shortly before and after tendering his resignation, and used the information, without plaintiff's consent, after commencing employment with plaintiff's competitor in an attempt to solicit a client of plaintiff. *See, e.g. ExpertConnect*, 2019 WL 3004161, at * 6.

Moreover, contrary to defendants' contention, (*see* Def. Mem. at 35), plaintiff proffered sufficient evidence to show that defendants obtained its trade secrets and information through "improper means[,]" which specifically includes, *inter alia*, "breach of a duty to maintain secrecy." 18 U.S.C. § 1839(6)(A). In any event, plaintiff is not required to establish "improper means" in order to show a likelihood of success on the merits of its DTSA claim because "[a] plaintiff succeeds on a DTSA misappropriation claim if she shows that the trade secret was: (A) acquired by someone who knows or has reason to know that the trade secret was acquired by improper means; *or* (B) disclosed by another without express or implied consent." *Cicel (Beijing) Sci. & Tech. Co., Ltd. v. Misonix, Inc.*, No. 2:17-cv-1642, 2020 WL 376581, at *8 (E.D.N.Y. Jan. 23, 2020); *accord ExpertConnect*, 2019 WL 3004161, at * 6. Since, at the very least, plaintiff proffered sufficient evidence that defendants disclosed its trade secrets and confidential information without its consent, it has established a likelihood of success on its DTSA claim. Accordingly, plaintiff has adequately demonstrated a likelihood of success on the merits of its federal and state law claims for misappropriation of trade secrets against the individual defendants and, therefore, the branch of its motion seeking a preliminary injunction enforcing the confidentiality provisions in the individual defendants' agreements with plaintiff and enjoining them from further misappropriation or dissemination of plaintiff's trade secrets and confidential information is granted.

c. Tortious Interference with Contractual Relations Claim

Under New York law, a claim for tortious interference with contractual relations requires the plaintiff to show: "[1] the existence of a valid contract between the plaintiff and a third party, [2] defendant's knowledge of that contract, [3] defendant's intentional procurement of the third-party's breach of the contract without justification, [4] actual breach of the contract, and [5] damages resulting therefrom." *Rich v. Fox News Network, LLC*, 939 F.3d 112, 126-27 (2d Cir. 2019) (brackets in original). "Moreover, a plaintiff must allege that the contract would not have been breached 'but for' the defendant's conduct." *Id.* at 127; *see also Conte v. Emmons*, 895 F.3d 168, 173 (2d Cir. 2018).

As a general rule, where "there is an existing, enforceable contract and a defendant's deliberate interference results in a breach of that contract, a plaintiff may recover damages for tortious interference with contractual relations even if the defendant was engaged in lawful behavior." *NBT Bancorp Inc. v Fleet/Norstar Fin. Grp.*, 87 N.Y.2d 614, 621, 641 N.Y.S.2d 581, 664 N.E.2d 492 (N.Y. 1996). Nonetheless, "New York law emphasizes the requirement that a tortious interference with contract claimant establish that the defendant purposefully intended to cause a contract party to breach a particular contract." *Conte*, 895 F.3d at 172.

However, with respect to contracts terminable at-will, like the individual defendants' employment agreements, liability will only be imposed upon proof of "wrongful means"[20], such as (i) "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure[,]" *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50

---

[20] "[A] claim for tortious interference with an at-will employment contract[] . . . is essentially synonymous with [a claim for] tortious interference with business relations[.]" *Guzik v. Albright*, No. 16-cv-2257, 2018 WL 4386084, at * 6 (S.D.N.Y. Sept. 14, 2018). "A defendant becomes liable for tortious interference with a plaintiff's business relations when four conditions are met: (1) there is a business relationship between the plaintiff and a third party; (2) the defendant, knowing of that relationship, intentionally interferes with it; (3) the defendant acts with the sole purpose of harming the plaintiff, or, failing that level of malice, uses dishonest, unfair, or improper means; and (4) the relationship is injured." *Goldhirsh Group, Inc. v. Alpert*, 107 F.3d 105, 108-09 (2d Cir. 1997).

N.Y.2d 183, 191, 428 N.Y.S.2d 628, 406 N.E.2d 445 (N.Y. 1980); *see also Okoi v. El Al Israel Airlines*, 378 F. App'x 9, 11 (2d Cir. May 19, 2010) (summary order); (ii) a "violation of a duty of fidelity owed to the plaintiff by the defendant by reason of a relation of confidence existing between the[m]," *Guard-Life*, 50 N.Y.2d at 193, 194, 428 N.Y.S.2d 628; or (iii) malice on the part of the defendant. *Brinn v. Syosset Pub. Library*, 624 F. App'x 47, 50 (2d Cir. Dec. 15, 2015) (quoting *Albert v. Loksen*, 239 F.3d 256, 274 (2d Cir. 2001)); *see also Shernoff v. Soden*, 266 F. App'x 12, 13 (2d Cir. Feb. 20, 2008) (summary order) (holding that in order to proceed on a claim alleging tortious interference with a contract terminable at-will, the plaintiff must "show that the defendants' actions were 'wrongful' or 'culpable.'"); *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 190, 785 N.Y.S.2d 359, 818 N.E.2d 1100 (N.Y. 2004) ("[W]here a suit is based on interference with a nonbinding relationship, the plaintiff must show that defendant's conduct was not lawful but more culpable. . . . [A]s a general rule, the defendant's conduct must amount to a crime or an independent tort. Conduct that is not criminal or tortious will generally be 'lawful' and thus insufficiently 'culpable' to create liability for interference with prospective contracts or other nonbinding economic relations.")

The term "wrongful means" does not "include persuasion alone [even if] it is knowingly directed at interference with the contract." *Guard-Life*, 50 N.Y.2d at 191, 428 N.Y.S.2d 628. Moreover, "economic pressure must be 'extreme and unfair' before it may qualify as wrongful." *Shernoff*, 266 F. App'x at *13-14 (quoting *Carvel*, 3 N.Y.3d at 192-93, 785 N.Y.S.2d 359).

An exception to the general rule that plaintiffs cannot recover absent a showing that the defendants' conduct was criminal or independently tortious "has been recognized where a defendant engages in conduct for the sole purpose of inflicting intentional harm on plaintiffs." *Carvel*, 3 N.Y.3d at 190, 785 N.Y.S.2d 359; *see also 16 Casa Duse, LLC v. Merkin*, 791 F.3d

247, 262 (2d Cir. 2015). However, "this exception is narrow: When a defendant has acted with a permissible purpose, such as 'normal economic self-interest,' wrongful means have not been shown. . . ." *16 Casa Duse*, 791 F.3d at 262 (quoting *Carvel*, 3 N.Y.3d at 190, 785 N.Y.S.2d 359).

Although perfunctorily disputed by plaintiff, (*see* Plf. Reply at 21), it is clear that the individual defendants were at-will employees. "Under New York law, 'absent an agreement establishing a fixed duration, an employment relationship is presumed to be a hiring at will, terminable at any time by either party.'" *Kroshnyi v. U.S. Pack Courier Servs., Inc.*, 771 F.3d 93, 110 (2d Cir. 2014) (quoting *Sabetay v. Sterling Drug, Inc.*, 69 N.Y.2d 329, 333, 514 N.Y.S.2d 209, 506 N.E.2d 919 (N.Y. 1987)); *accord Albert*, 239 F.3d at 264. Since none of the individual defendants' employment agreements establish a fixed duration of employment, they were all at-will employees.

Although plaintiff has submitted some proof of persuasion and an offer of better terms on the part of BAT, its evidence is insufficient to establish fraud, misrepresentation, threats, criminal activity or other wrongful conduct on the part of BAT in purportedly interfering with the individual defendants' agreements with plaintiff, *see, e.g. Brinn*, 624 F. App'x at 50; *Carvel*, 3 N.Y.3d at 192, 785 N.Y.S.2d 359; *Guard-Life*, 50 N.Y.2d at 196, 428 N.Y.S.2d 628; or that BAT acted with malice or "for the sole purpose of harming the company." *16 Casa Duse*, 791 F.3d at 262. Indeed, the only conduct on the part of BAT which plaintiff contends is wrongful is BAT's purported conduct in repeatedly soliciting plaintiff's employees, which, alone, is insufficient to establish that BAT engaged in any wrongful means for purposes of plaintiff's tortious interference claim. *See, e.g. Barbagallo v. Marcum LLP*, 820 F. Supp. 2d 429, 444 (E.D.N.Y. 2011) ("Courts are disinclined to find tortious interference with an at-will

employment contract unless a former employer can show that fraudulent or criminal activity was used in soliciting its employee."); *Metito (Overseas) Ltd. v. Gen. Elec. Co.*, No. 05 Civ. 9478, 2009 WL 399221, at * 14 (S.D.N.Y. Feb. 18, 2009) ("Even assuming that [the defendant] did engage in solicitation, inducement of an at-will employee to join a competitor is not actionable, unless dishonest means are employed, or the solicitation is part of a scheme designed solely to produce damage."); *Headquarters Buick-Nissan, Inc. v. Michael Oldsmobile*, 149 A.D.2d 302, 304, 539 N.Y.S.2d 355 (N.Y. App. Div. 1989) ("[T]he mere inducement of an at will employee to join a competitor [is not] actionable, unless dishonest means are employed, or the solicitation is part of a scheme designed solely to produce damage[.]")

Moreover, plaintiff has not produced sufficient evidence to attribute any allegedly wrongful conduct on the part of Asklund in purportedly "surreptitiously remov[ing]" the "Non-Solicitation/Hiring of Employees" provision in plaintiff's October 4, 2019 agreement with BAT, (Plf. Reply at 22), to BAT itself. "[M]ere suspicions" are insufficient to support a claim for tortious interference with business relations or prospective economic advantage. *Brown Media Corp. v. K&L Gates, LLP*, 586 B.R. 508, 529 (E.D.N.Y. 2018); *Threeline Imports, Inc. v. Vernikov*, No. 15 Civ. 02333, 2016 WL 11472749, at * 17 (E.D.N.Y. Oct. 28, 2016); *see also John R. Loftus, Inc. v. White*, 150 A.D.2d 857, 860, 540 N.Y.S.2d 610 (N.Y. App. Div. 1989) (holding that a conclusory allegation of malice is insufficient to state a cause of action for tortious interference).

Nor did plaintiff establish that BAT's conduct was the "but for" reason why the individual defendants terminated their employment with it. *See generally Rich*, 939 F.3d at 127 (holding that the proper question in determining whether the contract would not have been breached "but for" the defendant's conduct "is whether, in the absence of interference by [the

defendant,] the breach would not have occurred.") Accordingly, plaintiff has not established a likelihood of success on the merits of its tortious interference claim against BAT.

Plaintiff also has not submitted sufficient evidence to demonstrate, *inter alia*, that Nicholas and Asklund knew of the restrictive covenants in Pennisi's Agreements or intentionally procured or induced Pennisi's breach of the restrictive covenants; nor that Pennisi would not have breached those agreements but for any allegedly wrongful conduct by Nicholas or Asklund.[21]

Moreover, plaintiff has not sufficiently established, *inter alia*, that BAT knew of the confidentiality provisions in Asklund's or Nicholas's employment agreements with plaintiff or intentionally procured or induced their breach of those provisions. Since plaintiff has not demonstrated a likelihood of success on the merits of its tortious interference claim against the BAT defendants, the branch of its motion seeking a preliminary injunction enjoining the BAT defendants from tortiously interfering with the individual defendants' agreements with it is denied in its entirety.

---

[21] In addition, plaintiff has not demonstrated a likelihood of success on the merits of its tortious interference claim against Asklund, notwithstanding evidence indicating, *inter alia*, that Asklund removed the "Non-Solicitation/Hiring of Employees" provision in the agreement between Intertek and BAT that she prepared before tendering her resignation, since such claim challenges only past conduct which has ended, and plaintiff has not shown (i) any likelihood that Asklund will harm it again in a similar fashion, *see Marcavage v. City of New York*, 689 F.3d 98, 103 (2d Cir. 2012) ("To obtain prospective relief, such as . . . an injunction, a plaintiff must show, *inter alia*, a sufficient likelihood that he or she will again be wronged in a similar way. . . . That is, a plaintiff must demonstrate a certainly impending future injury."); *Pungitore v. Barbera*, 506 F. App'x 40, 41 (2d Cir. Dec. 20, 2012) (summary order) ("[W]hen seeking prospective injunctive relief, the plaintiff must prove the likelihood of *future* or *continuing* harm"); nor (ii) that any threat of future injury by Asklund would be prevented by granting the injunctive relief sought against her with respect to plaintiff's tortious interference claim. *See Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016) ("Although past injuries may provide a basis for standing to seek money damages, they do not confer standing to seek injunctive relief unless the plaintiff can demonstrate that she is likely to be harmed again in the future in a similar way."); *Marcavage*, 689 F.3d at 103 ("In establishing a certainly impending future injury, a plaintiff cannot rely solely on past injuries; rather, the plaintiff must establish how he or she will be injured prospectively and that the injury would be prevented by the equitable relief sought.")

3.    Balance of Hardships

Plaintiff has sufficiently demonstrated that the balance of hardships weighs in its favor with respect to its claims for preliminary injunctive relief (i) to enforce the restrictive covenants in Pennisi's Agreements and enjoin him from further violating those provisions; and (ii) to enforce the Confidentiality Agreements and enjoin Asklund and Nicholas from further misappropriation or dissemination of its  trade secrets and confidential information. Injunctive relief enforcing the restrictive covenants in Pennisi's Agreements and the Confidential Agreements may burden: (i) Pennisi by, *inter alia*, restraining him from engaging in the business of commercial inspection and testing in the construction industry, or soliciting former customers to whom he provided services as an MT Group Member from October 26, 2012 through October 26, 2015, or with whom he had contact while employed by plaintiff from October 24, 2017 until October 24, 2019, within the States of New York and New Jersey until on or about October 26, 2020, at the latest; and (ii) the individual defendants by preventing them from using and disclosing any of plaintiff's trade secrets and confidential information.

However, although, for a limited period of time, Pennisi would lose the ability to engage in the business of commercial inspection and testing in the construction industry in the States of New York and New Jersey, and to service a limited number of clients or customers who are clearly covered by the restrictive covenants in Pennisi's Agreements, he agreed to such restrictions as a condition of his employment, and in order to induce plaintiff to enter into the Purchase Agreement. Moreover, the restrictions are only for a period of approximately eight (8) more months and do not extend to business or potential clients or customers outside of New York and New Jersey; nor to potential clients or customers to whom he did not provide services as a member of MT Group during the period from October 26, 2012 through October 26, 2015,

or with whom he did not have contact on behalf of plaintiff during the period from October 24, 2017 through October 24, 2019.

On the other hand, absent an injunction, plaintiff will likely lose the confidentiality of its trade secrets and confidential information, its goodwill with longstanding clients, and the benefit of its bargain in the acquisition of MT Group. Moreover, in granting preliminary injunctive relief, the Court would be enforcing contractual obligations to which the individual defendants freely agreed, and in exchange for which they received the benefits of their employment with plaintiff; and for which Pennisi also received the benefits of plaintiff's acquisition of MT Group, including part of the considerable compensation plaintiff paid therefor. Thus, the limitations imposed upon the individual defendants by the granting of the preliminary injunction herein do not outweigh the threat of continuing harm to plaintiff caused by their conduct. *JTH Tax, Inc. v. Sawhney*, No. 19-cv-4035, 2019 WL 3051760, at * 7 (S.D.N.Y. July 11, 2019); *see also Citizens Sec., Inc. v. Bender*, No. 1:19-cv-916, 2019 WL 3494397, at * 5 (N.D.N.Y. Aug. 1, 2019) (finding that the equities favored the employer where the injunction would not prevent the defendant from earning a living, working for any competitor of plaintiff, or even competing with the plaintiff for customers in general, but rather would simply prohibit the defendant from soliciting business from the plaintiff's clients, who he agreed not to solicit as a condition of his employment, for one year); *Capstone*, 2018 WL 6786338, at * 34 ("Considering that the restriction was freely bargained for as part of a negotiated contract, it cannot be said that the equities favor defendant."); *Uni-World*, 73 F. Supp. 3d at 237 (finding that the balance of hardships weighed heavily in the plaintiffs' favor because the injunctive relief sought merely barred the defendant from violating his non-compete agreements and "would not impose any new legal duty on him; instead it would give necessary teeth to an existing contractual duty[;]"

whereas the plaintiffs "would suffer a substantial hardship if their request were denied, because [the defendant] would be likely to continue his breach of the non-compete."); *Cortland Line Holdings LLC v. Lieverst*, No. 5:18-cv-307, 2018 WL 8278554, at * 9 (N.D.N.Y. Apr. 6, 2018) (finding that the balance of hardships favored the plaintiffs, who hired the defendant with the understanding that he would not compete with the company for two years after leaving the company, and would not use confidential company information to do so, because "[f]ailing to receive the benefit of its bargain would create a hardship to the Plaintiffs."); *Mercer*, 307 F. Supp. 3d at 354-55 (finding that the balance of equities tipped decidedly in the plaintiff's favor because the plaintiff merely sought "to maintain the status quo for its current clients and prevent Defendants from breaching their contractual obligations . . . and engaging in tortious and unfair business practices.")

### 4. Public Interest

The public interest would not be disserved by granting preliminary injunctive relief in this action. *See generally U.S. S.E.C. v. Citigroup Glob. Mkts. Inc.*, 673 F.3d 158, 163 n. 1 (2d Cir. 2012) ("[W]hen a court orders injunctive relief, it should ensure that injunction does not cause harm to the public interest."); *Salinger*, 607 F.3d at 80 ("[T]he court must ensure that the public interest would not be disserved by the issuance of a preliminary injunction.") Indeed, "injunctive relief would serve the public interest by ensuring that reasonable restrictive covenants into which the parties voluntarily entered are enforced," *JTH Tax*, 2019 WL 3051760, at * 7; *see also Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 897 (2d Cir. 2015); *Uni-World*, 73 F. Supp. 3d at 237; *Bender*, 2019 WL 3494397, at * 6; *Cortland*, 2018 WL 8278554, at * 9, and protecting plaintiff's legitimate interests in maintaining the value of its

business relationships; the benefit of its bargain in acquiring MT Group; and the secrecy of its trade secrets and confidential information. Accordingly, plaintiff's motion for a preliminary injunction is granted to the extent set forth herein.

C.    Security

Defendants contend that if plaintiff is granted a preliminary injunction, it should be required to post security of not less than $1.35 million pursuant to Rule 65(c) of the Federal Rules of Civil Procedure[22], based upon, *inter alia*, the individual defendants' salary and bonuses prior to leaving plaintiff's employment; and the losses BAT would allegedly incur if it is enjoined from competing with plaintiff. (*See* Def. Mem at 46-47). However, plaintiff is not granted injunctive relief against BAT; and the injunctive relief granted herein does not enjoin Asklund or Nicholas from "performing their jobs [or] earning a livelihood," (*id.* at 46); nor does it prevent Pennisi from earning a living, but merely enforces the restrictive covenants to which he agreed, and which are reasonably limited in terms of their time, space and scope of activity. Furthermore, plaintiff has not demonstrated what Pennisi's salary is at BAT or whether he is entitled to any bonuses from his employment with BAT, nor any other basis providing a reasonable measure of the damages that he might incur as a result of the preliminary injunction. Accordingly, the Court declines to require plaintiff to post additional security other than the amount ordered upon the issuance of the TRO.

---

[22] Since defendants' heading of this section requests, and the damages they allegedly would sustain if a preliminary injunction is granted total, $1.35 million, the Court presumes that their further request for an undertaking of no less than $1,300,000.00, (Def. Mem. at 47), is a typographical error.

III.     CONCLUSION

For the reasons set forth herein, plaintiff's motion for a preliminary injunction is granted

to the extent that:

1. Defendants shall not, directly or indirectly, use, disclose or disseminate any of

plaintiff's confidential information or trade secrets pending the final disposition of this action;

2. Until October 26, 2020 or final disposition of this action, whichever is earlier, Pennisi

shall not directly or indirectly: (i) engage in the "Restricted Business," as defined in the Purchase

Agreement, or (ii) solicit or assist in the solicitation of such "Restricted Business" from any

Person to whom he provided services as an MT Group Member for the period from October 26,

2012 through October 26, 2015, within the States of New York and New Jersey; and

3.  Until October 24, 2020 or final disposition of this action, whichever is earlier, Pennisi

shall not directly or indirectly: (i) engage in any business which is a "competitor of Intertek," as

defined in his Employment Agreement, or (ii) contact, solicit, attempt to solicit, or conduct

business with any of plaintiff's customers, suppliers and agents with whom he had contact during

the period from October 24, 2017 through October 24, 2019, for the purpose of selling,

providing, or obtaining some or all of the same products and/or services as those sold or

provided by or to plaintiff, within the New York metropolitan area.

SO ORDERED.

_____/s/ _Sandra J. Feuerstein_____
Sandra J. Feuerstein
United States District Judge

Dated:  March 9, 2020
        Central Islip, New York